# SINGLE ROOM LIVING IN NEW YORK CITY

A REPORT PREPARED BY
ANTHONY J. BLACKBURN

FOR
THE CITY OF NEW YORK
DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT
SEPTEMBER 1996

RUDOLPH W. GIULIANI
MAYOR

FRAN REITER
DEPUTY MAYOR FOR ECONOMIC DEVELOPMENT AND PLANNING

LILLIAM BARRIOS-PAOLI
COMMISSIONER
DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT

CYNTHIA D. FISHER
DEPUTY COMMISSIONER
OFFICE OF HOUSING PRESERVATION

MOON WHA LEE
ASSISTANT COMMISSIONER
DIVISION OF POLICY
ANALYSIS AND RESEARCH



# INTRODUCTION

## 1.1    Overview

In 1985, motivated by concern over the loss of single-room occupancy (SRO) units, housing some of its poorest and most vulnerable residents, New York City enacted Local Law 59, which placed a moratorium on further conversion, alteration, or demolition of SRO multiple dwellings. Local Law 59 also mandated a study of the policy issues created by the loss of SRO buildings. This study, *Single Room Occupancy in New York City*, commissioned by the Department of Housing Preservation and Development (HPD) and supported by a survey of New York City SRO buildings conducted by HPD and by a survey of SRO residents performed by the Human Resources Administration (HRA), was issued in January 1986.[1]  In September 1986, HPD issued an SRO Implementation Plan which embodied most of the study's recommendations.

In view of the demonstrated public interest in the circumstances of SRO buildings and in the welfare of their residents, it was logical that HPD would consider using its triennial New York City Housing and Vacancy Survey (HVS) to monitor the City's SRO housing.  However, because the HVS does not include units in "special places", where SRO units are commonly located, HPD commissioned the U.S. Bureau of the Census to conduct a supplementary survey of units in buildings believed to contain SRO units.  Data from this survey, referred to here as the HVS-SRO survey, used the same questionnaire as the regular HVS, so that it could then be combined with data from the regular HVS on SRO units not included in the HVS-SRO survey to arrive at findings on New York City's SRO housing which could be generalized to the universe of all SRO units.

The major focus of this report is on the presentation of findings on the SRO housing inventory and on its resident population based on the surveys conducted in 1991 and 1993.  The report also includes a chapter on studios and studio residents, which represent New York City's other form of single-room living.  The final chapter of the report is devoted to a brief description of the substantial commitment which has been made by City and State public agencies and by the not-for-profit sector over the last 12 years to develop and operate SRO housing for single adults who have been homeless or at risk of homelessness.

---

[1]Anthony J Blackburn, *Single Room Occupancy in New York City*, January 1986

## 1.2    Survey Design

The regular HVS is a survey of the occupants of a representative sample of dwelling units in New York City. The survey is carried out by the U.S. Bureau of the Census under contract to the City of New York. Excluded from the HVS sample frame are "special places", such as transient accommodations, group quarters, dormitories, prisons, and emergency shelters.

The HVS-SRO survey was based on a survey of occupants of dwelling units in buildings which were believed to contain SRO units, specifically hotels, rooming houses, and the tenements which had at one time been legally converted to SRO use under Section 248 of the Multiple Dwelling Law. These buildings were screened to confirm that they contained one or more SRO units. A sample of units believed to be SROs was then selected for the survey. Most, but not all, of these units turned out to be SROs. In 1991, 457 SRO units were actually surveyed, a sampling rate of 1:83 (1.2 percent); in 1993, 589 SRO units were actually surveyed, a sampling rate of 1:55 (1.8 percent).

The sample frames used in the regular HVS and in the HVS-SRO survey necessarily overlap because the regular HVS is designed, with certain exceptions common to the HVS-SRO survey, to be representative of the universe of all New York City dwelling units. To eliminate this overlap, SRO units which had been surveyed in the course of the regular HVS but which were also in the HVS-SRO sample frame were dropped from the regular HVS file, as were all non-SRO units. The resulting data file was then combined with the HVS-SRO file to create a new file consisting of SRO units surveyed under the HVS-SRO survey, together with SRO units surveyed under the regular HVS which could not also have been selected for the HVS-SRO survey. This merged file is referred to hereafter as the "HVS and HVS-SRO Survey".[2]

## 1.3    Definition of an SRO

The definition of an SRO unit used in this study is a housing unit consisting of one or two rooms and lacking, or sharing, complete kitchen and/or bathroom facilities. This definition has been used consistently in HVS reports over many years.[3] It should be noted that other definitions of an SRO unit have, from time to time, surfaced in research publications and in legislation. Furthermore, in the last chapter of this report, which deals with publicly financed SRO development, the reader will encounter "efficiency units", which do have complete, unshared cooking and bath facilities, and which do not, therefore, conform to the SRO definition used elsewhere in this report.

---

[2] Further details of the survey design, sampling, and combining procedure are provided in Appendix A, *1993 New York City Housing and Vacancy Survey - SRO Survey Source and Accuracy Statement.*

[3] See Paul L. Niebanck, *Rent Control and the Rental Housing Market, New York City 1968*, New York City Housing and Development Administration, January 1970, page 212.

---

1.4    Presentation and Interpretation of Statistical Findings

Almost all of the findings presented in this report are based on tabulations of the HVS and HVS-SRO surveys. These findings are subject to statistical sampling error because they are based on extrapolations from a sample of New York City's SRO units or households to the universe of New York City's SRO units or households.

Strictly speaking, the numbers presented in this report should be called estimates of the true values of the variables of interest. Thus we should properly refer to the *estimated* vacancy rate, the *estimated* median income, the *estimated* mean household size, and so on. To avoid the tiresome repetition of the word "estimated" that this convention would require, findings in this report have not been qualified by describing them as "estimates", though estimates is what they are.

To make the report digestible for the non-statistician, measures of the statistical reliability of findings, such as standard errors and confidence intervals, are also generally not included in the material which follows. An exception to this rule is the practice of qualifying estimates of numbers and percentages which are very small. Estimates of numbers, such as the number of housing units or households, which are less than 2,000 are not reported; and estimates of numbers which are between 2,000 and 2,999 are qualified by warning the reader to interpret them with caution. Similarly, estimated percentages in which the numerator is less than 1,000 are not reported, and estimated percentages in which the numerator is between 1,000 and 1,999 are qualified by warning the reader to interpret them with caution. An effort has also been made to avoid drawing attention in the text to differences in the values of variables if these differences are based on a number of cases that is too small.

1.5    Report Contents

The report consists of six substantive chapters. Chapter 2, Background, provides a brief history of the changing role of SRO housing in New York City, with emphasis on the evolution of City policy towards SRO housing over the last forty years. Chapters 3, 4, and 5 present findings based on the HVS and HVS-SRO survey database. Chapter 3 describes changes in the size of the SRO housing inventory, SRO housing conditions, and vacancy rates. Chapter 4 profiles the residents of SRO housing in terms of their demographic and socio-economic characteristics. Chapter 5 presents findings on the rent levels and affordability of SRO housing. As a counterpoint, Chapter 6 provides a look at New York City's studio housing, the other form of single-room living. Finally, in Chapter 7, the report describes and documents the efforts undertaken over the last 12 years by public agencies and non-profits to develop a new form of SRO housing to meet the needs of single adults who have been homeless or who are at risk of homelessness.

# 2 BACKGROUND

## 2.1    The Historical Role of SRO Housing in New York City

In the middle of the last century, there were four predominant types of housing in New York City. The first, and oldest, was single-family housing, which in Manhattan was becoming increasingly unaffordable for middle class families.[4] The second was the City's early tenement housing, which served the needs of the poor and laboring classes and was at that time still supplemented by self-built squatter shacks. The third type of housing was predominantly single-family houses converted, or partially converted, into a broad range of shared accommodations, typically boarding houses, rooming houses, and lodging houses. The fourth type of housing was provided by hotels, which were by then already being commonly used as permanent, as opposed to transient, housing.

All but the first of these four housing types involved some form of shared living arrangements. In the tenements, water taps and water closets, located on the small unbuilt areas of the 25' x 100' lots, were shared by the families living in the surrounding buildings.[5] In boarding houses, residents were provided with a dining room meal service, common areas for socializing, and private furnished rooms. Rooming houses, which were typically converted brownstones, would have one bath per floor but no cooking facilities, no meal service, and no common areas. Lodging houses, typically for the very poor, were tenements where lodgers were provided with small shared sleeping areas and communal sanitary facilities. At the other end of the shared living arrangements price range, providing both transient and permanent accommodation for the relatively affluent, were hotels. By 1869, there were between 700 and 800 hotels in the City, catering both to single persons and families, who thereby avoided the expense of domestic servants without foregoing the excellent services and appointments which hotels provided.[6]

---

[4]Elizabeth Collins Cromley, *Alone Together, A History of New York's Early Apartments*, Cornell University Press, 1990, pp. 14-20.

[5]Richard Plunz, *A History of Housing In New York City*, Columbia University Press, 1990, pp. 13-16.

[6]Cromley, page 18

All these forms of housing, which abounded in turn-of-the-century New York City, involved some measure of shared living arrangements, such as shared bathrooms, central meal service, and common areas. This housing was by no means restricted to single adults, however, and it was common for families to reside in tenements, boarding houses, lodging houses, and hotels, sometimes in one-room tenement or lodging house units, sometimes in several rooms in boarding houses, sometimes in hotel suites.

In the first half of the twentieth century, two new forms of housing, catering almost exclusively to single adults and providing singles rooms, emerged. The Apartment-Hotel provided one or two rooms with cooking facilities, bathrooms, and foldaway beds in newly constructed high-rise buildings.[7] These were appealing to moderately well off singles who wanted smaller units with good locations and hotel services. The other form of single-room housing was the converted tenement. During the Depression, many owners of Class A Old-Law and New-Law Tenements found it profitable to subdivide larger units into single rooms. These were typically lined up along a railroad corridor and rented by the week. Bathrooms and kitchens were shared and there were no common areas. These Class A single-room units were legalized by the Pack Law in 1939 and are referred to in this report as Section 248 SROs.[8] The SRO units legalized under the Pack Law are distinguished from other SRO units constructed in Class A apartment buildings, which often were originally intended as rooms for servants or visitors in upscale Class A buildings. Along with the Apartment Hotels mentioned above, they are referred to in this report as Class A SROs.

At the beginning of the 1940s, New York City had a fairly substantial number of single-room units without complete unshared bathroom and/or kitchen facilities. These were located in the newly legalized Section 248 buildings, in other Class A buildings, in boarding and rooming houses, and in hotels. The evolution of this segment of New York City's housing inventory is now best examined in the context of the City's subsequent policy towards SRO housing.

## 2.2    SRO Housing Policy in New York City 1939-1986

During World War II, New York City experienced an acute housing shortage as employment in munitions plants grew sharply. This shortage persisted in the immediate post-war years as servicemen returned and migrants from the south and from Puerto Rico further swelled the population. Much of this housing shortfall was filled by subdivision of apartments and further conversion of tenements into single-room-occupancy housing. The economic incentive to convert was strengthened by a provision of the New York State rent-control law which exempted from rent control newly created units, including units created through alterations to existing buildings.[9] It

---

[7] *Alone Together*, pp. 189-199.

[8] New York State Multiple Dwelling Law, Article 7, Title 2-A, Section 248.

[9] Warren Moscow, "When SRO Meant Something Else", *The Chief*, July 1, 1985.

should also be noted that SRO housing may have been attractive to many of its residents by virtue of its affordability, furnishings, switchboards and phone services, and convenient locations.[10]

By the early 1950s, many of the households living in converted SRO units were families with children, especially families from Puerto Rico, who by then accounted for over half of the population living in converted units.[11] These overcrowded and substandard units attracted the adverse attention of city officials, who were concerned about overcrowding and children's welfare. In 1955, amendments to the New York City Housing Maintenance Code incorporated a permanent ban on the creation of new rooming units, except for school and college dormitories, hospital residences, and other limited institutional uses, and restricted the number of boarders to two.[12] In 1960, the City prohibited occupancy of rooming units by children under 16, to take effect in 1965 and to be phased in on vacancy. In 1967, the new Housing Maintenance Code mandated that all Section 248 SROs be returned to their original use within 10 years.[13]

In part as a result of the more stringent occupancy requirements, and in part as a result of the deteriorated conditions of many of the SRO buildings, SRO housing came in the 1960s to be occupied predominantly by low-income single adults living alone. Many of these were the elderly and working poor, the disabled, and with increasing frequency, drug addicts, alcoholics, ex-offenders, and, after deinstitutionalization of patients in state psychiatric institutions, the mentally ill, without sufficient community support services.[14, 15]

It is now apparent that the City's 1955 prohibition of further conversions to single-room occupancy was probably redundant because the market forces which had driven conversions were, by the 1960s, headed in the other direction. Many owners of SRO buildings, particularly those in better locations, were only too willing to convert Section 248 SROs and hotels to rental apartments and cooperatives. Although impeded by rent regulations governing eviction and tenant harassment,

[10]*Single Room Occupancy Hotels: Standing in the Way of the Gentry*, Coalition for the Homeless and SRO Tenants Rights Coalition, March 1985, pp. 12-13.

[11]Jose Sanchez, "Residual Work and Residual Shelter: Housing Puerto Rican Labor in New York City from World War II to 1983", in *Critical Perspectives on Housing*, Bratt, Hartman and Meyerson, eds., Temple University Press, 1986.

[12]New York City Housing Maintenance Code, Article 4, Sections 27-2077 and 27-2078.

[13]New York City Local Law 56 of 1967.

[14]Steven Coe and Adam Whiteman, *An Evaluation of Housing Alternatives for Tenants in Single Room Occupancy Hotels and a Design for a Community Response*, prepared for the Mayor's Office of SRO Housing, Graduate School of Management and Urban Professions, New School for Social Research, June 1979.

[15]*Single Room Occupancy Hotels: Standing in the Way of the Gentry*, Coalition for the Homeless and SRO Tenants Rights Coalition, March 1985, pp 10-12

many SRO and hotel owners were successful in emptying their buildings and converting them to more profitable use.[16]

By the early 1970s, the re-conversion of the Section 248 SRO buildings, which had been mandated by the 1967 Housing Maintenance Code, no longer seemed such a good idea, given the dislocation and hardship which reconversion would create for their low-income residents facing a lack of affordable alernatives. In 1972, under pressure from West Side elected officials, tenant advocates, and some SRO building owners, the requirement to eliminate the Section 248 SROs by 1977 was rescinded.[17] Nevertheless, conversions to rental apartments and cooperatives proceeded apace, with the further incentive of J-51 tax benefits being extended to SRO buildings in the mid-1970s. A 1980 audit of the J-51 program indicated that 41 SRO conversions received J-51 abatements in FY 1979 alone.[18] There is also evidence that the City's use of SRO hotels to house homeless families in the 1980s contributed to the loss of units for poor single adults.[19]

In 1972, the Mayor's Office of SRO Housing was established to deal with problems in a group of Upper West Side SROs Its jurisdiction was later extended to all New York City SROs, and, by the early 1980s, the Mayor's Office of SRO Housing had funded two SRO Law Projects in Manhattan and had worked to eliminate J-51 tax benefits to SROs and to pass an SRO anti-harassment law which required an owner to demonstrate absence of harassment for three years before a building permit for alteration or demolition could be issued. The Mayor's Office of SRO Housing received a relatively small amount of funds ($2-$3 million per annum) to finance improvements to privately owned SRO housing; these preservation efforts were administered through HPD.

## 2.3    The Moratorium

The events described above constituted a remarkable about-face in City policy towards the SRO. This shift from a policy of SRO elimination to one of SRO preservation reflected the growing realization that the continuing loss of SRO buildings, housing some of the City's most vulnerable inhabitants, was a direct contributor to the growing problem of homelessness. It was also apparent that, notwithstanding the existing eviction and anti-harassment laws, SRO building owners were still able to empty their buildings to carry out conversions and that the loss of SRO buildings would likely continue unabated.

---

[16]*Single Room Occupancy Hotels: Standing in the Way of the Gentry*, pp. 24-25.

[17]New York City Local Law 33 of 1972.

[18]*Tax Incentives Under the J-51 Program of New York City*, New York City Office of the State Controller Audit Report, New York, June 1980.

[19]*Single Room Occupancy Hotels  Standing in the Way of the Gentry*, Coalition for the Homeless and SRO Tenants Rights Coalition, March 1985, pp 56-57

---

It was in response to this problem that the City Council enacted Local Law 59, signed into law on August 5, 1985. This law imposed an 18-month moratorium on "the conversion, alteration, or demolition of single-room occupancy multiple dwellings". The need for the moratorium was based on a legislative finding that "a serious public emergency exists...created by the loss of single-room occupancy dwelling units housing lower income persons...that a considerable number of such persons have become part of a growing homeless population..." Local Law 59 also mandated a study "to determine the best means of making available single-room occupancy dwelling units and other housing for low-income persons". In July 1986, the SRO Moratorium, augmented by an anti-warehousing provision, was extended for a further six months, and, in February 1987, a second "permanent" SRO Moratorium, now limited to buildings with 25 units or more and including a "buy-out" provision, was enacted.[20] Shortly thereafter, the SRO Moratorium was challenged in court.

## 2.4    SRO Housing Policy After the Moratorium

In January 1986, the report on single-room occupancy housing, mandated by Local Law 59 and prepared by a consultant to HPD, was released.[21] This report contained a number of recommendations for city policy toward SROs. These included:

1.    Enactment of anti-warehousing legislation.

2.    Creation of a "buy-out" program, under which SRO owners could convert their buildings to other uses, the proceeds to be applied to the creation of replacement units.

3.    Acquisition of SRO properties, which do not "buy out" to be owned and operated as SROs by non-profit organizations.

4.    Acquisition and rehabilitation of buildings for use as SROs by Special Needs Groups to be operated by non-profit organizations.

5.    Complete tax exemption to be made available to SRO buildings operated by non-profits

6.    Expansion of the New York State network of community-based, licensed facilities for disabled adults.

7.    Conduct of a comprehensive review of obstacles to private development of SROs with particular reference to needed code and zoning amendments.

---

[20]New York City Local Law 22 of 1986 and New York City Local Law 9 of 1987.

[21]Anthony J. Blackburn, *Single-Room Occupancy in New York City*, Urban Systems Research & Engineering, January 1986.

The first two of these recommendations were subsequently embodied in city legislation extending the moratorium (anti-warehousing in 1986 and "buy-outs" in 1987). The moratorium legislation, initially upheld on appeal, was overturned in 1989 by the New York State Court of Appeals, and the U.S. Supreme Court subsequently declined to review the decision.

The other recommendations of the consultant's report were broadly adopted in HPD's SRO Implementation Plan, issued in September 1986. Eventual annulment of the moratorium legislation meant that preservation of SRO buildings in danger of conversion could be accomplished only through acquisition of the buildings by non-profit organizations, as contemplated in Recommendations 3, 4, and 5, above. The City's Capital Budget Homeless Housing Program (CBHHP), established in 1985 to provide loans to not-for-profit corporations to develop supportive housing for homeless families and adults, provided a vehicle for pursuing this objective. Subsequently, in 1989, the City's development efforts for single adults was assigned to a new SRO Loan Program which has financed the development of SRO buildings to be owned and operated by non-profits as supportive housing for homeless, disabled, and housing needy single adults (see Chapter 7). Furthermore, the SRO tax exemption objective was largely attained by 1993 changes in the New York State Real Property Tax law, which granted full exemption from real estate taxes for buildings owned by a partnership controlled by a non-profit aided by a loan from the City or State and operated under regulatory agreements with public agencies and participating in the federal Low Income Housing Tax Credit program.[22] The sixth of these recommendations (expansion of New York State supported community facilities for disabled adults) has also been implemented through the programs of the New York State Office of Mental Health and the State Homeless Housing Assistance Program (HHAP).

The status of the review of obstacles to private development of SROs (Recommendation 7) remains unclear. HPD's SRO Implementation Plan recommended that a Task Force be convened to evaluate the feasibility of for-profit SRO development and recommend statutory, regulatory, and administrative changes "to facilitate the creation of SROs for low-income singles". While there has been no public action on this recommendation, a number of private initiatives have outlined changes in law and regulation designed to make private SRO development legal and economically feasible.[23] Even if the prohibition of private SRO development were removed, and the applicable zoning and building codes were to be made more SRO-friendly, it remains unclear whether the private sector would respond to such an opportunity.

The decline in the SRO housing inventory and the sharp reversal of City policy which it evoked should properly be viewed as one aspect of a broader low-income housing shortage, affecting

---

[22]New York State Real Property Tax Law, Section 420-c.

[23]In 1981, a task force organized by the Settlement Housing Fund proposed creation of a new class of permanent housing called the Mini Dwelling Unit (MDU), this was modified in a 1983 revised proposal calling for a new classification of a Class C Multiple Dwelling. More recently (1996) The Citizens Housing and Planning Council has proposed modification of the Multiple Dwelling Law to allow development of a "mini-studio", and the New York Chapter of the American Institute of Architects has also proposed legalizing and simplifying private development of SROs

both singles and families. Between 1981 and 1993, the number of housing units renting for below $450 in 1993 dollars fell by over 40 percent, while renters' median household incomes remained essentially unchanged. Over the same period, the vacancy rate for units renting for below $450 fell from 1.74 percent to 0.94 percent; the median rent burden increased from 27 percent to 31 percent; and the percentage of units which were crowded increased from 6.5 percent to 10.3 percent.[24] In the light of these statistics, the continuing demand for affordable single-room units by the City's poorest and most vulnerable should come as no surprise

---

[24]*Housing New York City 1993*, pp. 73, 176, 281, and 257

---

# 3 THE SRO HOUSING INVENTORY

## 3.1 Definitions of SRO Housing Types

For the purpose of this report, an SRO unit is defined as a unit with one or two rooms (not counting any bathroom or kitchen) and lacking complete bathroom and/or kitchen facilities for exclusive use. As will become clear, SRO units can be usefully differentiated by the structure classification of the buildings in which they are located. Four building structure classifications account for almost all SRO units in New York City:[25]

- Class A Multiple Dwellings

- Section 248 SRO Buildings

- Rooming Houses

- Hotels

The first two categories (Class A Multiple Dwellings and Section 248 SROs) are both designated for permanent occupancy. Section 248 SRO buildings are Old Law and New Law Tenements which were converted to single-room occupancy under Section 248 of the New York State Multiple Dwelling Law. The last two categories (Rooming Houses and Hotels) are both designated for transient occupancy, although they are now frequently used for permanent occupancy.

Certain SRO buildings were excluded from the 1991 and 1993 HVS-SRO surveys because they were not available to the general public or because they were unaffordable by low income

---

[25]See Appendix B, *Glossary of Terms*, for further descriptions of these categories.

persons.[26] These include SRO units in dwellings restricted to persons qualified by their institutional affiliations, e.g. college dormitories, nurses' residences, and clubhouses. However, some buildings which have been developed in recent years to serve homeless and housing-needy populations, were included in the sample. Also excluded from the HVS-SRO surveys are all SRO units in hotels charging $55 or more per night for a single room and facilities operated by the City, State, or other political subdivision (i.e. homes for the aged, halfway houses, etc.).

## 3.2    The SRO Housing Inventory 1991-1993

The estimated number of SRO units declined by just over 18 percent, from 57,128 to 46,744, between 1991 and 1993 (Table 3.1). The decrease was sharpest for rooming units, which fell by almost a quarter. By 1993, rooming units accounted for just over one third of all SRO units, Class A SRO units for just under a quarter, and Section 248 SROs and hotel units each for around a fifth of all SRO units (Figure 3.1).

---

[26]For further information on the 1991 and 1993 HVS-SRO Surveys, see Appendix A, *1993 New York City Housing and Vacancy Survey - SRO Survey Source and Accuracy Statement.*

**Table 3.1**
**Number and Change in Renter-Occupied, Vacant for Rent,**
**and Vacant Unavailable SRO Units by Building Structure Class**
**New York City 1991 and 1993**

| Structure Class | 1991 | | 1993 | | Change 1991-1993 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| All | 57,128[†] | 100.0% | 46,744 | 100.0% | -10,384 | -18.2% |
| Class A | 10,925 | 21.6% | 10,053 | 24.0% | ** | ** |
| Section 248 SRO | 10,727 | 21.2% | 9,296 | 22.2% | ** | -13.3%* |
| Rooming House | 18,664 | 36.9% | 14,277 | 34.0% | -4,387 | -23.5% |
| Hotel | 10,278 | 20.3% | 8,328 | 19.8% | ** | -19.0%* |
| Other[‡] | 6,535 | ------ | 4,789 | ------ | ** | ------ |

Source:  U.S. Bureau of the Census, 1991 and 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
[†]  Some numbers in this and other tables in this report may not add precisely due to rounding.
[‡]  "Other" includes units whose structure classification could not be determined (4,363 in 1991 and 3,317 in 1993) as well as a few SRO units in 1-2 family houses.  "Other" units are excluded in the calculation of percentages.
[*]  Since the number of units is small, interpret with caution.
[**]  Too few units to report.

Figure 3.1
Distribution of Renter-Occupied, Vacant for Rent, and
Vacant Unavailable SRO Units by Building Structure Class
New York City 1993



| Class A | Section 248 SRO |
| Rooming House | Hotel |

Source: U.S. Bureau of the Census, 1993 New York City
Housing and Vacancy Survey and HVS-SRO Survey.

The decline in the SRO inventory between 1991 and 1993 represents the continuation of a long-term trend. Local Law 59, which imposed the 1985 moratorium on conversions, alterations, or demolitions of single-room occupancy multiple dwellings, cited as its rationale, "the loss of single-room occupancy dwelling units housing low-income persons." A number of earlier studies, using sampling frames which are not directly comparable to the one used for this report, support this finding. These include:

(1)    The New York City Housing and Vacancy Surveys, which, for a number of years, included SRO units other than commercial hotel units where at least 25 percent of units were intended for transient occupancy. Using this more constrained definition of an SRO unit, the occupied SRO inventory was found to have declined from 129,000 in 1960 to 98,000 in 1965 and to 73,500 in 1968.[27]

---

[27]Paul L. Niebanck, *Rent Control and the Rental Housing Market, New York City 1968*, prepared for the City of New York, Housing and Development Administration, January 1970, page 165.

(2)    A study of lower priced hotels in New York City between 1975 and 1979 by the New York City Human Resources Administration, which found the number of lower priced hotel units to have declined from around 50,000 in January 1975 to around 28,000 in July 1979.[28]

(3)    A 1986 study of single-room occupancy in New York City, mandated by Local Law 59, which found the 1986 SRO inventory to be approximately 52,000.[29]

Differences in exact definitions of SROs, data collection methodology, and scope among these early studies and the present study do not admit direct comparison of these numbers. They do, however, provide strong circumstantial evidence that the 1991-1993 decline in the SRO inventory represents the continuation of a thirty-year trend.

The forces which have been driving the decline in the SRO inventory cannot be readily identified from the HVS-SRO surveys, which are administered to sitting tenants.[30] It is clear, however, that the 1991-1993 decline in the number of hotel units was not the result of inflation pushing hotel room rates over $55 per night. In the 1991 HVS-SRO survey, 90 percent of hotel units rented for less than $700 per month, and there were essentially no units renting for anywhere close to $1,650 a month ($55 per night).

### Regulatory Status, Location, and Building Size

The SRO inventory was almost all subject to rent regulation in 1993, either rent stabilization or rent control. Approximately 81 percent of all SRO units were regulated, and the percentages did not vary significantly between SRO units in different types of structures (Table 3.2).[31] Almost two-

---

[28]*The Diminishing Resource: Lower Priced Hotels in New York City 1979*, New York City Human Resources Administration, Office of Crisis Intervention Services, 1979, page 10.

[29]Pearl Beck, *The Changing Face of New York City's SROs: A Profile of Residents and Housing*, New York City Human Resources Administration, Office of Policy and Program Development, October 1987, page 13.

[30]In hearings before the New York City Rent Guidelines Board on June 17, 1996, the most commonly cited reason for the loss of SRO units was the conversion of permanent SRO housing units into transient units catering to tourists at much higher per-night rates

[31]The primary method for determining the regulatory status of SRO units is to check unit status in the computerized rent registration database of the New York State Division of Housing and Community Renewal. A secondary method is used for units which do not appear in DHCR records. These procedures are exactly equivalent to those used for determining the rent regulation status of all rental units in the 1991 and 1993 HVSs as specified in Appendix C, "Definitions of Rent Regulation Status", *Housing New York City 1993*, pages 397-403.

There are, however, two unique qualifications for units to be SRO stabilized units which may impact on the accuracy of rent regulatory status classification made by the second procedure First, only hotel units with rents of less than $350 per month or $88 per week on May 31, 1968, are covered by the Rent Stabilization Law. Since the HVS and HVS-

---

thirds of all SRO units were located in Manhattan  Hotel units (90 7 percent) and Section 248 SRO units (87.7 percent) were the most heavily concentrated in Manhattan.  Almost two thirds of the rooming units and 44 percent of the Class A units were in Manhattan.  Approximately half of the Manhattan rooming units were located in the Central Harlem sub-borough area, and about one fifth were located in the Chelsea/Clinton/Midtown sub-borough area.[32]  Given that Manhattan accounted for less than 30 percent of all New York City's rental housing, it will be apparent that SRO units were heavily over-represented in Manhattan.[33]

---

SRO surveys do not have information on rent levels in 1968, it is possible that some units have erroneously been coded as stabilized  However, since the HVS-SRO survey does exclude units renting for $55 or more a night in 1991 and 1993, this problem should be minimal.  Second, a hotel occupant is protected by rent stabilization only if the tenant is a permanent resident, residing in the same building for a period of six months or more, requests a lease of six months or more, or is in occupancy pursuant to a lease of six months or more even if the actual occupancy is less than six months.  The data necessary to determine this "permanent tenancy" requirement is not collected for the HVS and HVS-SRO surveys and thus cannot be used in determining regulatory status.

[32]Sub-borough areas and their boundaries are described in *Housing New York City 1993*, Appendix A, pp. 331-336 and pp. 360-367.

[33]*Housing New York City 1993*, p. 138.

Table 3.2
Distribution of Renter-Occupied and Vacant for Rent SRO Units
Which are Rent Regulated and In Manhattan
by Building Structure Class
New York City 1993

| Structure Classification | Number Renter-Occupied and Vacant For Rent Units | Percent Rent Regulated[†] | Percent in Manhattan | Number of Renter-Occupied Units |
|---|---|---|---|---|
| All | 39,599 | 81.4% | 63.3% | 35,097 |
| Class A | 8,634 | 81.1% | 44.3% | 8,322 |
| Section 248 SRO | 8,199 | 88.6% | 87.7% | 7,596 |
| Rooming House | 11,561 | 86.7% | 63.4% | 10,507 |
| Hotel | 7,097 | 93.2% | 90.7% | 5,222 |
| Other* | 4,108 | ** | ** | 3,449 |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
†        Includes rent stabilized and rent controlled units.
*        "Other" includes units whose structure class was not reported, as well as a few SRO units in 1-2 family houses.
**       Too few units to report.

Rooming houses and hotels are distinguished under the Multiple Dwelling Laws by the size of the buildings, with rooming houses being defined as inns with fewer than 30 sleeping rooms and hotels as inns with 30 or more sleeping rooms. This distinction is apparent in Table 3.3, which shows that 5 out of 6 rooming units are in buildings with fewer than 20 units, while 3 out of 4 hotel units are in buildings with 100 or more units. Four out of five of the Section 248 SRO units are in buildings with 50 or more units; the Class A units are more evenly distributed across the four building size categories.

**Table 3.3**
**Distribution of Renter-Occupied and Vacant for Rent SRO Units**
**by Building Size and Structure Class**
**New York City 1993**

| Structure Class | All | Building Size | | | |
|---|---|---|---|---|---|
| | | 1-19 Units | 20-49 Units | 50-99 Units | 100 or More Units |
| All | 100.0% | 42.0% | 13.4% | 14.6% | 29.9% |
| Class A | 100.0% | 34.8% | 17.3%* | 17.8%* | 30.1% |
| Section 248 SRO | 100.0% | ** | 20.5%* | 29.8% | 47.6% |
| Rooming House | 100.0% | 83.3% | 16.7%* | 0.0% | 0.0% |
| Hotel | 100.0% | 0.0% | ** | 21.6%* | 75.4% |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
\*        Since the number of units is small, interpret with caution.
\*\*      Too few units to report.

### 3.3    Amenities and Facilities of SRO Housing

SRO housing units, by definition, lack complete, unshared bathroom facilities or complete, unshared kitchen facilities, or they may lack both.  The absence of some or all of these amenities typically makes this type of housing more affordable, while it also presumably detracts from the appeal of SRO housing, at least for many individuals.

There are some marked differences in bathroom and kitchen amenities among SRO units in different structure classes.  In Table 3.4, the extent and sharing arrangements of bathroom facilities for units in the four structure classes are presented.

Table 3.4
**Presence and Sharing Arrangements of Bathroom Facilities**
**in Renter-Occupied SRO Units by Building Structure Class**
**New York City 1993**

| Bathroom Facilities and Sharing Arrangements[†] | Structure Class | | | | |
| --- | --- | --- | --- | --- | --- |
| | All | Class A | 248 SRO | Rooming House | Hotel |
| All | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Complete Facilities: Exclusive Use | 17.9% | 34.4% | ** | ** | 19.7%* |
| Complete Facilities: Shared Use | 14.1% | 13.7%* | ** | 22.0% | ** |
| Incomplete Facilities | 37.9% | 42.2% | 50.0% | 38.5% | 36.0%* |
| No Facilities in Unit | 30.1% | ** | 39.1% | 37.4% | 43.3% |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
[†]      Complete bathroom facilities are defined as hot and cold piped water, a flush toilet, and a bathtub or shower.
*      Since the number of units is small, interpret with caution.
**      Too few units to report.

   Over a third of all Class A units had complete bathroom facilities within the unit for exclusive use.  By contrast, almost no rooming units nor Section 248 SRO units had complete, unshared bathroom facilities; and only around a fifth of hotel units enjoyed these amenities.  Sharing bathroom facilities within a unit was very uncommon for all SRO housing types except for rooming units; just over a fifth of all rooming units had complete, but shared, bathroom facilities.  Almost two fifths of all SRO units had some, but not all, bathroom facilities within the unit.  The percentage of units with partial bathroom facilities ranged from 36.0 percent for hotel units to 50.0 percent for Section 248 SRO units.  With the exception of the Class A units, around two fifths of SRO units had no bathroom facilities within the unit.

   Comparable data on the presence and/or sharing of kitchen facilities are presented in Table 3.5.  Eighteen percent of all SRO units had no kitchen facilities, either in the unit or elsewhere in the building, while just over 30 percent had no kitchen facilities in the unit, but did have access to kitchen facilities elsewhere in the building.  Only around a quarter of all SRO units had complete, unshared kitchen facilities within the unit, and around a sixth had some, but not all, kitchen facilities.  Shared kitchen facilities within the unit were fairly uncommon in all types of SRO units.

**Table 3.5**
**Presence and Sharing Arrangements of Kitchen Facilities in**
**Renter-Occupied SRO Units by Building Structure Class**
**New York City 1993**

| Kitchen Facilities and Sharing Arrangements[1] | Structure Class | | | | |
|---|---|---|---|---|---|
| | All | Class A | 248 SRO | Rooming House | Hotel |
| All | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Complete Facilities: Exclusive Use | 25.0% | 30.8% | 24.8%* | 36.1% | ** |
| Complete Facilities: Shared Use | 10.0% | 14.0%* | ** | ** | ** |
| Incomplete Facilities | 16.6% | 22.7%* | ** | 18.3%* | ** |
| No Facilities in Unit but Available in Building | 30.5% | 19.6%* | 54.6% | 22.6% | 31.7%* |
| No Facilities in Building | 18.0% | 12.8%* | ** | 14.0%* | 61.1% |

Source: U.S Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
[1]      Complete kitchen facilities are defined as a sink with piped water, a range or cookstove, and a refrigerator.
*       Since the number of units is small, interpret with caution.
**      Too few units to report.

The most common arrangement in Class A units is a complete kitchen which is sometimes shared and some but not complete bathroom facilities. The Section 248 SROS appear most commonly to have incomplete bathroom facilities, and no kitchen facilities in the unit but shared kitchen facilities elsewhere in the building. Like Section 248 residents, rooming house tenants generally have incomplete bathroom arrangements, and, while over one third have their own complete kitchen, an equal number have no kitchen facilities in their unit. For hotel units, it was most common to have neither bathroom nor kitchen facilities in the unit and no kitchen facilities elsewhere in the building.

### 3.4    SRO Housing Conditions

Data on dilapidation, on the presence of observable defects in the buildings in which SRO units are located, and on the presence of maintenance and equipment deficiencies in the units themselves provide useful indicators of the condition of SRO housing. Approximately 7 percent of renter-occupied SRO units were located in dilapidated buildings; by comparison, the dilapidation rate for all renter-occupied units in the city was around 1 percent.[34] Using the presence of building defects as an additional indicator, SRO units were also on average in much worse condition than other renter units. A third (32.9 percent) of all SRO units were in buildings with at least one observable defect; this compares to an incidence of 10.7 percent of all rental units in New York City (Table 3.6). The incidence of building defects was particularly high for SRO units in Section 248 SRO buildings (40.5 percent) and for SRO units in rooming houses (50.8 percent). While the incidence of building defects for SRO units is much higher than for all rental units, much of this difference is related to the finding that SRO units are typically located in older buildings. Almost a quarter of all renter-occupied units in Old Law Tenements also had one or more building defects in 1993.[35]

---

[34]U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey and 1993 New York City HVS-SRO Survey

[35]*Housing New York City 1993*, page 241

Table 3.6

**Percentage of Renter-Occupied Units in Buildings with 1 or More Observable Defects and Percentage of Units with 3 or More Maintenance and Equipment Deficiencies for SRO Units by Structure Class and for All Renter Units New York City 1993**

| Structure Class | Percentage in Buildings with 1 or More Observable Defects | Percentage of Units with 3 or More Maintenance Deficiencies |
|---|---|---|
| All SRO Structure Classes | 32.9% | 26.4% |
| Class A | 12.6%* | 28.0%* |
| Section 248 SRO | 40.5% | 22.6%* |
| Rooming House | 50.8% | 40.1% |
| Hotel | ** | ** |
| All New York City Renter Units | 10.7% | 21.5% |

Source: U.S. Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
\*       Since the number of units is small, interpret with caution.
\*\*     Too few units to report.

In light of the sharp disparity between the building conditions of renter-occupied SRO units and all renter units in New York City, it might be expected that SRO units would also have a much higher incidence of maintenance and equipment deficiencies. Such was not the case, however. The overall incidence of 3 or more maintenance deficiencies for SRO units was only slightly higher than for all renter-occupied units (26.4 percent versus 21.5 percent). This somewhat surprising finding may reflect the fact that SRO units, being smaller than other units and having less kitchen and bathroom equipment, simply have fewer things to go wrong; or it may be that SRO residents are less likely than other renters to identify maintenance deficiencies. It should also be noted, however, that rooming units, which had the highest incidence of building defects, also had the highest incidence of maintenance and equipment deficiencies.

### Crowding

Most SRO units, having only one room, are by definition crowded if the household has more than one member. Although SRO residents are predominantly single persons living alone (see Chapter 4), there are and always have been a significant number of SRO households with 2 or more

persons, both related and unrelated [36] Approximately one fifth (18.6 percent) of all SRO units were crowded in 1993 (Table 3.7)  What is particularly striking in these results is the extremely high incidence of crowding in the Class A SRO units (36.8 percent)  Indeed, although the Class A buildings house only around one quarter of all SRO units, they accounted for about half of all crowded SRO units.[37] The incidence of crowding in the Section 248 and rooming house SRO units, both around 14 percent, was only a third of the incidence of crowding in the Class A units, and was not that much higher than the overall incidence of crowding in all renter units (10.3 percent).

**Table 3.7**
**Incidence of Crowding in Renter-Occupied SRO Units by Building Structure Class**
**and in All Renter Units**
**New York City 1993**

| Structure Class | Percentage |
| --- | --- |
| All | 18.6% |
| Class A | 36.8% |
| Section 248 SRO | 13.8%* |
| Rooming House | 13.8%* |
| Hotel | ** |
| All New York City Renter Units | 10.3% |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
*        Since the number of units is small, interpret with caution.
**       Too few units to report.

### Neighborhood Conditions of SRO Units

Two indicators of the conditions of the neighborhoods in which SRO units are located are the presence of buildings with broken or boarded up windows on the same street and the SRO residents' ratings of the physical condition of residential buildings in the neighborhood.  It will be apparent from Table 3.8 that SRO residents are much more likely than other renters to live on streets with broken or boarded up windows.  Overall, 32 percent of all SRO residents lived on such streets, compared to only around 14 percent of all renters.  This is consistent with the earlier finding that SRO residents were much more likely to live in dilapidated buildings and buildings with defects than were other

---

[36] Karen A. Franck, "Rediscovering and Redefining SRO Housing", in *SRO Housing Here and Now*, American Institute of Architects/New York Chapter, 1995, page 5.

[37] U.S. Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.

renters. Also noteworthy is the extremely high percentage of rooming units on the same street as buildings with broken or boarded up windows.

**Table 3.8**

**Presence of Buildings with Broken or Boarded Up Windows on the Same Street and Residents' Ratings of the Physical Condition of Residential Buildings in the Neighborhood, for Renter-Occupied SRO Units by Structure Class and for All Renter-Occupied Units New York City 1993**

| Structure Class | Percent on Same Street as Buildings with Broken or Boarded Up Windows | Percent Rating Condition of Residential Buildings in Neighborhood *Fair* or *Poor* |
|---|---|---|
| All | 32.2% | 44.6% |
| Class A | 25.5% | 47.2% |
| Section 248 SRO | 21.5%* | 36.4% |
| Rooming House | 51.1% | 59.1% |
| Hotel | 28.0%* | 27.3%* |
| All New York City Renter-Occupied Units | 13.7% | 38.2% |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
*        Since the number of units is small, interpret with caution.

In terms of their subjective rating, 44.6 percent of SRO residents rated the physical condition of residential buildings in their neighborhoods *Fair* or *Poor*, compared to 38.2 percent for all renters. Once again, it appears that the rooming house residents were living in the most run-down areas.

## 3.5    Vacancies and Vacancy Rates in SRO Housing

The number of vacant SRO units identified during the course of the 1991 and 1993 HVSs was quite small. This makes it difficult to estimate the vacancy rates with much accuracy, especially when broken down by structure classification, location, or rent level. It is estimated that 7,233 SRO units of all kinds were vacant and available for rent in 1991, out of a total of 49,993 SRO rental units, both occupied and vacant available for rent (Table 3 9). The 1991 SRO vacancy rate was 14.47 percent.

By 1993, the estimated number of vacant available SRO units had fallen to 4,502; the number of occupied and vacant available for rent had fallen to 39,599; and the vacancy rate had fallen to 11.37 percent. The vacancy rate for SROs is typically much higher than the vacancy rate for all rental units, which in 1993 was 3.44 percent.

### Table 3.9
### Vacancies and Vacancy Rates in SRO Housing
### New York City 1991 and 1993

|  | 1991 | 1993 |
|---|---|---|
| All Renter Occupied and Vacant Available Units | 49,993 | 39,599 |
| Renter Occupied Units | 42,760 | 35,097 |
| Vacant Units Available for Rent | 7,233 | 4,502 |
| Vacancy Rate | 14.47% | 11.37% |

Source: U.S. Bureau of the Census, 1991 and 1993 New York City Housing and Vacancy and HVS-SRO Surveys.

In the two non-transient structure classes (Class A Apartment Buildings and Section 248 SROs), the total number of 1993 vacancies was extremely small. About three-quarters of all SRO vacant available units were in the two so-called transient structure classes (Rooming Houses and Hotels). The 1993 vacancy rate for rooming units was 9.12 percent; and the 1993 vacancy rate for hotel units was 26.42 percent.[38]

The vacancy rate for units renting below $400 per month was 5.85 percent, while the vacancy rate for units renting for $400 per month and over was 20.67 percent (Table 3.10). It should be noted, however, that these estimates are based on very small samples and should be interpreted with caution. A positive association between vacancy rates and rent levels for all rental units in 1993 has also been demonstrated.[39]

---

[38]U.S. Bureau of the Census, 1993 New York City HVS and HVS-SRO Surveys. Since the number of units on which the percentages are based is small, interpret with caution.

[39]Anthony J. Blackburn, *Housing New York City 1993*, pp. 168-174.

**Table 3.10**
**Vacancies and Vacancy Rates for SRO Units Renting for Below $400 per Month**
**and for $400 and Over per Month**
**New York City 1993**

| Rent Level | Number of Vacancies | Number of Renter Occupied and Vacant Available Units | Vacancy Rate |
|---|---|---|---|
| Both | 4,502 | 39,599 | 11.37% |
| Below $400 | ** | 21,423 | 5.85%* |
| $400 and Over | 3,021 | 14,615 | 20.67% |
| Rent Not Reported | ** | 3,561 | ** |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
*       Since the number of vacant units is small, interpret with caution.
**      Too few units to report.

A total of 7,145 SRO units were vacant and unavailable for sale or rent in 1993, almost unchanged from 1991 (Table 3.11). More than a third of these units were in buildings awaiting or undergoing renovation (34.1 percent), and a fifth of these units were in dilapidated buildings. It should be noted that vacant unavailable SRO units represented about 15 percent of the SRO housing inventory of around 47,000 in 1993. This is an extraordinarily high percentage, compared to the city as a whole, where vacant unavailable units account for less than four percent of the housing inventory.[40]

---

[40] Anthony J. Blackburn, *Housing New York City 1993*, page 131.

**Table 3.11**
**Number of Vacant SRO Units Unavailable for Sale or Rent**
**by Reason for Unavailability**
**New York City 1991 and 1993**

| Reason for Unavailability | 1991 | | 1993 | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| All | 7,135 | 100.0% | 7,145 | 100.0% |
| Dilapidated | ** | 16.3%* | ** | 20.0%* |
| Awaiting/Undergoing Renovation | 2,501* | 35.1% | 2,440* | 34.1% |
| Other† | 3,472 | 48.7% | 3,276 | 45.9% |

Source: U.S. Bureau of the Census, 1991 and 1993 New York City Housing and Vacancy and HVS-SRO Surveys.
† "Other" includes: reason not reported; converted to non-residential; unit held for occasional, seasonal, or recreational use; owner unable to rent or sell due to personal problems; held pending sale of building; in legal dispute; and other reasons.
* Since the number of units is small, interpret with caution.
** Too few units to report.

## 3.6    Conclusions

The estimated number of SRO units in New York City declined by approximately 18 percent, from 57,128 to 46,744, between 1991 and 1993. This decrease represents the continuation of a trend which has been variously documented over the last 30 years. The 1991-1993 decrease was sharpest for rooming units, which fell by almost a quarter.

The SRO inventory of all types was heavily concentrated in Manhattan, which has almost two thirds of all renter-occupied and vacant available SRO units.

The Class A SRO units generally have the most complete bathroom and kitchen amenities; over 90 percent of Class A SRO units had at least some bathroom facilities within the unit, although almost a third (32.4 percent) had no kitchen facilities available. Over a third of all Section 248 SRO units, rooming units, and hotel units had no bathroom facilities within the unit, and very few units had complete bathroom facilities for their exclusive use. Over half of the Section 248 SRO units had no kitchen facilities within the unit, and about one third of the hotel units had no kitchen facilities within the unit, but had facilities within the building; more than 60 percent had no kitchen facilities anywhere.

SRO units, especially rooming units, were much more likely to be in buildings with observable defects than other renter units in New York City. They were not significantly different from all renter units in terms of reported levels of maintenance, except that rooming units reported twice the incidence of 3 or more maintenance deficiencies. With the exception of the Class A SRO units, crowding rates for SRO units were not much higher than for other renter units. The crowding rate for the Class A SRO units (36.8 percent) was extraordinarily high, over three and a half times the city-wide rate for all renter housing.

SRO units, especially rooming units, were much more likely to be on streets with boarded up and/or broken windows than all renter units; however, residents' ratings of the condition of buildings in their neighborhoods, again with the exception of the rooming housing residents, were not much different from the ratings of all renters.

Vacancy rates for SRO units, at 11.37 percent overall in 1993, were typically much higher than for all rental units. This is particularly noticeable for units in the two transient classes (rooming houses and hotels) and for units renting for $400 per month and over.

There were over 7,000 vacant SRO units unavailable for sale or rent in 1993, almost unchanged from 1991. About one fifth of these were dilapidated, and more than a third were awaiting/undergoing renovation. The proportion of the SRO inventory that was vacant and unavailable in 1993 was 15 percent, remarkably high considering that vacant unavailable units account for less than four percent of the city-wide housing inventory. This is consistent with the finding of on-going decline in the inventory, since units generally become unavailable prior to abandonment or conversion to other uses.



# 4  SRO RESIDENT PROFILE

## 4.1  SRO Residents

Between 1991 and 1993, the number of individuals living in renter SRO units declined by almost 15 percent, from 54,963 to 46,952 (Table 4.1). Essentially all SRO residents are renters, and all the discussions and tables which follow are limited to SRO residents who rent. To put this in perspective, it should be noted that SRO renters accounted for less than 1 percent of New York City's residential population of approximately 7 million.[41] The number of persons living in hotels fell by a quarter; the number living in Section 248 SROs fell by 23 percent; and the number living in rooming houses fell by 16 percent. Partially offsetting these declines, the number of persons living in SRO units in Class A buildings appears to have grown slightly in 1993.

---

[41] U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey. The residential population, which is the sample universe for the New York City Housing and Vacancy Survey, excludes persons living in "special places", such as transient accommodations, group quarters, dormitories, prisons, and emergency shelters.

---

**Table 4.1**
**Population of Individuals Living in SRO Units by Structure Class of SRO**
**New York City 1991 and 1993**

| Structure Class | 1991 | 1993 | Percentage Change 1991-1993 |
|---|---|---|---|
| All | 54,963 | 46,952 | -14.6% |
| Class A | 12,700 | 14,121 | +11.2%* |
| Section 248 SRO | 12,150 | 9,408 | -22.6% |
| Rooming House | 15,106 | 12,623 | -16.4% |
| Hotel | 7,510 | 5,598 | -25.5%* |
| Other† | 7,496 | 5,201 | ---- |

Source: U.S. Bureau of the Census, 1991 and 1993 New York City Housing and Vacancy Surveys (HVSs) and 1991 and 1993 HVS-SRO Surveys.
*    The number of persons is small, so interpret with caution.
†    "Other" includes unreported structure class and a few persons in 1-2 family houses.

The nature of the growth in the Class A SRO population is of some interest. Between 1991 and 1993, the number of renter-occupied Class A SRO units decreased by a little, while the number of individuals living in Class A SRO units increased by around 11 percent. The principal factor of growth in this sub-population was therefore an increase in the average household size from 1.4 persons in 1991 to 1.7 persons in 1993.[42] It should be noted that over half of the 2-room SROs were to be found in the Class A buildings.[43] The relatively high incidence of crowding in the Class A SRO units, noted in the previous chapter, appears therefore to be a fairly recent phenomenon. The subject of household size in the Class A and other SRO units is revisited later in this chapter.

**Gender, Age, and Race/Ethnicity of SRO Residents**

SRO residents were much more likely to be male than female (Table 4.2). Approximately 47 percent of the overall New York City renter population was male in 1993, while about 62 percent of SRO residents were male. Among residents of hotel SRO units, the male-female ratio (12:11) was closest to the city-wide ratio. For rooming house residents, however, the male-female ratio was

[42]Notwithstanding the relatively small sample sizes on which these estimates are based, this increase in mean household size is statistically significant at the 99 percent level.

[43]U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.

almost 7:3. The male-female ratio was also quite high for Section 248 SRO residents and for Class A SRO residents.

**Table 4.2**
**Distribution of SRO Residents and All Renters by Gender and Building Structure Class**
**New York City 1993**

| Structure Class | Gender | | |
| --- | --- | --- | --- |
| | Both | Male | Female |
| All SRO Residents | 100.0% | 62.1% | 37.9% |
| Class A | 100.0% | 58.9% | 41.1% |
| Section 248 SRO | 100.0% | 65.5% | 34.5% |
| Rooming House | 100.0% | 69.8% | 30.2% |
| Hotel | 100.0% | 52.2% | 47.8% |
| All New York City Renters | 100.0% | 46.5% | 53.5% |

Source: U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.

The SRO population was overwhelmingly adult, with persons aged 17 years or less accounting for only around 6 percent of all SRO residents, whereas this group accounted for over a quarter of all New York City renters (Table 4.3). There was considerable variation in the age distribution of adults among the four building structure classes. There were hardly any children in rooming and hotel units, and there were relatively few persons aged 62 years or older living in Class A SRO units (9.2 percent) or in Section 248 SRO units (too few to report). By contrast, almost a third of all hotel SRO residents were in the upper age group. Residential hotel units, where cleaning and other services are provided, have been traditionally favored by the elderly. The overall mean age of SRO residents was 39 years, compared to 33 years for the overall renter population.

Table 4.3
Distribution of SRO Residents by Structure Class
and All Renters by Age Group and Mean Age
New York City 1993

| Structure Class | All | Age Group | | | | Mean Age |
| | | Under 18 Years | 18-34 Years | 35-61 Years | 62 Years and Over | |
|---|---|---|---|---|---|---|
| All SRO Residents | 100.0% | 5.9% | 36.0% | 44.8% | 13.3% | 39 |
| Class A | 100.0% | 9.9%* | 43.0% | 38.0% | 9.2%* | 35 |
| Section 248 SRO | 100.0% | ** | 36.5% | 49.0% | ** | 37 |
| Rooming House | 100.0% | ** | 31.1% | 50.8% | 14.4%* | 42 |
| Hotel | 100.0% | ** | 25.3%* | 41.5% | 32.2%* | 48 |
| All New York City Renters | 100.0% | 26.7% | 29.7% | 31.5% | 12.1% | 33 |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.
*        Since the number of persons is small, interpret with caution.
**       Too few people to report.

Together, blacks (40.9 percent) and Hispanics (29.1 percent) accounted for seven out of ten SRO residents (Table 4.4).  Whites typically accounted for around a fifth of residents of Class A, Section 248 SRO, and rooming units; but over half of all residents of hotel SRO units were white. Rooming houses, which in Manhattan are heavily concentrated in Harlem, were occupied predominantly by blacks (53.0 percent) and Hispanics (24.7 percent).

**Table 4.4**
**Distribution of SRO Residents by Race/Ethnicity and Building Structure Class**
**New York City 1993**

| Race/ Ethnicity | All | Class A | Section 248 SRO | Rooming House | Hotel |
|---|---|---|---|---|---|
| All | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| White | 22.4% | 20.4% | 20.1%* | 18.2% | 51.4% |
| Black | 40.9% | 39.2% | 38.9% | 53.0% | 30.1%* |
| Hispanic | 29.1% | 28.4% | 34.9% | 24.7% | ** |
| Other | 7.7% | 12.0%* | ** | ** | ** |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.
*        Since the number of persons is small, interpret with caution.
**       Too few persons to report.

Comparing the universe of SRO residents with the universe of all renters in terms of race/ethnicity, white renters are under-represented in SROs (22.4 percent versus 31.3 percent), and blacks are over-represented (40.9 percent versus 30.5 percent) (Table 4.5). Hispanic and Other renters account for almost exactly the same percentage of SRO residents as they do of all renters. Compared to studio renters, SRO residents are much more likely to be black (40.9 percent versus 16.4 percent) and much less likely to be white (22.4 percent versus 56.0 percent). Studios are here defined as single-room units with complete, unshared bathroom and kitchen.

**Table 4.5**
**Distribution of SRO Residents, All Renters, and Studio Renters by Race/Ethnicity**
**New York City 1993**

| Race/Ethnicity | SRO Residents | All Renters | Studio Renters |
|---|---|---|---|
| All | 100.0% | 100.0% | 100.0% |
| White | 22.4% | 31.3% | 56.0% |
| Black | 40.9% | 30.5% | 16.4% |
| Hispanic | 29.1% | 29.4% | 13.8% |
| Other | 7.7% | 8.8% | 13.9% |

Source: U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.

## National Origin

Approximately 60 percent of all SRO householders were born in the U.S., just slightly higher than the percentage of all New York City renter householders born in the U.S. (Table 4.6). Indeed, the breakdown of SRO householders by birth region is similar to the breakdown of all New York City renter householders.

**Table 4.6**
**Distribution of SRO Households and of All Renter Households**
**by Birth Region of Householder**
**New York City 1993**

| Birth Region of Householder | SRO Households | All Renter Households |
|---|---|---|
| All | 100.0% | 100.0% |
| U.S.A. | 59.1% | 54.4% |
| Puerto Rico | 9.4% | 8.4% |
| Caribbean | 10.3% | 12.5% |
| Latin America | 7.2% | 7.2% |
| Europe | 4.1%* | 9.1% |
| Other | 9.8% | 8.3% |

Source: U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.
* Since the number of households is small, interpret with caution.

### Educational Attainment

Almost 38 percent of SRO residents had not completed high school (Table 4.7), while about 30 percent of all New York City renters had not completed high school. The educational attainment of SRO residents in Class A SRO units, in Section 248 SRO units, and in rooming houses was quite similar. Residents in hotel SRO units were more likely to have completed high school. It is also apparent that SRO residents were generally better educated than residents of *in rem* and public housing units.

**Table 4.7**
**Distribution of Educational Attainment Among SRO Residents Aged 18 or Older**
**by Building Structure Class and All Renters by Regulatory Status**
**New York City 1993**

| Structure Class/ Regulatory Status | All | Less than 12 Years | High School Graduate | 13-15 Years | At Least College Graduate |
|---|---|---|---|---|---|
| **All SROs** | **100.0%** | **37.7%** | **36.6%** | **15.0%** | **10.8%** |
| Class A | 100.0% | 39.7% | 33.1% | 13.8%* | 13.4%* |
| Section 248 SRO | 100.0% | 38.8% | 35.5% | 16.4%* | ** |
| Rooming House | 100.0% | 41.8% | 31.5% | 19.2%* | ** |
| Hotel | 100.0% | 31.3%* | 34.5%* | ** | ** |
| **All New York City Renters** | **100.0%** | **29.8%** | **30.0%** | **19.1%** | **21.1%** |
| Controlled | 100.0% | 32.4% | 35.7% | 14.2% | 17.7% |
| Stabilized | 100.0% | 28.5% | 27.8% | 18.9% | 24.8% |
| Unregulated | 100.0% | 24.1% | 32.3% | 20.4% | 23.3% |
| Mitchell-Lama | 100.0% | 23.3% | 33.0% | 25.0% | 18.8% |
| Other Regulated[†] | 100.0% | 41.4% | 31.4% | 18.0% | 9.2% |
| Public | 100.0% | 49.2% | 30.1% | 17.6% | 3.1% |
| *In Rem* | 100.0% | 54.6% | 28.1% | 13.8% | 3.4%* |

Source: U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.
* Since the number of persons is small, interpret with caution.
** Too few persons to report
† Includes HUD-subsidized, Article 4, and New York City Loft Board regulated units.

## Composition of SRO Households

As might be expected, most households (77.8 percent) consisted of single adults living by themselves (Table 4.8). However, a significant percentage (22.2 percent) of SRO households consisted of two or more persons. Single adult householders living with one or more other people accounted for 7.2 percent of SRO households. Couples without children, either with or without secondary persons present, accounted for approximately 1 in 10 SRO householders, and approximately 1 in 20 SRO households included one or more children.

### Table 4.8
### Distribution of Primary SRO Households by Presence of
### Secondary Individual or Family
### New York City 1993

| Presence of Secondary Person or Family* | | Primary Household Type | | | |
| --- | --- | --- | --- | --- | --- |
| | Total | Single-No Child | Couple-No Child | Single or Couple with Child |
| Total | 100.0% | 85.0% | 10.1% | 4.8%* |
| Not Present | 90.4% | 77.8% | 8.5% | 4.1%* |
| Present | 9.6% | 7.2% | ** | ** |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.

*        For the purpose of this analysis, primary households consist of the householder, spouse or unmarried partner, and their minor children (age 17 or under). Secondary persons or families are non-householding adults related or unrelated to the householder with or without minor children.

**       Too few households to report.

The mean size of an SRO household was 1.3 persons in 1993 (Table 4.9), approximately half the average size of all New York City renter households (2.5 persons). The average household size was lower for hotels (1.1 persons), rooming units (1.2 persons), and Section 248 SROs (1.2 persons), which rarely had more than one person in the household. By contrast, almost 42 percent of the Class A SRO units were occupied by more than one person, and the average size of the Class A SRO households was 1.7 persons, as noted previously, a significant increase from 1.4 persons in 1991. These units were much more likely to be occupied by couples than were units in other types of buildings. The distribution of households by household size is presented in Table 4.10 and Figure 4.1.

**Table 4.9**
**Mean Size of SRO Households by Building Structure Class**
**and Mean Size of All Renter Households**
**New York City 1991 and 1993**

| Structure Class | Mean Household Size[1] | |
|---|---|---|
| | 1991 | 1993 |
| All SRO Households | 1.3 | 1.3 |
| Class A | 1.4 | 1.7 |
| Section 248 SRO | 1.3 | 1.2 |
| Rooming House | 1.2 | 1.2 |
| Hotel | 1.1 | 1.1 |
| All Renter Households | 2.5 | 2.5 |

Source: U.S. Bureau of the Census, 1991 and 1993 New York City Housing and Vacancy Surveys (HVSs) and 1991 and 1993 HVS-SRO Surveys.

[1] Mean household size is here computed by dividing the total number of persons by the total number of households.

**Table 4.10**
**Distribution of SRO Households by Household Size**
**and by Building Structure Class**
**New York City 1993**

| Structure Class | Household Size | |
|---|---|---|
| | 1 Person | 2 or More Persons |
| All SRO Households | 77.8% | 22.2% |
| Class A | 58.3% | 41.7% |
| Section 248 SRO | 85.5% | 14.5%* |
| Rooming House | 83.5% | 16.5%* |
| Hotel | 93.9% | ** |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO
        Survey.
*       Since the number of households is small, interpret with caution.
**      Too few households to report.

Figure 4.1
Distribution of SRO Households by Household Size
and Building Structure Class
New York City 1993



Source: U.S. Bureau of the Census, 1993 New York City
Housing and Vacancy Survey (HVS) and 1993 HVS-SRO
Survey

### Crowded SRO Households

SRO households are almost always crowded when the household consists of two or more members; the exceptions are provided by the relatively small number of two-room SROs which are only crowded when there are three or more members of the household. Altogether, it is estimated that about 16,500 persons, or 35 percent of the SRO population, were living in crowded SRO units (Table 4 11). Of the almost 10,000 persons other than the 6,700 householders living in crowded SRO units, 40 percent were the spouse or partner of the householder. Approximately 2,500 children under 18 years were living in crowded SROs.

Table 4.11
Composition of Crowded SRO Households
New York City 1993

| Relationship to Householder | Number of Persons | Percent (Excluding Householder) |
|---|---|---|
| All | 16,488 | |
| Self (Householder) | 6,698 | |
| Other than Householder | 9,790 | 100.0% |
| Spouse or Partner | 3,941 | 40.3% |
| Child | 3,621 | 37 0% |
| Child Under 18 | (2,521)* | (25.8%) |
| Other Relative | ** | 13.9%* |
| Non-Relative | ** | ** |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.
*    Since the number of persons is small, interpret with caution.
**    Too few persons to report.

### Length of Residence

The average length of time that an SRO household had lived in the same unit was 6.0 years in 1993 (Table 4.12).  Paradoxically, both the mean and median length of residence for households in the two "permanent" building structure classes (Class A and Section 248 SRO) were much lower than for households in the two "transient" building structure classes (rooming houses and hotels). The "permanent/transient" distinction embodied in the Multiple Dwelling Law is clearly long since obsolete in this context.  The relatively high mobility of the Class A SRO residents, indicated by their 1-year median length of residence, may reflect their relatively high incidence of crowding and their higher incomes (see below).  These factors may provide Class A SRO residents with both the incentive and the resources to move to better housing situations.

**Table 4.12**
**Length of SRO Residence in Years by Building Structure Class**
**New York City 1993**

| Structure Class | Mean Length of Residence (Years) | Median Length of Residence (Years) |
|---|---|---|
| All | 6.0 | 3.0 |
| Class A | 4.4 | 1.0 |
| Section 248 SRO | 4.6 | 2.0 |
| Rooming House | 7.6 | 4.0 |
| Hotel | 6.9 | 4.0 |

Source: U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.

## 4.2    Income, Labor Force Participation, and Dependency

The median income of SRO households in 1992 was $9,500 (Table 4.13). This was 32 percent lower than the median income of all single person renter households, which was $13,986 in 1992 (Table 4.14). Measured by the percentage of households with annual incomes below $10,000, the Section 248 residents, over three quarters of whom had incomes of less than $10,000, were worst off. Next from the bottom were hotel residents, over three fifths of whom had incomes below $10,000. At the other end of the spectrum were the residents of Class A SRO units, with a median household income of $15,000. Over a quarter of the Class A SRO residents had household incomes of $25,000 or over, but still almost 40 percent had household incomes below $10,000.

**Table 4.13**
**Distribution of Income of SRO Households by Building Structure Class**
**New York City 1993**

| Income Group[†] | All | Class A | Section 248 SRO | Rooming House | Hotel |
|---|---|---|---|---|---|
| All | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Less than $10,000 | 53.2% | 39.4% | 76.4% | 45.6% | 61.8%* |
| $10,000-$24,999 | 31.6% | 33.2% · | ** | 41.8% | ** |
| $25,000 and Over | 15.3% | 27.4%* | ** | ** | ** |
| Median | $9,500 | $15,000 | $6,144 | $10,000 | $7,700 |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.

[†]  Approximately 34 percent of SRO residents surveyed declined to provide data on their incomes. It is not known if the incomes of reporters and non-reporters are materially different, so the extent of any resulting bias in estimates of household income is also unknown.

*  Since the number of households is small, interpret with caution.

**  Too few households to report.

Looking simply at the median incomes of single-person households in different types of rental housing, it is possible to get a sense of the relative economic situation of SRO tenants (Table 4.14)). Single-person households in Class A SRO units are in the top three of the median income rankings, along with tenants in studios and unregulated units. Rooming house single-person households have a median income exactly half that of the Class A SRO single-person households and just slightly above the median income of rent-controlled single-person households. Hotel single-person households, with a median income of $7,608, are pretty far down the list, and Section 248 SRO single-person households are at the bottom, with a median income of $6,084, below even the median income of single-person *in rem* households. The low median incomes of the hotel and Section 248 SRO single-person households almost certainly reflect the low labor force participation rates of these two groups, with many hotel residents being of retirement age and many Section 248 SRO residents receiving public assistance (see below)

**Single Room Living in New York City**

**Table 4.14**
**Median Income of Single-Person SRO Renter Households by Structure Class,**
**of Single-Person Renter Households by Regulatory Status,**
**and of Single-Person Studio Renter Households**
**(Descending Order by Median Income)**
**New York City 1993**

| Household Category | Median Income |
| --- | --- |
| Studio | $21,000 |
| Unregulated | $20,000 |
| *Class A SRO* | *$20,000* |
| Post-1947 Stabilized | $18,300 |
| Pre-1947 Stabilized | $18,000 |
| **All Single-Person Renter Households** | **$13,986** |
| Mitchell-Lama Rental | $10,800 |
| *Rooming House* | *$10,000* |
| Rent-Controlled | $9,852 |
| **All Single-Person SRO Households** | **$8,400** |
| *Hotel* | *$7,608* |
| Other Regulated[†] | $6,456 |
| Public Housing | $6,408 |
| In Rem | $6,240 |
| *Section 248 SRO* | *$6,084* |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO
Survey.
[†]      Includes HUD-subsidized, Article 4, and New York City Loft Board regulated units.


### Sources of Income of SRO Households

Almost three quarters of SRO households' aggregate income is derived from earnings (Table 4.15), only a slightly lower percentage than for all single-person renter households. There are, however, quite sharp differences in the sources of household income of SRO residents living in different structure types. While over three quarters of rooming households' income and almost 88 percent of Class A SRO households' income comes from earnings, the Section 248 and hotel households obtain just a little over half of their income from earnings. For the Section 248 SRO residents, the second most important source of income is public assistance (33.7 percent); for hotel

residents, who are more likely to be elderly, the second most important source of income is Social Security (24.1 percent).

**Table 4.15**

**Distribution of Aggregate Income by Source for SRO Households by Structure Class and for Single-Person Renter Households**

**New York City 1993**

| Source of Income* | Structure Type | | | | | Single-Person Renter House-holds |
|---|---|---|---|---|---|---|
| | All SROs | Class A | Section 248 SRO | Rooming House | Hotel | |
| All | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Earnings | 73.2% | 87.5% | 51.4% | 76.5% | 54.6% | 78.4% |
| Interest | 1.5% | 1.8% | 0.3% | 1.0% | 1.4% | 2.5% |
| Social Security | 8.2% | 3.3% | 9.1% | 7.2% | 24.1% | 10.6% |
| Public Assistance | 13.6% | 6.4% | 33.7% | 11.3% | 9.5% | 3.6% |
| Pension | 2.0% | 0.9% | 2.7% | 2.5% | 4.6% | 3.6% |
| Other | 1.5% | 0.0% | 2.8% | 1.5% | 5.7% | 1.4% |

Source: U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.

* Each household's income is the sum of reported income from each of six possible sources for all members of the household. Percentages in this table are computed by dividing the aggregate income from a given source (i.e. Social Security) for each group by aggregate income from all sources for each group.

### Labor Force Participation, Unemployment, and Occupational Classification

The overall labor force participation rate of SRO residents aged 16 years or over was 60.6 percent, which was almost identical to the city-wide renter labor force participation rate of 59.3 percent in 1993 (Tables 4.16 and 6.20).

**Table 4.16**
**Labor Force Participation and Unemployment Rates of SRO Residents**
**Aged 16 Years and Over by Structure Class**
**New York City 1993**

| Structure Class | Labor Force Participation Rate | Unemployment Rate |
|---|---|---|
| All | 60.6% | 20.5% |
| Class A | 64.8% | 13.6%* |
| Section 248 SRO | 48.0% | ** |
| Rooming House | 65.6% | 27.7%* |
| Hotel | 41.2%* | ** |

Source:   U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO
          Survey.
*         Since the number of persons is small, interpret with caution.
**        Too few persons to report.

The labor force participation rate was lowest for residents of hotels (41.2 percent), who were much more likely to be elderly, and Section 248 SROs (48.0 percent), the two groups with the lowest median household incomes. Notwithstanding the fact that rooming house residents have the lowest rate of public assistance dependency (same as Class A SRO tenants) and the highest labor force participation rate, almost 37 percent of rooming house residents were living in poverty in 1993 (see Table 4.18). Only the Class A SRO residents had an unemployment rate (13.6 percent) comparable to the city-wide rate for renters of 15.0 percent in 1993.[44]

The occupational classification of SRO residents and all single-person renters aged 16 and over is presented in Table 4.17. Compared to all single-person renter households, SRO residents are over-represented in the Service, Precision Production, Craft and Repair, and Operator, Fabricator, Laborer occupations. As a corollary, SRO residents are correspondingly under-represented in the white collar occupations.

---

[44]U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey.

**Table 4.17**
**Distribution of SRO Residents and All Single-Person Renter Households**
**Aged 16 or Older by Occupational Class**
**New York City 1993**

| Occupational Class | SRO Residents | All Single-Person Renter Households |
|---|---|---|
| All | 100.0% | 100.0% |
| Executive, Administrative, Managerial | ** | 16.2% |
| Professional Specialty | 8.1%* | 25.2% |
| Technical, Sales, Administrative Support | 24.0% | 30.9% |
| Service | 34.8% | 14.0% |
| Precision Production, Craft, Repair | 11.2% | 5.5% |
| Operator, Fabricator, Laborer | 18.4% | 7.9% |
| Other | ** | ** |

Source:  U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.
\*         Since the number of persons is small, interpret with caution.
\*\*        Too few persons to report.

### Public Assistance Dependency and Poverty

It will be apparent from the earlier discussion of the incomes of SRO residents that as a group they are quite poor. This finding is reinforced by the statistics on public assistance dependency and poverty (Table 4.18). Over a third of all SRO households received some form of cash public assistance. Dependence was highest for the Section 248 SRO households, half of whom received public assistance. The poverty rate for all SRO residents (45.1 percent) was substantially higher than the city-wide poverty rate for renter households (29.9 percent), and 7 out of 10 Section 248 SRO households lived in poverty.[45]

---

[45] For single-person households, which accounted for 4 out of 5 SRO households, the applicable poverty threshold in 1993 was $7,299 for a person under 65 years and $6,729 for a person 65 years or older.

**Table 4.18**
**Public Assistance Dependency and Poverty Rates**
**of SRO Households by Structure Class**
**New York City 1993**

| Structure Class | Percentage of Households Receiving Public Assistance | Percentage of Households in Poverty |
|---|---|---|
| All | 33.7% | 45.1% |
| Class A | 27.9% | 40.3% |
| Section 248 SRO | 50.4% ⁱ | 70.5% |
| Rooming House | 27.9% | 36.6% |
| Hotel | 30.7%* | ** |

Source:   U.S. Bureau of the Census, 1993 New York City Housing and Vacancy Survey (HVS) and 1993 HVS-SRO Survey.
*        Since the number of households is small, interpret with caution.
**       Too few households to report.

## 4.3    Conclusions

The 18-percent decline in the number of SRO units between 1991 and 1993 was accompanied by about a 15-percent decrease overall in the number of SRO residents. In Class A SRO units the mean household size increased from 1.4 to 1.7 persons.

The SRO resident population was predominantly male and almost exclusively adult. Except for hotel units, where almost a third of the residents were 62 years or older, there were relatively few elderly SRO residents. Blacks and Hispanics made up 70 percent of the overall SRO resident population. Except for hotel units, over half of whose residents were white, whites accounted for only around one in five SRO residents. SRO residents had significantly lower levels of educational attainment than the general population of New York City renters, but higher than public housing and *in rem* renters.

Almost four out of five SRO households consisted of a single adult living alone, and more than one out of five SRO households consisted of two or more persons. One in ten SRO households consisted of a couple, without children, and around 5 percent of SRO households included at least one child. Couples were most likely to be found in the Class A SRO units. About 16,500 persons, 35 percent of the population of SROs, lived in crowded households.

The mean length of residency of SRO residents was 6 years. SRO residents in the two "transient" classes (rooming houses and hotels) had typically lived in their current units longer than residents in the two "permanent" classes (Class A and Section 248 SRO).

SRO residents, especially those in Section 248 SROs and in hotels, were quite poor, with an overall median household income of $9,500. The median income of the Section 248 SRO households was $6,144; and the median income of the hotel households was $7,700. The Class A SRO households, with a median income of $15,000, appear much better off than other SRO households, but 40 percent of them were still under the poverty level, and 28 percent were on public assistance. It is apparent that there was substantial dispersion of incomes within this group. Almost three quarters of all SRO households' aggregate income came from earnings, but this share was much lower for Section 248 SRO residents, who received a third of their incomes from public assistance, and for hotel residents, who received a quarter of their incomes from Social Security.

The labor force participation rate for SRO residents was 61 percent, roughly equivalent to the city-wide rate for all renters. However, the unemployment rate for SRO residents in the labor force was over 20 percent, much higher than the city-wide rate. SRO residents were more likely to be in blue collar occupations than all single-person renters. Over a third of all SRO households received cash public assistance, and over half of all Section 248 SRO households received cash public assistance. The poverty rate, at about 45 percent, for all SRO households was substantially higher than the city-wide poverty rate for all renters.

The SRO resident population was heterogeneous in many respects. Furthermore, much of the variation in the characteristics of the SRO population is associated with the types of SRO buildings they inhabit. A prototypical household in a Class A SRO unit would consist of a black or Hispanic man or woman of working age, possibly a couple, with an annual income of $15,000. By contrast, a resident of a Section 248 SRO would be more likely to be male, more likely to be single, much more likely to be on public assistance, and with an annual income of only around $6,000. A rooming house resident would be most likely black or Hispanic, more likely to be working or looking for work, and with an annual income of around $10,000. A hotel resident on the other hand would most likely be white, probably older, less likely to be working, and with an annual income of $7,700.