UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

JUANA SIERRA,

                                             Plaintiffs,

- against -

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF BUILDINGS AND PATRICIA
LANCASTER, in her capacity as COMMISSIONER
OF NEW YORK CITY DEPARTMENT OF
BUILDINGS, NEW YORK CITY DEPARTMENT
OF HOUSING PRESERVATION AND
DEVELOPMENT, and SHAUN DONOVAN, in his
capacity as COMMISSIONER OF NEW YORK
CITY DEPARTMENT OF HOUSING
PRESERVATION AND DEVELOPMENT,

                                             Defendants.

------------------------------------------------------------------x

**REPLY AFFIDAVIT OF MOON WHA LEE**

07 Civ. 6769 (JSR)

STATE OF NEW YORK   )
                               ) ss:
COUNTY OF NEW YORK  )

    **MOON WHA LEE,** being duly sworn, deposes and says:

    1.    I am the Assistant Commissioner for Housing Policy Analysis and Statistical Research of the New York City Department of Housing Preservation and Development ("HPD"). In preparing this affidavit, I have relied on my education, research, teaching and professional experience in housing, urban studies and planning and statistical analysis. A copy of my curriculum vitae is attached as Exhibit A.

    2.    I submit this supplemental affidavit, which is based upon my personal knowledge of information contained in the 2005 New York City Housing and Vacancy Survey in further support of defendants' motion to dismiss the complaint and in particular, to respond to

the statements made in the Affidavit of Rebecca Widom, dated January 28, 2008 ("Widom Aff."); the affidavit of Krista Hanson, dated January 25, 2008 ("Hanson Aff."); the affidavit of Stephan Russo, dated January 24, 2008 ("Russo Aff."); the affirmation of Jim Provost, dated January 24, 2008 ("Provost Aff."); and the affirmation of Christopher Schwartz, dated January 24, 2008 ("Schwartz Aff.").

3.  At a hearing on January 14, 2008, this Court commented that plaintiff had presented no evidence to establish her standing to challenge Section 27-2076(b) of the New York City Administrative Code ("the Housing Code"), which restricts children under the age of sixteen from living in a rooming unit operated for profit. See Transcript of Hearing, dated January 14, 2008 ("Tr. 1/14/08") at page 24 (attached as Exhibit B). Despite a further opportunity to establish standing provided by the Court, none of the additional affidavits submitted on behalf of plaintiff identify any vacant available rooming unit plaintiff can afford. Moreover, plaintiff's own testimony is that it is "very difficult for her to find anything." See Tr. 1/14/08 at 12.

4.  This is confirmed by the very low vacancy rate[1] of 2.30% reported for all rental units with an asking-rent between $500 and $699, based on 2005 HVS data. See Moon Wha Lee, Selected Findings of the 2005 New York City Housing and Vacancy Survey, dated February 10, 2006, Table 6 (a copy of the table is attached as Exhibit C). The vacancy rate falls to just 1.59% in 2005 for all rental units in her price range of up to $600 per month. Even so, as I described in my earlier affidavit, sworn on January 2, 2008 (¶¶ 6, 7), the vast majority of those

---

[1] The vacancy rate is the percentage of rental units that are unoccupied or not rented at a given time, and calculated by dividing vacant available for rent units that not dilapidated by the sum of vacant available for rent units that are not dilapidated plus all renter-occupied units (dilapidated and not dilapidated).

vacant rental units in her price range (less than $600) do include a complete kitchen and bath for exclusive use and thus are <u>not</u> rooming units. The number of vacant available <u>rooming</u> units in her price range is so drastically further limited that I must conclude, based on my knowledge of the New York City housing market, that it is virtually impossible in 2008 that plaintiff will find affordable rooming units for herself and her family, and there is a much greater likelihood that she will find an affordable apartment instead.

A. **Affidavit of Rebecca Widom**

5.  In her affidavit, Rebecca Widom, who completed some relevant coursework but does not hold a doctorate in housing and urban studies or planning or statistical analysis, admitted that she was not familiar with all of the 2005 HVS content and procedures. <u>See</u> Widom Aff., ¶ 11. She relied for her analysis on basic data tables, on a very limited number of data items, pre-prepared by the Census Bureau, rather than the micro-data (computerized) files that contain complete data on all items the Census Bureau collected. These are publicly available[2] and allow more precise and detailed data analyses using a computer. In addition to not using the available computerized data, Widom made conclusions about availability of vacant SRO-type units without having data that substantiates her conclusions. Mastery of the statistical specifications concerning reliability of data is particularly essential when data from a sample survey are used for housing analyses. Housing analysts must be very careful not to compromise any of the statistical principles and guidelines for correctly drawing conclusions based on data from a sample survey, such as the HVS.

6.  Contrary to Widom's assertion (Widom Aff. at ¶ 5), all data and conclusions cited in this affidavit and my earlier affidavit are based on data from the 2005 HVS,

---

[2] The web link is http://www.census.gov/hhes/www/housing/nychvs/2005/userinfo2.html.

conducted by the U.S. Bureau of the Census, using a randomly drawn sample of 18,516 housing units representing all the housing units in the City. They are not speculative. The HVS is required by New York state rent regulation laws and the New York City Administrative Code. Its basic purpose is to establish whether the City continues to experience a housing emergency, defined as a rental vacancy rate of less than 5.00%. The reliability of the survey is specified by contract between the City and the Census Bureau such that, if the overall rental vacancy rate were to be 3.00 percent, the standard error of the estimate may not be more than 0.25%. This is an extremely high standard of reliability. Survey results must be highly reliable and highly credible because the outcome of the survey affects the fate of the owners and renter households of some 1,087,000 rent stabilized and rent controlled housing units reported in 2005.

7. However, Widom did not use HVS data with a clear understanding of sampling and non-sampling errors of the data, as specified in the *2005 New York City Housing and Vacancy Survey: Sample Design, Estimation Procedures and Accuracy Statement*, which the Census Bureau released on its website.[3] Widom ignored these rules and guidelines by estimating the number of SRO-type units to be 1,153 based on only six sample cases. Widom's estimate of the number of vacant SRO-type units has a sampling error of +/- 1083 based on a 95% confidence interval.[4] In another instance, the statistical sampling error for the 6.9 percent vacancy rate she calculated (Widom Aff., ¶ 14) was +/- 6.3% based on 95% confidence interval, both of which are much too large to be reliable in making definitive conclusions. Her estimates and conclusions are completely unreliable, and should be set aside.

---

[3] The web link is http://www.census.gov/hhes/www/housing/nychvs/2005/s&a2005_2.pdf.

[4] A confidence interval is a measure of an estimate's statistical reliability.

8. Widom (Widom Aff., ¶ 6) compares two very different categories of units: <u>vacant</u> rooming units and <u>vacant plus occupied</u> rooming units. The number of vacant rooming units is extremely small, while the number of vacant plus occupied rooming units is much greater. I discussed the number of vacant rooming units with great caution because it is based on extremely few sample cases.

9. Contrary to Widom's assertion (Widom Aff., ¶ 7), the information I provided was clear. In my first affidavit, I reported that the median rent for all vacant plus occupied rooming units was $644, as some evidence of the general lack of affordability of rooming units for plaintiff. The median asking rent for vacant available rooming units must be substantially higher than $644. According to the 2005 HVS, the median asking rent for all vacant available rental units was $1,000, which is $150 or 17.6 percent higher than the $850 median rent for all occupied and vacant available rental units together.

10. In further response to the Court's inquiry, the range of asking rents for vacant available rooming units is $250 to $5,846. Only 5 sample cases had rents below $600. One sample case with an asking rent of $250 is almost certainly an extremely small sleeping room with a bed in a railroad type SRO found on the upper west side of Manhattan in a poorly maintained building, and is only suitable for single occupancy. Such a rooming unit could not physically house the plaintiff and her two children. The other vacant available rooming units include expensive residential hotels in luxury neighborhoods (at the Helmsley, perhaps), which plaintiff cannot afford.

11. Widom calculated from the Census Bureau's basic tables the total number of vacant for rent SRO units to be 1,153. <u>See</u> Widom Aff., ¶ 13. In making this calculation, Widom relied on two structure class categories: "Tenement Bldg – Single Room Occupancy"

and "1-2 Family Conv. To Rooming House." Upon review of the micro-data in these two structure class categories, I found that two of the six sample cases for these structure class categories had complete kitchen and bath facilities for exclusive use, and should have been excluded because these units do not fall within the definition of rooming unit as defined by Section 27-2004(15). Assuming for purposes of argument that are her estimate is reliable, and then accounting for this error, the number of vacant available for rent rooming units should be reduced from 1,153 to 789 or only 4 sample cases, one of which is the same $250 unit in a very small sleeping room for only a single individual that I described before.

12. In addition, upon information and belief, Widom's calculation of the number of vacant for rent SRO units could not have excluded so-called SRO-type units that are operated by not-for-profits such as Goddard Riverside, typically for supportive housing and social services. Section 27-2076(b) does not prohibit families with children from living in these units.[5] For instance, the New York City Department of Homeless Services ("DHS") reports that in FY 2005, 7,973 SRO-type supportive housing units were operated by not-for-profits. Upon information and belief, DHS is just one of several agencies that contract with not-for-profits for SRO-type housing. If we further exclude such units that are not prohibited by Section 27-2076(b), the number of vacant available for rent rooming units that plaintiff can afford is virtually none.

13. In contrast to the negligible supply of affordable, vacant available units for this plaintiff, the current demand for those units is overwhelming. According to the FY 2007 Mayor's Management Report (latest available) 10,165 families and 21,897 single adults entered

---

[5] However, upon information and belief, state and federal funding programs exclude families with children from eligibility.

the Department of Homeless Services (DHS) shelter services system in FY 2007, all of whom are seeking permanent affordable housing. See Excerpt of Mayor's Management Report, September 2007 (attached as Exhibit D). The result is that the chances of this plaintiff finding vacant rooming units for her family and herself are remote.

**B.    Affidavit of Stephan Russo**

14. In his affidavit, Stephan Russo, Executive Director of Goddard Riverside Community Center, provides an overview of the programs and services offered by his organization, the information on the rate of increase in SRO rents, and the demand for SRO housing. As to the demand for SRO housing, the increase of families moving into SRO units observed in the last ten years (Russo Aff., ¶ 12), further demonstrates that plaintiff is unlikely to find a rooming unit based upon this increased demand. Although Goddard Riverside manages 338 SRO units, it apparently has no vacant unit to offer plaintiff and her family.

**C.    Affidavit of Krista Hanson**

15. In her affidavit, Krista Hanson, who works under Widom, reported the total number of Class B units to be 25,692, based on data compiled from a list of SRO buildings maintained by the West Side SRO Law Project and HPD's website. Setting aside the methodology employed, this fact does not provide any information as to the number of vacant and affordable rooming units available for rent to the plaintiff.

**D.    Affirmations of Christopher Schwartz and Jim Provost**

16. The affirmations of Christopher Schwartz and Jim Provost, both attorneys for legal services organizations, provide anecdotal information about their clients who are living in SRO units. However, they offer no information as to the number of vacant and affordable rooming units available for rent to the plaintiff.

17.  Based on the foregoing, and my earlier affidavit, plaintiff has not affirmatively established that she and her family live or will likely live in a rooming unit in the near future, and as a result, her lawsuit must be dismissed.

*[signature]*
**MOON WHA LEE**

Sworn to before me this
11th day of February, 2008

*[signature]*
NOTARY PUBLIC

ALYSON L. LANZER
Notary Public State of New York
No. 02LA6106756
Qualified in New York County
Commission Expires March 15, 2008