81FSIEC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  JUANA SIERRA,

4                  Plaintiff,

5            v.                        07 CV 6769

6  THE CITY OF NEW YORK,

7                  Defendant.

8  ------------------------------x
                                   New York, N.Y.
9                                  January 14, 2008
                                   4:20 p.m.
10
   Before:
11
                       HON. JED S. RAKOFF,
12
                                       District Judge
13
                       APPEARANCES
14
   URBAN JUSTICE CENTER
15      Attorneys for Plaintiff
   AMI T. SANGHI
16 LESLIE T. ANNEXSTEIN

17 WEST SIDE SRO LAW PROJECT
        Attorney for Plaintiff
18 MARTI WEITHMAN

19 MICHAEL A. CARDOZO, Corporation Counsel
   for the City of New York
20      Attorney for Defendant
   JERALD HOROWITZ
21

22 Also present:

23 YARROW WILLMAN-COLE

24 Spanish Interpreter

25

81FSIEC

1          (Case called)

2          (In open court)

3          THE DEPUTY CLERK:  January 14, 2008, Juana Sierra v.

4    City of New York.  Counsel, please state your appearances for

5    the record.

6          MS. SANGHVI:  Ami Sanghi for Urban Justice Center for

7    plaintiff Sierra.

8          MS. ANNEXSTEIN:  Leslie Annexstein, Urban Justice

9    Center, for plaintiff Sierra.

10          MS. WEITHMAN:  Martha Weithman, West Side SRO Project,

11    for plaintiff Sierra.

12          THE COURT:  Is this Ms. Sierra?

13          MS. WEITHMAN:  Yes, your Honor.

14          THE COURT:  Do we have a translator for her?

15          MS. WEITHMAN:  Yes, we do.

16          MR. HOROWITZ:  Jared Horowitz, Corporation Counsel for

17    the City of New York for the defendant.  I also have with me

18    deputy agency counsel Carol Steinberg sitting with me and the

19    witness, Moon Wha Lee, is sitting behind me.

20          THE COURT:  Okay, very good.

21          All right, just for the purpose of the record, when

22    this cases was first brought, Ms. Sierra, the plaintiff, was

23    then living in a so-called SRO unit with her child, and was

24    facing eviction, and the lawsuit, which was brought both

25    against her landlord and against the City of New York and

81FSIEC

1    various agencies in the City of New York, challenged the New

2    York regulation, New York City Housing Maintenance Code Section

3    27-2076B, which prohibits children from living in single room

4    occupancy units on the ground that it constitutes

5    discrimination on grounds of familial status in violation of

6    the federal Fair Housing Act.

7           It early on became obvious to the Court that a

8    substantial issue needed to be briefed, namely, whether there

9    was a problem under the anti-injunction provision of federal

10   law, because part of what was being asked for was in effect a

11   stay of the eviction proceedings, and I determined that the

12   anti-injunction act did prohibit the actions as far as the

13   landlord was concerned, but not so far as the City was

14   concerned.

15          Meantime, the plaintiff entered into a settlement with

16   the landlord by which she vacated the premises in return for

17   $19,000, and thus the case was ultimately dismissed on consent

18   of all parties, including the City, with respect to the

19   landlord.

20          Since the plaintiff is no longer facing eviction, the

21   City then moved to dismiss the lawsuit as to it on grounds of

22   lack of standing in the sense that there was no actual

23   controversy sufficient to meet Article 3 standards, and that is

24   the motion that we will hear today.

25          In connection with that motion, in addition to the

81FSIEC

1   legal briefs from both sides, I received an affidavit from

2   Ms. Sierra and an affidavit from Dr. Lee, and I determined that

3   I did not need to have an evidentiary hearing, but that I might

4   have to address for my own clarification some modest questions

5   to them, and I think we ought to deal with that first so that

6   the argument then can be made by counsel in light of what

7   emerges from the very brief questioning that I have for the two

8   witnesses, and I appreciate their being here today.

9           Maybe we ought to start with Dr. Lee, because

10  Ms. Sierra may want to remain here in any event, but Dr. Lee,

11  although he's more than welcome to remain, may also want to go

12  home.  So, Dr. Lee, why don't you come on up?

13  MOON WHA LEE,

14      called as a witness by the Court,

15      having been duly sworn, testified as follows:

16          THE COURT:  Please be seated.

17  DIRECT EXAMINATION

18  BY THE COURT:

19  Q.  So I appreciate the benefit of your affidavit, but I had a

20  couple of questions.  For the record, the witness' full name is

21  Moon Wha Lee.  He is Assistant Commissioner for housing policy

22  analysis and statistical research of the New York City

23  Department of Housing Preservation and Development, a position

24  he has held since 1992, and he received a PhD in urban planning

25  from Columbia University in 1983.

81FSIEC                          Lee - direct

1        Now, in paragraph 5 -- do you have a copy of your

2   affidavit?

3   A.  No, I don't have it, sir.

4        THE COURT:  Can counsel please hand a copy to the

5   witness?

6   Q.  Did you draft this, by the way, or did counsel draft it for

7   you?

8   A.  Mostly I drafted myself, sir.

9   Q.  All right.  So on paragraph 5, you say, quote, "The median

10  rent for all occupied and vacant rooming units as a whole in

11  2005 was $644."  Do you see that?

12  A.  Yes, sir.

13  Q.  And then you say later in that paragraph, that in her

14  affidavit, quote, "Plaintiff stated the monthly rental payment

15  of $522.15 was affordable to her."  Do you see that?

16  A.  Yes, sir.

17  Q.  And you say, quote, "Based upon this statement, she could

18  not afford to live in a rooming unit today, even if such units

19  were available," close quote.  Do you see that?

20  A.  Your Honor, yes.

21  Q.  Now, what I don't understand is, a median rent means that

22  there's a range.  So one could not conclude that she couldn't

23  afford an SRO unit unless one knew the range, true?

24  A.  Yes, sir.

25  Q.  Do you know the range?

81FSIEC                          Lee - direct

1   A.  I don't have numbers now.

2   Q.  Okay.  And the other question I had is -- two more

3   questions, really.

4           The difference between an SRO unit and a non-SRO unit

5   is that the SRO unit doesn't have kitchen and bathroom

6   facilities, true?

7   A.  Yes, sir.

8   Q.  So if everything else was equal, wouldn't you expect the

9   rent of the SRO unit to be lower?

10  A.  I don't have rent information vacant available rooming

11  units, because such numbers are so small, but not necessarily

12  big rent for vacant available rooming units, it's the lower,

13  because usually asking rent for vacant unit is much higher than

14  contract rent for occupied units, sir.

15  Q.  Why is that?

16  A.  Because asking rent is rent information provided by either

17  owner or managing agent or supers and so on, and if unit is

18  vacant, owners usually expect higher rent than occupied unit.

19  Q.  Why?  In other words, I hear what you're saying and it's

20  important, but I don't understand why that would be so.  Why

21  would one -- obviously, this is ultimately an issue of supply

22  and demand, though not exclusively.

23  A.  Asking rent is what owners, managing agents and supers once

24  have it, but on the other hand, contract rent is rent specified

25  in lease contract.  So usually asking rent, asked by owner,

81FSIEC                          Lee - direct

1   managing agent, super is higher.  Ultimately, contract rent

2   usually is lower than asking rent, because after negotiation

3   they can have contract.

4   Q.  But I'm not sure you're focusing on my question.  I

5   understand the asking is higher than the ultimate rent, but

6   what I'm saying is, if you had two apartments that were

7   essentially identical in terms of location, amount of space,

8   everything except that one included a kitchen and bathroom and

9   the other did not, would not you expect that the price of the

10  SRO unit would be lower, the rent price?

11  A.  It may be conceivable, but rent for SROs or room units not

12  necessarily lower than regular apartment.  Therefore, also

13  start off also for short-term occupancy, sometimes not monthly

14  rent but weekly rent added up by how many weeks, months,

15  they're staying.  So not necessarily they are lower.  Sometimes

16  they could be higher.

17          For example, if you have residential apartment and the

18  long-term residential hotel, they're not necessarily lower, but

19  sometimes they could be higher than rent for regular apartment.

20  I don't have data in my hand.

21          THE COURT:  Okay.  All right.  Those are the questions

22  I had.  Thank you so much.  You may step down.

23          (Witness excused)

24          THE COURT:  Now, let's get Ms. Sierra on the stand

25  with the translator.

81FSIEC                              Lee - direct

1              Let me first ask the interpreter to identify herself

2     for the record.

3              THE INTERPRETER:  My name is Yarrow Willman-Cole.

4              THE COURT:  Are you a Court-certified interpreter?

5              THE INTERPRETER:  No.

6              THE COURT:  What's your training?

7              THE INTERPRETER:  I'm actually a tenant organizer, but

8     I'm fluent in Spanish.

9              THE COURT:  So you're associated with the plaintiff's

10    counsel here?

11             THE INTERPRETER:  I don't work on the case, but I work

12    in the same office.

13             THE COURT:  But you are, if you will, ideologically

14    aligned with them, yes?

15             THE INTERPRETER:  I work in the same office.

16             THE COURT:  In the same office, on similar matters,

17    from a tenant's point of view?

18             THE INTERPRETER:  Sure.

19             THE COURT:  Tell me your background.  How did you

20    become fluent in Spanish?

21             THE INTERPRETER:  I actually studied Spanish, it was

22    my major in college.

23             THE COURT:  Where did you go to college?

24             THE INTERPRETER:  I went to Ohio State.

25             THE COURT:  Okay.  You didn't study football?

81FSIEC                        Lee - direct

1              THE INTERPRETER:  I also lived abroad for a number of

2      years.

3              THE COURT:  Where?

4              THE INTERPRETER:  Spain, Central America, Costa Rica

5      and Honduras.

6              THE COURT:  For how long?

7              THE INTERPRETER:  For two-and-a-half years.

8              THE COURT:  Are you confident you can fairly and

9      accurately interpret these proceedings?

10             THE INTERPRETER:  Yes.

11             THE COURT:  Were you the interpreter on the affidavit?

12             THE INTERPRETER:  Yes.

13             THE COURT:  Please raise your right hand.  Do you

14     swear to accurately and completely interpret from English into

15     Spanish and Spanish into English the questions put to the

16     witness and the answers given?

17             THE INTERPRETER:  Yes, I do.

18             THE COURT:  All right.  Now ask the witness, if you

19     will, to raise her right hand.

20      JUANA SIERRA,

21         called as a witness by the Court,

22         having been duly sworn, testified as follows:

23             THE COURT:  Okay, please be seated.

24     DIRECT EXAMINATION

25     BY THE COURT:

81FSIEC                          Sierra - direct

1   Q.  So, Ms. Sierra, thank you very much for your affidavit.

2   What is the present status as of today of your search for an

3   apartment?

4        THE INTERPRETER:  She said she would like to live in

5   Manhattan.

6   Q.  Have you found an apartment?

7        MR. HOROWITZ:  I'm sorry, I can't hear the

8   interpreter.

9   A.  Not yet, no.

10       THE COURT:  You'll have to speak louder so counsel can

11  hear you.

12       THE INTERPRETER:  Sure.

13       THE COURT:  The answer is, "not yet."

14  Q.  Do I understand that you are able to spend something like

15  $522 or so on rent?

16  A.  Yes, but I don't, I can't find any place with that amount

17  that I was paying before.

18  Q.  How did you calculate that amount?

19       THE INTERPRETER:  She doesn't understand the question?

20  Q.  Who drafted your affidavit?

21       THE INTERPRETER:  Her lawyer.

22  Q.  Which lawyer?

23       THE INTERPRETER:  Marti, she says.

24       THE COURT:  Meaning?

25       MS. WEITHMAN:  That's me, your Honor.

81FSIEC                          Sierra - direct

1    Q.  Where are you living now?

2           THE INTERPRETER:  She lives at 135th West 238th Street

3    in the Bronx.

4    Q.  And is that a residence that you rent or is it a residence

5    that belongs to a friend or what?

6           THE INTERPRETER:  She's living with her son.

7    Q.  And so that's his apartment?

8    A.  Yes.

9    Q.  And, now, you have a young child, is that it?

10   A.  Yes.

11   Q.  One or several?

12          THE INTERPRETER:  She has two younger children; one

13   that's 15 and one that's 6.

14   Q.  Now this, the person whose apartment you're living in is an

15   older son?

16   A.  Yes.

17   Q.  How old is he?

18   A.  He's 23.

19   Q.  What does he do for a living?

20   A.  He works in a kitchen.

21   Q.  What kind of apartment does he have?

22   A.  An apartment of two bedrooms.

23   Q.  Now, are you presently employed?

24   A.  Not right now.

25   Q.  So you say in your affidavit, quote, "I have a low income

81FSIEC                          Sierra - direct

1   and my rent for two rooms was $522.15, which is affordable for

2   me."  Is that still affordable for you?

3   A.   Yes.

4   Q.   What is the most you think you could pay for an apartment?

5   A.   The most probably 600.

6   Q.   How are you presently conducting your search for a new

7   apartment?

8            THE INTERPRETER:  She doesn't understand the question,

9   your Honor?

10  Q.   I think you said you were looking for a new apartment?

11           THE INTERPRETER:  She's saying yes, she is looking,

12  because the Bronx is too far since her children are going to

13  school in Manhattan.

14  Q.   So my question is, how are you going about looking for an

15  apartment?

16           THE INTERPRETER:  She's saying that she was asking

17  around, but then she said that she was working before, and that

18  at such a low income that it makes her very difficult for her

19  to find anything.

20  Q.   Well, I understand that, but what I'm unclear about is when

21  you say you're asking around, are you still continuing to look

22  for an apartment now?

23           THE INTERPRETER:  She said yes to your question.

24  Q.   And if a single room occupancy unit was available for $600

25  or less, would that be an apartment you would consider moving

81FSIEC                          Sierra - direct

1  into?

2  A.  Yes.

3        THE COURT:  All right.  Thank you very much, you may

4  step down.

5        (Witness excused)

6        THE COURT:  All right, I'm ready to hear oral argument

7  from counsel, beginning with counsel from the City.

8        MR. HOROWITZ:  Good afternoon, your Honor.  Your

9  Honor, because of the plaintiff's vacatur of the rooming unit,

10  there's no longer a case or controversy before the Court.

11        THE COURT:  Why not?  She wants to move with her two

12  young children into an apartment.  She would be perfectly happy

13  to move into an SRO for $600 or less, but she is effectively

14  prohibited by law from doing so because if she does so, she

15  will be in violation of New York City, of the very New York

16  City ordinance that she is challenging.  What more does she

17  need?

18        MR. HOROWITZ:  But, your Honor, previously before the

19  Court, the plaintiff had two rooming units for $522.  Now, just

20  to seek one rooming unit, which, by the way, can't house three

21  people, would cost, assuming, you know, the facts that she's

22  presenting, that she could even find a rooming unit for $522,

23  it still would not be sufficient for the living requirements

24  for herself and her family.

25        THE COURT:  That's not her testimony.  I don't for

81FSIEC

1    these purposes make any credibility determinations.  She says

2    she'd be happy to move into that.  It's clear from what your

3    expert said that he doesn't have information as to the full

4    range of rents, he only knows the average rent.  It's clear

5    that she'd be willing to go up to $600, although she is low

6    income, she now has a little money, because she just got

7    $19,000 from her beloved former landlord, and so the situation

8    she's presented with is that one segment of the otherwise

9    available housing stock is not available to her by virtue of

10   the regulation of the City.

11         MR. HOROWITZ:  But, your Honor, the point I'm trying

12   to make is simply that while she has an interest in -- she's

13   expressed an interest, testified that she has an interest in

14   obtaining an SRO unit, the defendant's position is that it's

15   economically prohibitive because she requires two rooming

16   units, and she hasn't established that she can afford two

17   rooming units.  A rooming unit can physically only house one or

18   possibly --

19         THE COURT:  What was your understanding of the rent

20   she was paying at the previous place that she was living; $520,

21   right?

22         MR. HOROWITZ:  That's correct, for two rooming units.

23         THE COURT:  So we know from that, that there are

24   rooming units available at that price, right?

25         MR. HOROWITZ:  No, we don't, your Honor.

81FSIEC

1          THE COURT:  Oh?  This was a unique landlord who was

2     giving a special bargain to anyone he could then induce to come

3     in in violation of the law that he would thereafter evict?

4          MR. HOROWITZ:  Your Honor, I can't speculate as to how

5     she came about getting those two rooming units.

6          THE COURT:  What's your basis for believing there was

7     no such unit available other than the one she actually was

8     living in?

9          MR. HOROWITZ:  Your Honor, all defendants are saying,

10    based upon Moon Wha Lee's affidavit, Dr. Lee's affidavit is

11    that the median rent for one unit is $644.

12         THE COURT:  But the question I put to him, and I agree

13    that that was very helpful, but he was frank to tell me that he

14    doesn't know the range.  The median is meaningless without the

15    range.

16         MR. HOROWITZ:  Well, your Honor, we're not suggesting

17    that there aren't rents that are less than $644.

18         THE COURT:  Well, that's good, because the median by

19    definition means there must be.

20         MR. HOROWITZ:  That's correct.  What we are saying,

21    and this is the thrust of the defendant's argument, is

22    possibilities.  There is a very slim possibility that -- and

23    Mr. Lee's conclusion was highly improbable -- that the

24    defendant -- I'm sorry, that the plaintiff would be able to get

25    another rooming unit, for two reasons:  One is affordability,

81FSIEC

1    and second, is the available units.  There aren't many units.

2    Dr. Lee's testimony or his affidavit suggests that the number

3    of rooming units is so small, I believe he mentioned that in

4    his testimony before your Honor today, it's so small that you

5    can't even really measure it properly because of it, and, your

6    Honor, I'd like to --

7            THE COURT:  Well, I'm not sure what -- I don't believe

8    he ever gave me a number, either in this affidavit or in his

9    testimony.  What he says, and you're referring to paragraph 4

10   of his affidavit, is that according to the 2005 New York City

11   housing and vacancy survey, which is the latest survey

12   containing data on occupied and vacant rental housing in New

13   York City, the number of vacant available rooming units, which

14   is what he's referring to or what we've been calling SRO

15   rooming units, quote, "is too small to be used in a

16   statistically reliable manner, considering sampling and

17   non-sampling errors," and I inferred from that that, therefore,

18   any generalizations about this are highly speculative on your

19   part.

20           MR. HOROWITZ:  Well, no, your Honor.  The statistics

21   relating to the number of apartments as opposed to rooming

22   units, that is can be measured, and those statistics are

23   provided in paragraphs 6 and 7 of -- and also 5, I guess.  I'm

24   sorry, 6 and 7 for the vacant rental units.

25           THE COURT:  I mean, this was why I put the question.

81FSIEC

1   In those two paragraphs he says that there were 7,318 vacant

2   available rental units of all types in the city with a monthly

3   asking rent less than $600.  The vast majority of these units

4   were regular apartments, not rooming units.  So it follows from

5   that that there is some number of rooming units that are vacant

6   that have a monthly asking rent of less than $600, correct?

7       MR. HOROWITZ:  That's correct.

8       THE COURT:  So, and she says those would be something

9   she'd like to consider.

10      MR. HOROWITZ:  Your Honor, the point I'm trying to

11  bring out is probabilities of that happening are slim to none.

12  Your Honor, the --

13      THE COURT:  So slim to none that she managed to find

14  in actuality two rooms for $522.  *Mirabile dictu*, as you would

15  say.

16      MR. HOROWITZ:  Your Honor, if I may, the burden which

17  is on the plaintiffs to establish standing also requires that

18  the controversy be of immediacy and reality.  Beyond even

19  finding a rooming unit which you and I have been arguing about,

20  there's also the inability that the defendant has to issue a

21  violation pursuant to --

22      THE COURT:  No, I don't agree with that at all.  Your

23  point about the number of units is not without some force and I

24  want to hear from your adversary on that, although I'm

25  skeptical of the argument.  The argument about violation seems

81FSIEC

1    to me to be, forgive my putting it this way, sufficiently

2    lacking in merit as not to require a response.

3        She is harmed by the fact that assuming that there are

4    such units realistically available, assuming, therefore, the

5    contrary of your first argument, that she can't possibly

6    consider, realistically consider moving in, because it would be

7    a violation of law. You seem to be making the argument in your

8    papers that she should first break the law, then the landlord

9    should break the law, and only after the City finally enforces

10   the law does she have standing to challenge the law. I know of

11   no case that supports that proposition.

12       MR. HOROWITZ:  But, your Honor --

13       THE COURT:  That she has to be a law-breaker first and

14   the landlord has to be a law-breaker second, before she could

15   have standing to challenge this ordinance. That would be an

16   extraordinary view of Article 3 standing.

17       MR. HOROWITZ:  Well, your Honor, in her affidavit she

18   says that the basis upon which she's challenging the statute is

19   she doesn't want to risk eviction.

20       THE COURT:  Yes.

21       MR. HOROWITZ:  Again, and if possibly when --

22       THE COURT:  She doesn't want to put herself in the

23   position of breaking the law. And that's why she's bringing

24   this challenge.

25       MR. HOROWITZ:  But, your Honor --

81FSIEC

1          THE COURT:  Are you saying, I mean, for example,

2     supposing, let us assume contrary to the fact, supposing

3     99 percent of all housing units in her price range available to

4     her were SRO's, and she very much would have been happy to live

5     in one of those, in my hypothetical, innumerable available

6     units, but she could not go into those units because she knew

7     the law said that she was, if she did so, she'd be violating

8     the law.  And you're saying in that situation, before she would

9     have standing to bring an action under the Fair Housing Act,

10    she would have to say, notwithstanding that, I'm prepared to be

11    a law-breaker, I'll bet I could find a landlord who will also

12    break the law with me, and it will only be when the City issues

13    a violation that I'll be able to challenge this law.  That

14    cannot be the law standing, counsel.

15         MR. HOROWITZ:  Well, your Honor, the statute, the way

16    the statute is drafted, the statute applies to the landlord,

17    not to the tenant.  The statute directs that in the event

18    that -- well, first of all, gives the City the discretion to

19    impose a violation for the statute --

20         THE COURT:  So you're saying you can't challenge a law

21    that violates, a city ordinance that violates federal law

22    because the City sometimes will choose to enforce its laws and

23    sometimes won't?  That can't be the law, either.

24         MR. HOROWITZ:  Your Honor, all we're talking about is

25    contingencies, and what we're saying is that there are

81FSIEC

1    contingencies to the enforcement of this statute against the

2    plaintiff which haven't yet happened yet, and that's -- there's

3    not a sufficiently concrete controversy before the Court,

4    because, number one, the plaintiff isn't in a rooming unit, and

5    we don't even know whether she can get a rooming unit.

6             THE COURT:  I see.  I mean, this is in effect a facial

7    challenge and basically what she's saying is you have through

8    the ordinance excluded her from some segment of the available

9    housing units that she otherwise would like to consider.  In

10   terms of the Fair Housing Act, you are in effect making

11   unavailable to her a dwelling because of familial status.

12   That's her argument.

13            Now, I agree with you that if the housing supply

14   consisted of 5 million non-SRO's and one SRO, something that is

15   that remote might not supply sufficient standing to bring a

16   facial challenge.

17            MR. HOROWITZ:  Well, that's what we have here, your

18   Honor.

19            THE COURT:  That's your first argument.  We're past

20   your first argument, we're on to your second argument.  The

21   first argument I'm going to hear from your adversary in a

22   minute.  But your fallback argument is, even if that's not so,

23   it's not until she actually gets violated that she has

24   standing.  I just don't see that at all.

25            MR. HOROWITZ:  Well, your Honor, the cases that talk

81FSIEC

1   about it, which are cited in our reply brief in particular,

2   have -- do present cases where, for instance, in the Golden v.

3   Zwickler case, which was a facial challenge, the Court

4   ultimately rejected the challenge because of, that the

5   possibility that this -- the plaintiff there, who was Zwickler,

6   who was a Congressman who then took a position as a Supreme

7   Court judge wasn't in a position, that it was most unlikely

8   that he would again be subject to the statute.

9       The question is what is the likelihood that this

10  plaintiff is going to be subject to the statute again, and what

11  we're saying is that the burden is on the plaintiff to

12  establish that, and the only statement we have is in her

13  affidavit saying that she fears that she won't be able to get

14  into -- she wants an SRO, she'd like to be there, but we have

15  no information provided of the likelihood that she will be able

16  to get into an SRO unit.

17      THE COURT:  All right, let me hear from your

18  adversary.  We'll come back to you.  Thank you very much.

19      MS. SANGHVI:  Thank you, your Honor.

20      THE COURT:  So don't waste any time on the second

21  argument, but the first argument seems to me to be at least one

22  that I need to consider.  If, to take the opposite of the hypo

23  I gave to your adversary, if there was only one SRO unit in her

24  price range in New York, which was the one that she's now

25  agreed in her settlement with her landlord not to occupy, she

81FSIEC

1    wouldn't have standing, would she?

2          MS. SANGHVI:  I believe in that situation if there was

3    simply one SRO in all of Manhattan, then perhaps that harm

4    would be remote.  But in our understanding, there are many SRO

5    units that are available.  We're co-counsel with the West Side

6    SRO Law Project, they have expertise in this area.

7          THE COURT:  I didn't see in your papers where you

8    presented anything along those lines.  Maybe I missed it.

9          MS. SANGHVI:  We have not presented you any expert

10   information in regards to the availability or the number of SRO

11   units.

12         THE COURT:  So your adversary says he doesn't know how

13   many units it is, but it's small, the vast majority, I think is

14   his term, of the vacant units are not SRO in her price range,

15   so that this is just a remote contingency which would make for

16   a fun case involving able counsel, but has little or nothing to

17   do with actual standing.

18         MS. SANGHVI:  Absolutely, your Honor.  In the

19   affidavit that the defendants put forward, outside of there not

20   being much statistical reliability that they have offered us to

21   calculate these --

22         THE COURT:  Yes, but you didn't -- you just told me

23   two seconds ago all the unquestioned expertise that your side

24   has.  I didn't see anything from your side on this issue.

25         MS. SANGHVI:  Absolutely.  Well, first, I believe with

1    some further factual development we would be able to provide

2    your Honor and this Court with some additional expertise around

3    the fact that there are available SRO units throughout the

4    city; that she has not had yet the opportunity to locate one,

5    but even if she were to locate one, the harm remains absolute

6    today that she cannot in fact reside in one, and furthermore,

7    as has been stated in --

8            THE COURT:  I don't understand that last point,

9    because you agreed with me that if there was one and only one

10    unit, and that was the one that she had vacated, that she

11   wouldn't have standing.  Let's say I'll double the number.

12   Supposing there were two units; the one she vacated and one

13   other, completely unknown to her, not actually looked at by

14   her -- her search seems to have been very modest indeed -- and

15   she's not under, apparently, any terrible pressure because she

16   has an older son who's got a two-room apartment where she's at

17   least able to abide for the moment.  So if there was one other

18   apartment out there that fits her needs, but she doesn't know

19   about it, she hasn't looked for it and she hasn't found it,

20   would she have standing?

21           MS. SANGHVI:  Your Honor, first of all, even if there

22   were one or there were two, I agree that the harm would be a

23   bit more remote.  I don't know if I would agree that there

24   would be no standing.

25           THE COURT:  That's what I'm asking.  I'm delighted to

81FSIEC

1    know that you're not sure whether you would agree or not, so

2    which is it?

3            MS. SANGHVI:    I believe she would continue to have

4    standing because the harm remains imminent and actual.

5            THE COURT:    What's the imminent harm for not being

6    able to get into an apartment you don't even know about?

7            MS. SANGHVI:    The fact that the law bars her from any

8    available SRO unit, whether it's one, two or --

9            THE COURT:    I mean the law, for all I know, may bar

10   all of us from something we don't know about at the moment, but

11   since we don't know about it, how can we bring an action?    I

12   mean, she has not identified any SRO fitting her needs that she

13   would like to abide in.    She has not identified, short of that,

14   any number to suggest that there are many such units.    Yes, the

15   City's presentation is very, very weak, but at least it's

16   something.    As against that, you have given, to use a legal

17   term of art, zilch.    So how can I say that this is not a remote

18   contingency at best under the circumstances?

19           MS. SANGHVI:    Based even just solely on what the City

20   has provided us and this Court in terms of what available units

21   are there, the vast majority of these units are not rooming

22   units -- are, sorry, regular apartments and not rooming units.

23   That means that of the over 12,000 apartments the City claims

24   are available for affordable housing, the vast majority of them

25   are, yes, regular apartments, but that leaves, I don't know,

81FSIEC

20 percent of the 12,000 that could be rooming units, could be

30 percent, could be 10 percent.  I'm not clear on what

percentage of the 12,000 apparent --

THE COURT:  It seems to me, and I'll put it to you

this way so that your adversary can respond.  We know two

things.  We know that there are some number of these units.  We

know that from the way the City has couched its own expert

affidavit, and we know that a unit of that kind is something

that this plaintiff would be perfectly happy to live in because

not only has she so said, but more importantly, she was living

in just such a unit.  So the question is, is that sufficient to

warrant a facial challenge?  I know you're going to say the

answer is yes.  Let me hear from your adversary and I'll come

right back.

MR. HOROWITZ:  Your Honor, the housing situation the

plaintiff had previously is somewhat unusual.  She was living

in a rooming house, she had one occupied, I believe, one entire

floor of a rooming house.  There aren't that many rooming

houses in the City of New York.  The idea of finding one, let

alone two contiguous rooming units so that her entire family

can live together on one floor I find -- I think Dr. Lee could

testify further that those chances are very remote.

More importantly is the ability to afford two rooming

units, which I think it's undisputed that the plaintiff can't

afford, even assuming that it's the lower of the median rent

81FSIEC

1   that the defendants have put forward.  Both of those reasons;

2   the number of available rooming units and the rent that would

3   be charged today, as opposed to when the plaintiff was looking

4   for a rooming unit, I think weigh in favor of that there is no

5   standing because the possibility of this plaintiff being in a

6   situation where she might be able to be in a rooming unit is

7   remote.

8              THE COURT:  All right.  Here's what I think is the

9   bottom line so far as today is concerned.  I don't think I can

10  decide this motion on the present record.  In fairness to

11  plaintiff, the affidavit from Dr. Lee came in at the end of the

12  briefing and, therefore, there was no opportunity to respond.

13  So I will give plaintiff's counsel an opportunity to put in one

14  or more affidavits of a factual or expert nature.  I do not

15  want any more legal briefing.  I mean that completely.  If

16  anyone cites a case, I will not read your papers.  I just want

17  facts.

18             I will then give defense counsel the opportunity to

19  put in a supplemental affidavit responding to whatever the

20  affidavits are, such as from Dr. Lee or anyone else, but again,

21  I don't want any further legal briefing, I just want facts.  So

22  then I'll receive the motion after receiving those additional

23  submissions.

24             How long does counsel want to submit those additional

25  affidavits?

81FSIEC

1          MS. SANGHVI:  At a minimum, your Honor, we would

2     appreciate two weeks.

3          THE COURT:  Two weeks is fine.  Minimum.  Whenever

4     counsel asks for a minimum, I'm always happy to give them

5     exactly what they ask for.  So, let's see, today is

6     January 14th, so that's January 28th, and how long does the

7     City want to respond?

8          MR. HOROWITZ:  Your Honor, can I confer with the

9     witness to find out his schedule?

10          THE COURT:  Sure.  Although I should tell you the

11     choice is either two weeks or two weeks.

12          (Pause)

13          MR. HOROWITZ:  Your Honor, the defense also is

14     requesting two weeks.

15          THE COURT:  Good idea.  But I'm actually going to give

16     you two weeks and one day, because two weeks would be

17     February 11, which is a holiday so you get -- I'm sorry, no,

18     it's not.  February 12 is a holiday.  You may not realize

19     February 12 is a holiday, but this courthouse is actually

20     closed by order of Chief Judge Kimba Wood and a good thing, I

21     applaud her desire to honor Abraham Lincoln on his real

22     birthday and not be merely glomming him together with President

23     Washington.  So February 11 it is.  I will then, I guarantee

24     you, I will have you at least a bottom line and hopefully a

25     full decision, but at least a bottom line by no later than

81FSIEC

1    February 22nd.  This matter will in all other respects be

2    stayed until then and then depending on what I decide either it

3    will be dismissed or we'll pick up again with further

4    proceedings.

5              Thank you so much.  This matter is adjourned.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25