

| | | |
|---|---|---|
| **MICHAEL A. CARDOZO**<br>*Corporation Counsel* | T**HE** C**ITY OF** N**EW** Y**ORK**<br>**L**AW **D**EPARTMENT<br>100 CHURCH STREET, Room 5-189<br>NEW YORK, NY 10007 | **JERALD HOROWITZ**<br>Senior Counsel<br><br>Tel: (212) 442-0589<br>Fax:(212) 791-9714<br>email: jhorowit@law.nyc.gov |

April 18, 2008

**BY TELECOPY**
Hon. Jed. S. Rakoff
United States District Court Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007- 1312

       Re:  Sierra v. City of New York, et al.,
             07 Civ. 6769 (JSR)

Your Honor:

      Defendants submit this letter in response to plaintiff's letter dated April 7, 2008 ("Pl. Let."), concerning two matters raised at oral argument held on March 26, 2008 on the parties' motions for summary judgment. The first matter concerns defendants' submission of U.S. Department of Housing and Urban Development ("HUD") regulations that facially discriminate against families with children with respect to what type of housing is suitable for federal funding. The second matter concerns the legislative history concerning the Fair Housing law's familial status provision. As discussed more fully below, plaintiff's facial challenge to New York City Administrative Code Section 27-2076(b) fails because the Fair Housing Act Amendments Act of 1988 ("FHAA") was not intended to preempt a local law that has a rational nexus to a legitimate governmental interest -- safeguarding the health and well-being of children.

      At the outset, defendants must respond to plaintiff's argument that strict scrutiny should apply here, when a split exists among the Circuits between the rational basis test and a more searching inquiry that the statutory classification responds to legitimate safety concerns. The only argument advanced by plaintiff to reject the rational basis standard in favor of strict scrutiny is that "some classes of persons specifically protected by the Fair Housing Act, such as families and handicapped, are not protected classes for constitutional purposes." See Pl.

Summary Judgment Mem. at 5 (quoting Community House, Inc. v. City of Boise, 490 F.3d 1041, 1050 (9th Cir. 2007). This argument does not explain why strict scrutiny is any more appropriate. The Second Circuit has not had an opportunity to address what standard is appropriate under these circumstances. However, in the context of laws to protect children, the Second Circuit has explicitly rejected strict scrutiny and applied intermediate scrutiny instead. See Ramos v. Town of Vernon, 353 F.3d 171 (2d Cir. 2003).[1]

In Ramos, the Second Circuit was confronted with a constitutional challenge to a local ordinance that imposed a juvenile curfew. The Second Circuit noted "[w]hile the characteristic that defines the burdened class is not typically relevant to a constitutional rights inquiry, juveniles occupy a unique position in our constitutional scheme." Id. at 177. "[T]he State is entitled to adjust its legal system to account for children's vulnerability and their [other] needs . . ." Id. (quoting Belloti v. Baird, 443 U.S. 622, 635 (1979); see also, City of Dallas v. Stanglin, 490 U.S. 19 (1989) (upheld ordinance restricting persons between the age of 14 and 18 from dance halls). Strict scrutiny "reflects the notion that some rights are so important that they should be afforded to individuals in a manner blind to all group classifications. Id. at 179. But, as the Second Circuit concluded, "[y]outh blindness is not a constitutional goal, because, even with regard to fundamental rights, failing to take children's particular attributes into account in many contexts, such as marriage, would be irresponsible." Id. at 180. Unlike the juvenile curfew ordinance that was struck down in Ramos, Section 27-2076(b) is reasonably related to a legitimate governmental interest -- safeguarding the health and well-being of children.

Plaintiff argues that any governmental limitation on occupancy that makes a distinction based on a protected classification is not reasonable. See Pl. Let. at 5, 6. Such an argument blindly exalts the rights of families over children's needs, and should be rejected.

> If the law is to have any meaning, it must be to first lean toward survival rather than to the establishment or maintenance of individual rights. Eventually, abstract rights must give way to concrete perils. Thus, in interpreting the law and the Constitution, the judge of the future must be more astute in protecting man against himself.

People v. Taddeo, 62 Misc. 2d 833, 836 (County Ct. Onondaga Co. 1969) (quoting 53 Judicature, Nov. 1969, No. 4, 142). The legislative history of Section 27-2076 contains findings that rooming units do not constitute decent, safe and healthful living accommodations for children. See Affidavit of Mario Ferrigno, dated August 16, 2007 ("Ferrigno Aff."), Ex. B. A memorandum, included in the bill jacket and approved by the Department of Buildings, cited lack of family privacy, lack of proper kitchen facilities, lack of adequate, private sanitary

---

[1] To satisfy intermediate scrutiny, the challenged statute must be shown to be substantially related to an important governmental interest. Id. at 175 (citing Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150 (1980). "If the direct and primary beneficiaries are children, then the constraint on liberty is more likely to pass constitutional muster." Id. at 180.

facilities as "a most unhealthy environment in which to rear children." These legislative findings were confirmed in a 2001 report about SRO housing in San Francisco. See Ferrigno Aff., Ex. C. The San Francisco report confirmed, among other things, that children in SRO housing are less likely to meet normal developmental milestones. The 2001 report noted findings that children in SRO housing are at risk for learning and psychological development impairment due to lack of privacy, open space, and sanitary facilities. One example noted in the 2001 report is that toilet training of children is impeded because of unsanitary conditions of an SRO's common bathroom facility. See Ferrigno Aff., Ex. C at 17. Another example reported is of the adolescent child, who at that age becomes more aware of his or her body and sexual identity, is confronted by the risk of being exposed to inappropriate adult sexual interaction, and as a result, becomes depressed and anxious at always being "on guard." Id. These conditions of lack of space, lack of privacy, and lack of sanitation are not based on stereotypes, and this Court should not turn a blind eye to them, as plaintiff requests. These conditions create health and safety risks to children which can only be avoided by removing them from this type of housing. Lack of privacy is a sufficient justification. See Community House, Inc., 490 F.3d at 1051, n9. More vigilant enforcement of other applicable housing maintenance standards, as plaintiff proposes (see Tr., 3/26/08 at 16), will not change these conditions. Plaintiff has not presented any reasonable alternatives. Accordingly, Section 27-2076(b) satisfies any level of scrutiny. See Beatie v. City of New York, 123 F.3d 707 (2d Cir. 1997) (applying rational basis test); Regents of the University of California v. Bakke, 438 U.S. 265 (1978) (applying strict scrutiny).

Contrary to plaintiff's assertion (Pl. Let. at 7), a parental choice to place children in SRO housing is not "best for a child," and in fact may lead to loss of parental rights. See In the Matter of Nicole TT, 109 A.D.2d 919 (3d Dep't 1985) (parental rights terminated in part because parental residence for the year leading up to the dispositional hearing was an SRO); see also Ferrigno Aff., Ex. C at 17 ("children are at risk for removal (by Child Protective Services) from parents while living at SRO"). Plaintiff's reference to United States v. Grishman, 818 F. Supp. 21 (D. Maine 1993), and to HUD administrative cases, are distinguishable in that none of them address the inherent perils faced by children living in SRO housing. Rather, conditions "inherently dangerous to occupancy by families with children might well permit an inquiry about the ages of the family members." Soules v. HUD, 967 F.2d 817, 824 (2d Cir. 1992).

"States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular . . . ." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982). Accordingly, legislation enacted pursuant to a state or local government's police power is entitled to a strong presumption of validity. See Richmond Boro Gun Club, Inc. v. City of New York, 896 F. Supp. 276, 282 (E.D.N.Y. 1995), aff'd, 97 F.3d 681 (2d Cir. 1996) (upheld law criminalizing possession or transfer of assault weapons). Under the Supremacy Clause analysis, the well-established presumption is against federal preemption of local law unless a court is "absolutely certain" that such was Congress's intent. Gregory v. Ashcroft, 501 U.S. 452, 464 (1991); Maryland v. Louisiana, 451 U.S. 725, 746 (1981). Such certainty is particularly warranted when a challenged local law concerns public safety since the proper "assumption [is] that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). The key question is whether the consequences of complying with the local law "sufficiently injure the

objectives of the federal program to require nonrecognition." McCarty v. McCarty, 453 U.S. 210, 232 (1981) (quoting Hisquierdo v. Hisquierdo, 439 U.S. 572, 583 (1979)).

The FHAA was not intended to preempt state and local laws that reasonably provide for the health, safety and welfare of children. The plain language of its preemption provision, Section 816 (42 U.S.C. § 3615), disclaims any intention to occupy the field and expressly provides "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extant be invalid." To apply it to bar Section 27-2076(b) – a law designed to ensure that children live in decent housing for their health and well-being – is contrary to congressional policy. As Second Circuit noted,

> We have been wisely cautioned by Learned Hand that "there is no surer way to misread a document than to read it literally." Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (concurring opinion), aff'd sub nom. Gemsco, Inc. v. Walling, 324 U.S. 244, 89 L. Ed. 921, 65 S. Ct. 605 (1945). That aphorism is not always true with respect to statutes, whose text is always the starting point for analysis and sometimes the ending point. But literalism is not always the appropriate approach even with statutes, as the Supreme Court long ago recognized: "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intent of its makers." Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 36 L. Ed. 226, 12 S. Ct. 511 (1892).

United States v. Starrett City Associates, 840 F.2d 1096, 1105-1106 (2d Cir.) (Newman, J., dissenting), cert. denied, 488 U.S. 946 (1988). Rather, the concern should be whether Section 27-2076(b) stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941). As discussed below, Section 27-2076(b) comports with congressional objectives to provide decent housing for families with children.

A.   **Legislative History of FHAA's Familial Status Provision**

Congress enacted the familial status provision of the FHAA to help families find decent housing, not allow children to live in unhealthy conditions. "If we are ever going to be able to change the downward trend in our children's education and economic well-being, we must first ensure them a decent place to live." 134 Cong. Rec. H4604 (daily ed. June 22, 1988) (remarks by Representative Rodino). The American dream, as one Congressperson noted, is "having the ability to provide safe and decent housing for one's family." 134 Cong. Rec. H4607 (daily ed. June 22, 1988) (remarks by Representative Pepper). Enacted as Housing Resolution 1158, the FHAA "incorporates a good faith attempt to provide access to quality housing for

families with children. The bill's protections for children, families and the elderly are a genuine effort to balance the concerns of individuals and families whose preferences and needs at times conflict." 134 Cong. Rec. H4610 (daily ed. June 22, 1988) (remarks by Representative Hoyer).

While SRO housing is a "dwelling unit" covered by the FHAA (see 24 CFR § 100.201), it was not intended to be occupied by families with children. Not one member of Congress suggested that families with children should be allowed to live in SRO housing. To the contrary, Congress wanted to end the landlord's discriminatory practice of excluding families with children principally from two bedroom apartments. As Representative Scheuer stated,

> I think it is an outrage that apartment owners exclude especially kids from two-bedroom apartments. One might say that *there is a question on a one-bedroom apartment*, but even there the parents can use the living room as their bedroom and the regular bedroom for the kids, but in a two-bedroom apartment, there is not the slightest iota of an excuse to exclude kids. Parents can live in the one bedroom and the kids would live in the [*H4683] second bedroom, and for two-bedroom apartments, especially, to be prohibited for family use, I think that is an affront. It is immoral, it is unethical, it is unacceptable and un-American.

134 Cong. Rec. H4682-4683 (daily ed. June 23, 1988) (remarks by Representative Scheuer) (emphasis added). If members of Congress had a "question" with placing families with children in one bedroom apartments, then clearly Congress did not intend to place families with children in a rooming unit, without a complete kitchen and non-exclusive bathroom facilities.

The Supreme Court, in the City of Edmonds v. Oxford House, 514 U.S. 725 (1995), found it "telling" that the FHAA included a specific exemption to its anti-discriminatory policy for "reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling," (see 42 U.S.C. § 3607(b)(1)), stating " . . . landlords legitimately may refuse to stuff large families into small quarters." Id., 514 U.S. at 735 n.9. The maximum occupancy exemption is simply one example intended to prevent an overzealous judicial application of the FHAA's anti-discrimination policy from having the unintended consequence of invalidating legitimate State and local ordinances that eliminate perils (e.g. overcrowding). The FHAA was not intended to permit families with children to live wherever they desire. See Elliott v. City of Athens, 960 F.2d 975, 982-983 (11th Cir. 1992) (upheld zoning ordinance limiting the number of unrelated persons permitted to occupy a single dwelling even though it had disparate impact on group homes). The FHAA was also not intended to "prevent a landlord from determining that a family is otherwise qualified before agreeing to rent to them." Soules, 967 F.2d at 821 (quoting 134 Cong. Rec. H4681 (daily ed. June 23, 1988) (remarks by Representative Synar). Accordingly, a landlord would be able to restrict occupancy based on "State and local standards." 134 Cong. Rec. H4681 (daily ed. June 23, 1988) (remarks by Representative Synar).

The oft-cited 1980 HUD report did not demonstrate the "prevalence of discrimination" to families with children, as plaintiff ascribes (Pl. Let. at 3). Indeed, "[t]he most significant obstacle facing such families is affordability, rather than bias against children." 134 Cong. Rec. E2244 (daily ed. June 30, 1988) (remarks by Representative Kolbe)(prepared statement). Representative Miller urged Congress to protect what remained in federal housing assistance after the Reagan Administration cuts and to pass the familial status provision to redress discrimination which exacerbated the shortage of decent, affordable housing. 134 Cong. Rec. H4611 (daily ed. June 22, 1988) (remarks by Representative Miller)(prepared statement).

As evidenced by the legislative record, Congress did not envision SRO units to be appropriate housing for families with children. Under these circumstances, the anti-discrimination provisions of FHAA should not preclude localities from enacting laws consistent with Congress's interests in providing decent and safe housing. In that regard, Section 27-2076(b) is not inconsistent with or an obstacle to the objectives of the FHAA. Unlike the shelter in Community House, Inc. v. City of Boise, 490 F.3d at 1050, n6 (9th Cir. 2007) ("Community House provides separate rooms for men, women and families"), the SRO unit cannot be altered to serve the space, privacy, and sanitary needs of children without altering its classification as an SRO unit. Clearly, the strict scrutiny standard is inappropriate when the type of dwelling was not intended to be occupied by families with children. In other words, families with children would have to be "otherwise qualified" to live in an SRO unit in order for this strict standard to apply. School Board of Nassau County v. Arline, 107 S. Ct. 1123, 1131 n16 (1987) (allowing workplace to exclude individuals with contagious diseases and infections if reasonable accommodation will not eliminate the risk); see HR Report 100-711 (June 17, 1988) at 29.

**B.     HUD Regulations**

Pursuant to the Housing Choice Voucher Program (sometimes referred to as the "Section 8 voucher program" after the section of the United States Housing Act of 1937 (42 U.S.C. 1437f) that authorizes it), very low-income families, the elderly, and the disabled who are awarded vouchers use them to help pay the cost of decent, safe, and sanitary housing in the open market. The participant is free to choose any housing that meets the requirements of the program and is not limited to units located in subsidized housing projects as plaintiff suggests (see Pl. Let. at 7-8). See 24 CFR § 982.1.[2] The voucher program is administered at the federal level by the Department of Housing and Urban Development (HUD). At the local level, the program is run by local, state, and regional housing agencies, known collectively as public housing agencies (PHAs).

HUD's housing quality standards for families require "[a]t a minimum, the dwelling unit must have a living room, a kitchen area, and a bathroom." See 24 CFR § 982.401(d)(1). These standards, which were promulgated as requirements for assisted occupancy, further demonstrate Congressional intent that SRO housing is not suitable for families with children. In fact, HUD's housing quality standards for SRO units explicitly assume that children will not be housed, and therefore omit lead-based paint requirements. See 24 CFR

---

[2] See also http://www.hud.gov/offices/pih/programs/hcv/about/fact_sheet.cfm.

§ 982.605(a). Read *in pari materia* with the Housing Act, the FHAA was not intended to preempt Section 27-2076(b) – a local law that is consistent with the housing quality standards of the Section 8 voucher program.

For the reasons stated herein, and in defendant's memorandum of law in opposition to plaintiff's motion for a preliminary injunction, defendants respectfully request that summary judgment be granted in their favor, and the complaint be dismissed.[3]

                                                                         Respectfully submitted,

                                                                         _____/s/_____
                                                                          Jerald Horowitz (JH8395)
                                                                          Assistant Corporation Counsel

cc:
Leslie T. Annexstein
Ami T. Sanghvi
Urban Justice Center

Molly Doherty
Martha Weithman
West Side SRO Law Project

---

[3] The complaint in this action asserts only a facial challenge to Section 27-2076(b). While the court suggested amendment of the complaint to include as-applied challenges, plaintiff failed to do so. Accordingly, the complaint should be dismissed.