Index No.  07 CV 6769 (JSR)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUANA SIERRA,

Plaintiff,

- against -

THE CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF BUILDINGS; PATRICIA J.
LANCASTER, in her capacity as COMMISSIONER OF
THE NEW YORK CITY DEPARTMENT OF
BUILDINGS; NEW YORK CITY DEPARTMENT OF
HOUSING PRESERVATION AND DEVELOPMENT;
SHAUN DONOVAN, in his capacity as
COMMISSIONER OF NEW YORK CITY
DEPARTMENT OF HOUSING PRESERVATION AND
DEVELOPMENT; and EMAD IBRAHEM,

Defendants.

## CITY DEFENDANTS' POST-TRIAL
## MEMORANDUM OF LAW

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
*100 Church Street, Room 5-189*
*New York, N.Y.  10007*

*Of Counsel:  Jerald Horowitz*
*Tel:  (212) 442-0589*
*NYCLIS No. 2007-023070*

GABRIEL TAUSSIG,
AVE MARIA BRENNAN,
JERALD HOROWITZ,
JACQUELINE HUI,
            Of Counsel.
September 12, 2008

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii1

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 5

       A.   Plaintiff's Fact Witnesses ................................................................. 5

       B.   Defendants' Fact Witnesses.............................................................. 8

       C.   Expert Testimony.............................................................................. 10

ARGUMENT

     POINT I

          PLAINTIFF DOES NOT HAVE STANDING. ........................................ 16

     POINT II

          SECTION 27-2076(B) DOES NOT VIOLATE THE FAIR HOUSING ACT....................................................................... 17

     POINT III

          A PERMANENT INJUNCTION OF SECTION 27-2076(B) SHOULD BE DENIED. ............................................................. 22

CONCLUSION.................................................................................................................. 24

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                      <u>Pages</u>

Ambrose v. Malcolm,
   414 F. Supp. 485, 492 (S.D.N.Y 1976)..................................................................21

Anderson Group, LLC v. City of Saratoga Springs,
   2006 U.S. Dist. LEXIS 50073 (N.D.N.Y. 2006) ................................................17

Bryant Westchester Realty Corp. v. Board of Health,
   91 Misc. 2d 56 (Sup. Ct. NY Co. 1977),
   aff'd, 61 A.D.2d 889 (1st Dep't 1978)..................................................................21

Community House, Inc. v. City of Boise,
   490 F.3d at 1051 (9th Cir. 2007)..........................................................................19

Dayton Board of Educ. v. Brinkman,
   433 U.S. 406 (1977)..............................................................................................23

eBay Inc. v. MercExchange, L.L.C.,
   547 U.S. 388 (2006)..............................................................................................22

Elliott v. City of Athens,
   960 F.2d 975 (11th Cir. 1992) .............................................................................20

Everson v. Mich. Dep't of Corrections,
   391 F.3d 737 (6th Cir. 2004) ...............................................................................19

Fair Housing in Huntington Committee, Inc. v. Town of Huntington,
   316 F.3d 357 (2d Cir. 2003)..................................................................................16

Gladstone Realtors v. Village of Bellwood,
   441 U.S. 91 (1979)................................................................................................16

Golden v. Zwickler,
   394 U.S. 103 (1969)..............................................................................................16

Havens Realty Corp. v. Coleman,
   455 U.S. 363 (1982)..............................................................................................16

Hirschmann v. Hassapoyannes,
   11 Misc. 2d 265 (N.Y. Sup. Ct. 2005) ................................................................17

Housing Works, Inc. v. Safir,
   101 F. Supp. 2d 163 (S.D.N.Y. 2000)..................................................................22

**Cases**                                                                                          **Pages**

Huntington Branch, NAACP v. Huntington,
   844 F.2d 926 (2d Cir. 1988).......................................................................5, 17

Jenkins v. United States,
   386 F.3d 415 (2d Cir. 2004) .........................................................................22

Kumho Tire Co. v. Carmichael,
   526 U.S. 137 (1999).....................................................................................21

LeBlanc-Sternberg v. Fletcher,
   67 F.3d 412 (2d Cir. 1995)...........................................................................16

Muhammad v. City of New York Dep't of Corrections,
   126 F.3d 119 (2d Cir. 1997)..........................................................................16

Public Serv. Comm'n of Utah v. Wycoff Co.,
   344 U.S. 237 (1952).....................................................................................22

Resident Advisory Bd. v. Rizzo,
   564 F.2d 126 (3d Cir. Pa. 1977).....................................................................17

Rizzo v. Goode,
   423 U.S. 362 (1976).....................................................................................23

Robino v. Iranon,
   145 F.3d 1109 (9th Cir. 1998) ......................................................................19

Russman v. Bd. of Educ.,
   260 F.3d 114 (2d Cir. 2001)..........................................................................17

Sch. Bd. of Nassau County v. Arline,
   107 S. Ct. 1123 (1987)..................................................................................20

Soules v. HUD,
   967 F.2d 817 (2d Cir. 1992)..........................................................................20

Warth v. Seldin,
   422 U.S. 490 (1975).....................................................................................16

Wilton v. Seven Falls Co.,
   515 U.S. 277 (1995) .....................................................................................22

**Statutes**                                                          **Pages**

24 C.F.R. § 982.605(a)..................................................................................20

28 U.S.C. § 2283...........................................................................................3

42 U.S.C. § 3601 et seq..................................................................................1

42 U.S.C. 3602(i).........................................................................................16

42 U.S.C. § 3607(b)(1).................................................................................20

42 U.S.C. § 3613 (a)(1)(A)...........................................................................16

Fed. R. Civ. P. 12(b)(1).................................................................................1

Fed. R. Civ. P. 52..........................................................................................1

New York Executive Law § 296....................................................................17

N.Y.C. Admin. Code § 27-127..................................................................6, 17

N.Y.C. Admin. Code § 27-2002.....................................................................2

N.Y.C. Admin. Code § 27-2004(15)...............................................................2

N.Y.C. Admin. Code § 27-2076(b)........................................................ passim

N.Y.C. Admin Code § 27-2077.......................................................................2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

JUANA SIERRA,

                                        Plaintiff,

                          -against-

THE CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF BUILDINGS; PATRICIA J.
LANCASTER, in her capacity as COMMISSIONER OF
THE NEW YORK CITY DEPARTMENT OF                          No. 07 CV 6769 (JSR)
BUILDINGS; NEW YORK CITY DEPARTMENT OF
HOUSING PRESERVATION AND DEVELOPMENT;
SHAUN DONOVAN, in his capacity as
COMMISSIONER OF NEW YORK CITY
DEPARTMENT OF HOUSING PRESERVATION AND
DEVELOPMENT; and EMAD IBRAHEM,

                                        Defendants.

------------------------------------------------------------------------ X

## CITY DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

        Defendants the City of New York ("the City"), the New York City Department of

Buildings ("DOB"), Patricia J. Lancaster,[1] in her capacity as Commissioner of DOB, the New

York City Department of Housing Preservation and Development ("HPD"), and Shaun Donovan,

in his capacity as Commissioner of HPD (collectively "City Defendants"), submit this post-trial

memorandum of law in support of their renewed motion to dismiss pursuant to Fed. R. Civ. P.

12(b)(1), based on plaintiff's testimony at trial, and in support of a judgment pursuant to Fed. R.

Civ. P. 52 denying plaintiff's claims in this action for declaratory and permanent injunctive relief

---

[1] Robert D. Li Mandri is the Acting Commissioner, effective April 22, 2008.

pursuant to the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq.  ("FHAA").

Plaintiff's claim for damages was bifurcated.

In her complaint, plaintiff asserts that Section 27-2076(b) of the New York City

Administrative Code ("Administrative Code" or "Admin. Code") is discriminatory in violation

of the FHAA.   Her prayer for relief, other than damages, seeks (1) a declaration that Section 27-

2076(b) and any open or pending violations of Section 27-2076(b) are invalid and unenforceable;

and (2) a permanent injunction to ban enforcement of Section 27-2076(b) against the City

Defendants, their agents, employees, and successors, and all other persons acting in concert or

participating with them.

The City's Housing Maintenance Code, codified as Title 27, Chapter 2 of the

Administrative Code, is a "comprehensive code of standards for decent housing maintenance."

Admin. Code § 27-2002.  The challenged provision of law, Admin. Code § 27-2076(b) ("Section

27-2076(b)" or the "Provision"), entitled "Prohibited occupancies,"  states in relevant part:

> No rooming unit shall be occupied by a family with a child under
> the age of 16 years, except that if a child is born to a family
> residing in such accommodations, the unlawful occupancy shall
> not commence until one year after the birth of such child.

Exceptions to the restriction are made for "(1) in rooming units operated without profit by an

educational, religious or charitable institution of the type described and for the purposes set forth

in subdivision a of 27-2077 of this article, or (2) in a summer resort dwelling." Id.  One of the

purposes set forth in Section 27-2077(a), as an exception, is if the rooming units are "owned,

operated or used by any federal, state or local agency or instrumentality or by a non-profit

organization."  A "rooming unit" is defined as "one or more living rooms arranged to be

occupied as a unit separate from all other living rooms, and which does not have both lawful

- 2 -

sanitary facilities and lawful cooking facilities for the exclusive use of the family residing in such unit." Admin. Code § 27-2004(15).

      At the time plaintiff filed her complaint on or about July 26, 2007, she and her two children occupied two rooming units located at 24 West 119th Street in Manhattan, and were threatened by eviction purportedly due to the enforcement of the Provision. Plaintiff also concurrently moved for a temporary restraining order and a preliminary injunction to enjoin the holdover proceeding commenced by her landlord (former defendant) Emad Ibrahem, and further enforcement by the City Defendants of the Provision. The Court denied the request for a temporary restraining order because of plaintiff's five-month delay in making that application from the date the holdover proceeding was commenced against her in state court. See Compl.; Pl. Ex. 10 & 11.[2] By Order dated December 6, 2007, the Court ruled that the Anti-Injunction Act, 28 U.S.C. § 2283, barred plaintiff's claims for injunctive relief against the landlord, but did not bar her remaining claims against him or any of her claims against the City Defendants.

      Shortly after the December 6, 2007 rulings, however, plaintiff and the landlord entered into a stipulation whereby plaintiff, in exchange for $19,000, voluntarily vacated her two rooming units and agreed to drop her suit against the landlord. Subsequently, on consent of all parties, the landlord was dismissed from the suit. Stipulation for Dismissal of Defendant Emad Ibrahem, signed December 10, 2007.

      As a result of plaintiff's relinquishment of her rights to the two rooming units, the City Defendants moved to dismiss the action on the ground that, because plaintiff no longer occupied rooming units and, likely would not occupy one in the future, she lacked standing to challenge the Provision. By memorandum order dated March 3, 2008, the Court denied the

---

[2] Reference is made to exhibits admitted into evidence at trial.

motion on the grounds that sufficient evidence had been adduced to show that the Provision was causing her ongoing injury, to wit: plaintiff was living doubled up with her older son's family in a two-bedroom apartment and was looking for her own apartment.

On March 7, 2008, the remaining parties filed cross-motions for summary judgment, relying primarily on the briefing and affidavits supplied to the Court in conjunction with plaintiff's prior motion for a preliminary injunction, which had been held in abeyance while the jurisdictional issues were decided. By memorandum order dated May 13, 2008, the Court denied both sides' summary judgment motions. The Court found that Section 27-2076(b) serves a bona fide and legitimate purpose "in theory," but the present effect is the subject of genuine and material factual disputes between the parties to be determined at a trial. Plaintiff contended that Section 27-2076(b) was rarely enforced except at the initiation of landlords seeking to evict their low-income tenants (Mem. Order at 8); the enforcement of Section 27-2076(b) would lead to homelessness (Mem. Order at 10); and that there are non-discriminatory means of protecting children by enforcing sanitary, maintenance and maximum occupancy standards (Mem. Order at 10).

As discussed further herein, the testimony at trial manifestly alters the Court's Article III jurisdiction of this matter because there is no actual case or controversy before the Court. Plaintiff gave unequivocal testimony that she did not want to share a bathroom or kitchen with people other than her family, a requisite for any rooming unit living. Accordingly, granting the requested declaratory or injunctive relief would not benefit the plaintiff. Even if the plaintiff had both constitutional and statutory standing, the City Defendants have met their burden to establish that Section 27-2076(b) "further[s], in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory

- 4 -

effect." Op. at 11 (quoting Huntington Branch, NAACP v. Huntington, 844 F.2d 926, 936 (2d Cir. 1988)).

## STATEMENT OF FACTS

On September 3, 4 and 5, 2008, a bench trial was held where the following facts were presented:

**A.      Plaintiff's Fact Witnesses**

Plaintiff Juana Sierra testified that in the past year she had lived at three different residences, all of which had kitchens and bathrooms that were arranged for the exclusive use of her family.  At 24 West 119th Street, plaintiff occupied two dwelling units until early December 2007; she had a kitchen in one of the two units [40:12-13][3] and a bathroom adjacent to her units that only her family used [40:22-23, 42:9-11].  At 135 West 238th Street, where she lived doubled up with her older son's family in a two-bedroom apartment, the apartment had a bathroom and kitchen inside the unit [36:8-12].  Finally, at her current location 340 West 112th Street, where she lives doubled up with her sister's family in a two-bedroom apartment, the apartment has a bathroom and kitchen inside the unit [35:10-13].

Significantly, plaintiff testified that she would not consider sharing a bathroom or kitchen with someone other than her family [42:15-23] and that she has never looked at apartments where she would be sharing kitchens or bathrooms with someone who was not family [47:22-48:7].  Plaintiff testified that she can afford rents of $600 or less [41:24-25], and would consider living in apartments located only in Manhattan [43:7-14] or the Bronx [48:13-14]. Plaintiff offered no evidence that she is actively searching for an apartment.

---

[3] References to the trial transcript are referenced herein as " [page(s):line(s)]."

Plaintiff presented no evidence that the landlord threatened her with eviction from her former residence at 24 West 119th Street because of her family's occupancy contrary to Section 27-2076(b). Indeed, plaintiff testified she believed the landlord wanted to evict her because the landlord "wanted [her] to pay more" [44:23-25]. The papers filed to commence the holdover proceedings seeking eviction were based on alleged facts that plaintiff and her children were not parties to the lease agreement, that the landlord was entitled to be paid $1,000 per month and the purported existence of a violation of Section 27-2076(b). Pl. Ex. 10 & 11. However, the notice of violation issued by the New York City Department of Buildings was plainly issued for a violation of Section 27-127 of the Admin. Code, not Section 27-2076(b). Pl. Ex. 9. The notice of violation stated, in pertinent part, as follows:

> Provision of Law. 27-217. Violating conditions observed. Hazardous. Occupancy contrary to that allowed by CO/I-card. I-card states that a 3 story and basement building (SRO) multi-dwelling calls for a basement Class A apartment and 1st, 2nd and 3rd floor apartments as Class "B", w/3 communal kitchens & bathrooms. 1st floor has 2 rooms, 2nd has 4 rooms & 3rd floor has 4 rooms. On day of inspection, 1st floor had no communal kitchens as stated on I-card. Kitchen was located in 1st floor rear unit (Apt. #3) enclosed with sleeping area next to kitchen. Apt. #2 on 1st floor had no kitchen access, and rear apt. #3 (1st floor) had a 14 year old female child (Corina Carios). The above situation doesn't comply with Housing Maintenance Code 27-2076 prohibited occupancies: A. No kitchen shall be occupied for sleeping B. No rooming unit shall be occupied by a family with a child under the age of 16.
>
> Remedy. Discontinue use or amend certificate of occupancy.

Pl. Ex. 9. Moreover, plaintiff never proved the allegation in her complaint that the violation was issued as a result of a complaint by the landlord. See Compl. ¶ 23.

Kin Ping Lam testified that he, his wife and two children occupy two apartments, 227 and 228, at 38 West 31st Street (1234 Broadway) [55:2-55:9, 55:16-17]. The two

apartments contain five bedrooms [57:23-24], one kitchen [57:14-15], one bathroom [57:16-17], and a living room [57:18-22]. Lam offered hearsay testimony that the management refused to accept his rent because his name was not on the lease [65:13-20] and that children under the age of 16 were living in his apartments [66:1-11]. However, Lam testified that no eviction proceedings were commenced against him [66:15-17]. The circumstantial evidence offered by plaintiff that Lam occupies rooming units – a print-out from HPD's Building Information System (Pl. Ex. 6) – was later questioned by the Court. [104:3-10]. As the Court asked plaintiff's counsel:

> [I]f, in fact, you live in a dwelling that has both a private bathroom and a private kitchen, but through either some administrative error or through a failure to keep up with recordkeeping or whatever, it has been marked as a B dwelling, then we should ignore the actuality, the truth, the facts, the reality, and be bound by what the city regulation says.

Id. Accordingly, his testimony is most speculative of any harm due to the enforcement of Section 27-2076(b).

Susan M. Cohen testified that she is an attorney and former tenant organizer with 40 years of experience working with tenants and hundreds of SROs [77:5-13]. Cohen testified that SRO housing conditions have improved substantially over time [77:16–79:18]. Cohen did not deny that occupants of rooming units sharing bathrooms will be at the mercy of the hygiene or lack of hygiene of the other people that utilize the common bathrooms [81:11-82:4]. Conditions in common bathrooms and kitchens run the gamut [80:24-81:3, 82:5-7]. Cohen testified that SRO units in Manhattan today rent for $800 to $1000 dollars a month [86:23-87:15].

On cross-examination, Cohen testified that in her 40 years of work with SROs she never litigated a single violation of Section 27-2076(b) [90:8-13] or had conversations with

landlords concerning the restriction of children living in SROs [90:14-17]. In fact, Cohen testified that she saw children living in rooming units only once or twice in her 40-year career [90:18-22]. Cohen testified that she observed a family with children at the Breslin Hotel about four to six months ago [90:23-91:3]. The family lived in one room [91:7-8] and the bathroom was down the hall [91:13-14]. Cohen testified that the majority of rooming units she observed are only one room [91:15-17]. Cohen also testified that she has seen more special needs persons, those who have mental health issues or are former substance abusers, living in SROs than in other types of housing [91:20-92:1].

Plaintiff adduced no evidence that Section 27-2076(b) was rarely enforced except at the initiation of landlords seeking to evict their low-income tenants (Op. at 8); the enforcement of Section 27-2076(b) would lead to homelessness (Op. at 10); or that there are non-discriminatory means of protecting children by enforcing sanitary, maintenance and maximum occupancy standards (Op. at 10).

**B.     Defendants' Fact Witnesses**

Mario Ferrigno, HPD's Assistant Commissioner for Code Enforcement, testified that HPD records do not indicate if complainants are landlords [126:4-10]. Ferrigno further testified that HPD issued approximately 500,000 violations in the last fiscal year [130:15-16]. In contrast, HPD issued only 95 violations for Section 27-2076(b) in the last ten years [130:21-23]. Assistant Commissioner Ferrigno also testified that complaints made to the City's "311" number concerning occupancy contrary to law were directed to HPD until two or three years ago when they were redirected to DOB [132:23-133:13]. As to a memorandum written by HPD Deputy Commissioner Robert K. Davis, dated February 7, 1989, concerning enforcement of Section 27-2076(b) in motel units used to house families referred by HRA, Ferrigno testified that the motel

- 8 -

units housing the families had bathrooms and at least a kitchenette in the units, and therefore, as a practical matter, are the functional equivalent of units in Class B hotels, which are exempt from the child restriction [151:20-151:4]. Ferrigno also testified that violations of Section 27-2076(b) are classified as non-hazardous Class A violations, which makes sense because it offered a cure time period of 90 days to allow the most time, as compared to 24 hours or 30 days, for the child to be removed from the unit [190:17-24].

HPD Chief Inspector Frank Richards testified that he has been employed with HPD for 22 years, and during that time inspected close to a thousand rooming units [201:6-21]. During his career, he observed children living in rooming units on only one or two occasions [201:22-202:1]. Richards testified that the shared bathrooms of rooming units he observed were commonly not clean, and devoid of personal items such as towels, soaps or potty-training devices [203:13-204:8]. Richards testified that conditions in kitchens ran the gamut [204:12-13]. In comparison to conditions in other types of dwellings, Richards testified that the unsanitary conditions in shared bathrooms and kitchens of rooming units are far worse [205:8-25].

Paul Harkin, supervising construction inspector with DOB for the last six years, testified that he has not come across a complaint of a child living in a rooming unit [210:9-19]. Harkin testified that as a DOB inspector, he does not enforce the provisions of the Housing Maintenance Code [218:20-219:11]. Deposition testimony offered by plaintiff of DOB Inspector Frank Angilletta did not contradict Harkin's testimony [221:3-18].

Michael O'Connell, an inspector for HPD for ten years, testified that he inspected many rooming units [228:14-18]. O'Connell testified that conditions in common bathrooms of rooming units lacked privacy and were dirty [229:4-10]. O'Connell testified that community

bathrooms commonly had a cheap hook and eye on the bathroom door, which provided little security or privacy [229:22-230:15].

An excerpt of HPD Inspector Courtenay Cyrus's deposition testimony was introduced regarding his issuance of a violation of Section 27-2076(b) at 244 West 99th Street in July 2008. See Pl. Ex. 7.

## C.    Expert Testimony

The expert reports of plaintiff's expert Dr. Lance Freeman, a professor of Urban Planning at Columbia University, dated August 8, 2008, and August 26, 2008, along with his curriculum vitae were admitted into evidence as Plaintiff's Exhibits 1, 2 and 3, respectively, and stipulated as his direct testimony. Among the evidence offered by Dr. Freeman in his testimony are the following:

Dr. Freeman concludes that SROs are "roughly comparable in terms of housing quality" with affordable rentals. Pl. Ex. 1 at 15. Yet, Dr. Freeman's analysis comparing "housing quality" of SROs with affordable apartments disregards the element of SRO housing that makes such housing "physically poor" according to the United States Department of Housing and Urban Development -- that is, SRO housing "lacks a complete kitchen and/or bath for exclusive use." Pl. Ex. 1 at 9.

Similarly, Dr. Freeman's literature review ignores shared kitchens and/or bathroom as a distinctive element of SRO housing. See Pl. Ex. 1 at 21. By his own admission, he used neither "kitchen" nor "bathroom" as search terms in his literature review [29:6-8]. By ignoring this element of SROs in his report, Dr. Freeman fails to address how the use of shared kitchens and/or bathrooms in SRO housing affects child development, in particular, privacy issues, hygienic risks, safety problems and poor nutrition. Because of the serious limitations of

- 10 -

his analysis, Dr. Freeman could not reach "firm conclusions" regarding the "relationships between residence in a SRO and child health and well-being." Pl. Ex. 1 at 22.

In addition to the fundamental inadequacy discussed above, Dr. Freeman's quantitative analysis ignores the implications of both non-sampling errors and very large statistical sampling errors. As Dr. Freeman admits, "because SROs are a small subset of the NYCHVS [New York City Housing and Vacancy Survey ("HVS")] sample, the corresponding sampling errors will be relatively large." Pl. Ex. 1 at 10. Moreover, during cross-examination, Dr. Freeman's unfamiliarity with the HVS data was evident when he admitted to be unaware that 60 percent of the sample he used to compute the vacancy rate for SRO units renting for less than $600 were actually renting for more than $600 and in many instances were luxury hotel rooms [24:20-25]. Freeman agreed that sample sizes typically preclude precise estimates [23:9-11].

Freeman offered testimony that vacancy rate is a "preferred measure of housing availability." Pl. Ex. 2 at 2. The vacancy rate does not specifically address the housing market supply and demand; it merely provides information regarding the overall performance of a housing market [250:23-251:21]. As Dr. Freeman admits, the vacancy rate will not show an increase in the number of vacant units, assuming a proportional increase in the total number of rental units [23:16-23:22].

The expert reports of Dr. Moon Wha Lee, Assistant Commissioner for Policy Analysis and Statistical Research at HPD, dated August 1, 2008, and August 26, 2008, were admitted into evidence as City Defendants' Exhibits A and B, respectively, and stipulated as his direct testimony. Among the evidence offered by Dr. Lee in his testimony are the following:

- Of all renter households with children under 16 paying less than $600 contract rent in the City, 99 percent live in regular apartments with a complete kitchen and bathroom for their exclusive use. Def. Ex. A at 8:16-18.

- Of households in rooming units, 43 percent were single male households, while in regular apartments renting for less than $600, only 23 percent were single male households. Id. at 8:21-22.

- According to the 2005 HVS, the average length of time since move-in for single males age 18-44 in rooming units was 5 years. Families with children under 16 in rooming units had stayed 7 years, but families with children under 16 in regular apartments paying less than $600 contract rent had stayed an average of 12 years. Id. at 9:1-5.

- According to the 2005 HVS, there were 5,875 households with children under the age of 16 in rooming units in 2005. Id. The 2005 HVS reports 6,290 vacant, available regular apartments with complete kitchen and bath facilities for exclusive use at an asking rent less than $600. Id. at 9:15-18.

On cross-examination, Dr. Lee testified that the vacancy rate is not relevant to an assessment of the likelihood of whether or not enforcement of the Provision would make low-income families with children homeless because the vacancy rate does not estimate the number of housing units or rental housing units available [250:15-251:21]. Dr. Lee did not calculate the vacancy rate for rentals under $600 [254:10-18].

Dr. Roger A. Hart, defendants' expert on environmental psychology, provided testimony on the harmful impacts of rooming units on child development and that plaintiff's suggested alternatives to protect children in rooming units were inadequate. Dr. Hart's expert reports, dated August 8, 2008, and August 26, 2008, were admitted into evidence as Defendants'

- 12 -

Exhibit C and D, respectively, and stipulated as his direct testimony.[4]  Among the evidence offered by Dr. Hart in his testimony, are the following:

Dr. Hart, a professor of Environmental and Developmental Psychology and Director of the Children's Environments Research Group at the Graduate Center of the City University of New York, has 32 years of experience teaching and conducting research on children's relationships to the physical environment, and consults for international organizations UNICEF and Save the Children.  Def. Ex. C, Expert Report of Dr. Roger A. Hart, dated August 8, 2008 ("Hart Report"), ¶¶ 1-5.

Dr. Hart testified that lack of a toilet in the rooming unit negatively impacts children in different ways based on their age.  For children two and three years of age, development of self-confidence and independence is impeded, accompanied by health complications such as urinary tract infections and prolonged constipation and encopresis, because they cannot toilet train properly. Def. Ex. A, Hart Report at ¶¶ 11, 59-66.  For children of all ages, common bathrooms present risk of exposure to more contagion, spread of infection and communicable diseases, because hygiene of the bathroom is not controlled by the family.  Id. at ¶¶ 12, 67-68.  For children ages three years or more, particularly adolescents, the use of shared bathrooms outside of the dwelling unit further impedes psychological development because of a lack of privacy.  Id. at ¶¶ 14, 69-78.

---

[4] In a letter to the Court, dated August 29, 2008, plaintiff raised objections to portions of Dr. Hart's expert report that contained hearsay statements from the management or tenants of rooming units he visited in July 2008.  As evident from his testimony at trial, those hearsay statements were not material to his opinions, and therefore should not be excluded.  See FRE 703.  Alternatively, if the Court deems that portions of his testimony should be excluded, defendants again respectfully request the opportunity to cure the purported defects by eliciting further direct testimony from Dr. Hart, as we requested at trial [265:14-266:2].

Dr. Hart testified that lack of a kitchen inside the rooming unit also negatively impacts children. The absence of an accessible food preparation area, poor food storage and no prepared eating space makes the environment unhygienic for children's health. Id. at ¶¶ 15, 79-84. Lack of kitchens in the unit naturally cause parents not to cook or to simply buy and warm-up pre-packaged and "fast food." Id. at ¶ 16, 79, 85 & 88. This has implications for the increased weight of children, the increased risk for malnutrition, Vitamin D deficiency, rickets, diabetes, hypoglycemia and hypertension. Id. at ¶¶ 16, 85-86. Shared kitchens in rooming units cannot be "proofed" for a young child's safety and development. Id. at ¶¶ 17, 86-88. Shared kitchens make it impossible for children to learn about food, nutrition and normal eating habits when they have no regular access to a place for food preparation and have no specific space for consuming food. Id. at ¶¶ 18, 89. The lack of a kitchen/dining area in the dwelling impedes the focus of family life and children's acculturation. Id. at ¶¶ 19, 86-87.

Dr. Hart further testified that rooming units do not fulfill many of the common dimensions of the meaning of "home" in our culture and do not properly foster children's development in this dynamic manner when the most fundamental spaces for daily living - toileting, cleaning, grooming and eating - are not available. Id. at ¶¶ 20-21, 90-93. Dr. Hart further testified that the limited opportunities to find private space within the dwelling and shared kitchen and bathrooms of rooming units has toxic effects for children's brain development and thereby affect language, memory and cognitive control. See Rebuttal Report of Dr. Roger A. Hart, dated August 26, 2008 ("Hart Rebuttal Report"), ¶¶ 17-19. On further direct examination, Dr. Hart testified that he reached his opinions about the harmful effects of rooming unit living on children based on his 30 years of experience working in the field of environmental psychology, his site visits to rooming units in New York City in July 2008, and a review of available

literature, which included traditional, quantitative scientific studies, qualitative research, and clinical wisdom of professionals, particularly pediatricians [269:7-270:10]. Dr. Hart testified that these sources of information are generally used by environmental psychologists to evaluate physical environments [269:11-14], and that they were adequate for him to reach his opinions [278:18-20]. Dr. Hart testified he was escorted by an HPD inspector and visited a wide range of rooming unit buildings at Dr. Hart's request [278:1-16].

On cross-examination, Dr. Hart testified that he did not conduct any experiments or studies to reach or test his opinions [290:12-18, 291:11-14]. When questioned about the impact of lack of cleanliness in bathrooms, Dr. Hart testified to his experience in countries like Bangladesh where problems with disease were associated with lack of sanitation of the toilets due lack of soap and habits of using soap [298:24-299:22]. Dr. Hart testified that privacy concerns exist even if the child has his or her own bedroom [301:18-303:11]. Dr. Hart testified that based on his experience working with the National Institute for Child Health and Human Development and Johnson & Johnson, young children in New York City homes, and his recent visits to approximately 50 kitchens in rooming unit buildings, the kitchen environments in the rooming unit buildings are too small to be modified with gates or fencing for child safety [310:1-311:9].

Dr. Hart also testified that bathrooms, toilets and kitchens he observed were basically "public facilities"; there were no accoutrement, grooming material, private soaps in these facilities, and accordingly he drew the inference that any modification of those environments in the future is unlikely [310:1-311:9]. Dr. Hart testified that food preparation, and the eating and cleaning process is very difficult in rooming units where kitchens are typically 30 feet away, especially for a parent with two children under tow [315:14-316:6].

- 15 -

## ARGUMENT

## POINT 1

## PLAINTIFF DOES NOT HAVE STANDING.

The plaintiff lacks standing to challenge Section 27-2076(b) of the Admin. Code. Standing under the Fair Housing Act ("FHA") is coextensive with Article III standing. Fair Housing in Huntington Committee, Inc. v. Town of Huntington, 316 F.3d 357, 362 (2d Cir. 2003) (citing Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 109 (1979)). Therefore, to bring suit, a plaintiff must meet only "the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendants actions [s]he has suffered 'a distinct and palpable injury.'" Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)). The FHA confers standing to challenge discriminatory housing practices (such as making dwellings unavailable because of a person's familial status) on any "aggrieved person," 42 U.S.C. 3613(a)(1)(A), which is defined as a person who "(1) claims to have been injured by a discriminatory housing or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur," 42 U.S.C. 3602(i); LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 424 (2d Cir. 1995). The dispute must exist at all stages of review. Golden v. Zwickler, 394 U.S. 103, 108 (1969); Muhammad v. City of New York Dep't of Corrections, 126 F.3d 119, 123 (2d Cir. 1997).

The evidence adduced at trial establishes that plaintiff was not injured nor will be injured by enforcement of Section 27-2076(b). Plaintiff testified that she was threatened with eviction only because the landlord wanted her to pay more rent [44:23-25]. Moreover, the violation notice relied on by the landlord in the eviction proceeding was issued for a violation of Section 27-127, not Section 27-2076(b). See Pl. Ex. 9. Plaintiff testified that she would not

consider sharing a bathroom or kitchen with someone other than her family [42:15-23] and that she has never looked at apartments where she would be sharing kitchens or bathrooms with someone who was not family [47:22-48:7]. Based on plaintiff's own testimony, it is undisputed that plaintiff has no desire to occupy a rooming unit. Thus, enforcement of Section 27-2076(b) had, and will have, no palpable effect on plaintiff, and as such, plaintiff does not have standing to challenge Section 27-2076(b). The dispute now is simply "academic or conjectural." Russman v. Bd. of Educ., 260 F.3d 114 (2d Cir. 2001) ("if the dispute should dissolve at any time due to a change in circumstances, the case becomes moot.").

### POINT II

### SECTION 27-2076(B) DOES NOT VIOLATE THE FAIR HOUSING ACT.

Assuming *arguendo* that plaintiff has standing, the evidence adduced at trial establishes that Section 27-2076(b) does not violate the Fair Housing Act.[5] As a matter of first impression, the standard set by this Court to determine whether a statutory occupancy classification, like Section 27-2076(b) will stand, is if the law "further[s], in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." Huntington Branch, NAACP v. Huntington, 844 F.2d 926, 936 (2d Cir. 1988) (citing Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 148-149 (3d Cir. 1977)).

---

[5] Plaintiff's second claim under New York State Human Rights Law (New York Executive Law Section 296), which appears to be pleaded only against former defendant Imad Ibrahem, fails for the same reasons. New York follows the same analysis for a Human Rights Law claim as a claim brought under the Fair Housing Act. See Hirschmann v. Hassapoyannes, 11 Misc.2d 265, 272 (N.Y. Sup. Ct. 2005). Moreover, at least one court has questioned the application of the Human Rights Law to municipalities. See Anderson Group, LLC v. City of Saratoga Springs, 2006 U.S. Dist. LEXIS 50073 (N.D.N.Y. 2006).

Plaintiff's unwillingness to consider living in a rooming unit without exclusive use of both a kitchen and a bathroom for her family conforms with social norms that exist today and were present when the City legislature enacted the local law. Initially enacted as Local Law 6 of 1960, the New York City Administrative Code section challenged here was enacted based on the following legislative findings:

> It is hereby declared that with the exceptions hereinafter stated, rooming house accommodations, as defined in this title, and any room or rooms used for single room occupancy, as defined in this title, where not equipped with a water-closet and a bath or shower and cooking facilities for the exclusive use of the individual tenant, do not constitute decent, safe and healthful living accommodations for children under the age of sixteen years; that the rearing of children of such age in such inadequate and undesirable dwelling accommodations endangers their health, safety and welfare and is detrimental to the welfare of the people of the city . . .

See Pl. Ex. 13 (Aff. of Mario Ferrigno, dated August 16, 2007 ("Ferrigno Aff."), Ex. B (New York Legislative Service, Bill Jacket Local Law 6 of 1960)). A memorandum, included in the bill jacket and approved by DOB, cited lack of family privacy, lack of proper kitchen facilities, lack of adequate, private sanitary facilities as "a most unhealthy environment in which to rear children." Pl. Ex. 13, Ferrigno Aff., Ex. B.

These legislative findings were confirmed in a 2001 report about SRO housing in San Francisco. See Pl. Ex. 13, Ferrigno Aff., Ex. C. The San Francisco report confirmed, among other things, that children in SRO housing are less likely to meet normal developmental milestones. The 2001 report noted findings that children in SRO housing are at risk for learning and psychological development impairment due to lack of privacy and sanitary facilities. One example is that toilet training of children is impeded because of unsanitary conditions of an SRO's common bathroom facility. See Pl. Ex. 13, Ferrigno Aff., Ex. C at 17. Another example reported is of the adolescent child, who at that age becomes more aware of his or her body and

- 18 -

sexual identity, is confronted by the risk of being exposed to inappropriate adult sexual interaction, and as a result, becomes depressed and anxious at always being "on guard." Id. These conditions of lack of space, lack of privacy, and lack of sanitation are not based on stereotypes, and this Court should not turn a blind eye to them, as plaintiff requests. These conditions create health and safety risks to children which can only be avoided by removing them from this type of housing. Lack of privacy is a sufficient justification. See Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1051, n.9 (9th Cir. 2007). More vigilant enforcement of other applicable housing maintenance standards, as plaintiff proposes (see Tr. of Mar. 26, 2008 at 16), will not change these conditions. See, Hart Report at ¶¶ 127-29.

In Cmty. House, Inc., the Ninth Circuit, in a 2-1 decision, preliminarily enjoined a "men-only" policy at a homeless shelter in the City of Boise. The majority in that decision reasoned that the policy was facially discriminatory to women and children, and that the City of Boise provided little support that their "men-only" policy benefits women and families by protecting their safety. However, the Ninth Circuit did not foreclose the possibility that at a later stage in the litigation, the City might be able to provide evidence to establish that its men-only policy was indeed justified by legitimate safety concerns. See Cmty. House, Inc., 490 F.3d at 1051 (citing Everson v. Mich. Dep't of Corrections, 391 F.3d 737, 751-61 (6th Cir. 2004) (holding that female gender was a bona fide occupational qualification under Title VII for certain officers at female prisons since evidence showed that exclusion of males was reasonably necessary for prison security as well as the safety and privacy of the inmates); Robino v. Iranon, 145 F.3d 1109, 1110-11 (9th Cir. 1998) (same)).

Section 27-2076(b) is not inconsistent with the FHAA. Congress enacted the familial status provision of the FHAA to help families find decent housing, and to prevent

children from living in unhealthy conditions. "If we are ever going to be able to change the downward trend in our children's education and economic well-being, we must first ensure them a decent place to live." 134 CONG. REC. H4604 (daily ed. June 22, 1988) (remarks by Representative Rodino). The FHAA was not intended to permit families with children to live wherever they desire. See Elliott v. City of Athens, 960 F.2d 975, 982-83 (11th Cir. 1992) (upheld a zoning ordinance limiting the number of unrelated persons permitted to occupy a single dwelling even though it had disparate impact on group homes). Rather, conditions "inherently dangerous to occupancy by families with children might well permit an inquiry about the ages of the family members." Soules v. HUD, 967 F.2d 817, 824 (2d Cir. 1992). The FHAA was also not intended to "prevent a landlord from determining that a family is otherwise qualified before agreeing to rent to them." Soules, 967 F.2d at 821 (quoting 134 CONG. REC. H4681 (daily ed. June 23, 1988) (remarks by Representative Synar). In other words, families with children are not "otherwise qualified" to live in rooming units because of the harmful impacts on children. Sch. Bd. of Nassau County v. Arline, 107 S. Ct. 1123, 1131 n.16 (1987) (allowing workplace to exclude individuals with contagious diseases and infections if reasonable accommodation will not eliminate the risk); see H.R. REP. NO. 100-711, at 29 (1988). Even the housing quality standards for SRO units by the Department of Housing and Urban Development explicitly assume that children will not be housed in SROs, and therefore omit lead-based paint requirements. See 24 C.F.R. § 982.605(a).

The trial testimony of Dr. Hart and Dr. Lee, and Inspectors Richards and O'Connell clearly establish that the rooming units are most unhealthy for children's development because of the negative impacts associated with use of a common, public kitchen or bathroom. See, infra, at pages 8-9, 11-15. Dr. Hart's opinions should be relied upon by the Court. Dr.

Hart's opinions are based on "real life" observations of rooming units in New York City and 30

years of experience working to improve children's environments.  See Ambrose v. Malcolm, 414

F. Supp. 485, 492 (S.D.N.Y 1976).  In Ambrose, the District Court accepted expert testimony

from environmental psychologists to determine whether crowding conditions at four detention

facilities in New York City constituted cruel and unusual punishment of detainees.  In that case,

for example, the Court credited testimony from Dr. Susan Saegert, who like Dr. Hart, actually

visited the physical environments at issue, and applied analogous, tested theory to reach a

credible opinion.  Dr. Hart's opinions meet the standards of Kumho Tire Co. v. Carmichael, 526

U.S. 137 (1999), and good common sense.    Common sense provides ample justification to

conclude that by excluding children from unsafe, unhealthy and unsanitary conditions created by

rooming units, children's health and development will be advanced.    See Bryant Westchester

Realty Corp. v. Board of Health, 91 Misc. 2d 56, 58 (N.Y. Sup. Ct. 1977), aff'd, 61 A.D.2d 889

(1st Dep't 1978).

    Dr. Hart also addressed the fact that plaintiff's purported alternatives will not

solve the problem of separate kitchen or bathrooms.  See Hart Report at ¶¶ 127-29.  Clearly,

rooming units cannot be altered to serve the privacy, security and sanitary needs of children

without altering their classification as rooming units.  Plaintiff has failed to prove that families

will become homeless if Section 27-2076(b) is enforced.  Dr. Lee offered competent testimony

that there are more available vacant apartments for rent under $600 than there are households

with children living in rooming units.  See Lee Report at 9:15-18.  Even the plaintiff, who

voluntarily relinquished her former dwelling units, avoided homelessness by doubling up with

other family members [36:8-12, 35:10-13].   In any event, Dr. Hart offered uncontradicted

testimony that homeless shelters offer better housing options than rooming units.  See Hart
Report at ¶ 126.

Accordingly, a declaratory judgment that Section 27-2076(b) is unlawful should
be denied. See Jenkins v. United States, 386 F.3d 415 (2d Cir. 2004); Wilton v. Seven Falls Co.,
515 U.S. 277, 287 (1995) (quoting Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237,
241 (1952) ("the propriety of declaratory relief in a particular case will depend upon a
circumspect sense of its fitness informed by the teachings and experience concerning the
functions and extent of federal judicial power.")).


## POINT III

### A    PERMANENT    INJUNCTION    OF ENFORCEMENT OF SECTION 27-2076(B) SHOULD BE DENIED.

Plaintiff has failed to show actual success on the merits to justify the grant of the
sweeping permanent injunction requested.  Housing Works, Inc. v. Safir, 101 F. Supp. 2d 163,
167 (S.D.N.Y. 2000).   Generally, under traditional equitable principles a plaintiff seeking
permanent injunctive relief must demonstrate (1) that it has suffered an irreparable injury; (2)
that remedies available at law, such as monetary damages, are inadequate to compensate for that
injury; (3) that, considering the balance of hardships between the plaintiff and defendant, an
equitable remedy is warranted; and (4) that the public interest would be served by a permanent
injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  Because plaintiff has
failed to satisfy the four-factor test, this court should not grant the permanent injunction.

An equitable remedy is not warranted here.  First, plaintiff has testified explicitly
that the grant of a permanent injunction would not serve her interests because she has no desire

to live with her family in a rooming unit, and therefore there is no injury in fact [42:15-23, 47:22-48:7]. Second, the Court received unanimity of testimony from witnesses that Section 27-2076(b) is rarely enforced, and children are rarely found living in rooming units.   This evidence suggests that the effect of the purported discrimination is *de minimus*, at best.  See Testimony of Cohen [90:18-22], Ferrigno [130:21-23], Richards [201:22-202:1], and Hankin [210:9-19]. Accordingly, the requested injunction to ban all enforcement of Section 27-2076(b) and set aside all pending violations – only one pending violation was put in evidence – is too much cure for the purported pain.  See Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420 (1977) ("Only if there has been a systemwide impact may there be a systemwide remedy."); Rizzo v. Goode, 423 U.S. 362 (1976).

Fourth, the public interest would not be served by a permanent injunction because as discussed in Point II above, the provision serves a legitimate bona fide purpose in theory and in practice.

## CONCLUSION

**PLAINTIFF'S CLAIMS FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF SHOULD BE DENIED AND JUDGMENT SHOULD BE ENTERED IN FAVOR OF CITY DEFENDANTS.**

Dated:    New York, New York
          September 12, 2008

                                MICHAEL A. CARDOZO
                                Corporation Counsel of the City of New York
                                Attorney for Municipal Defendants
                                100 Church Street, Room 5-189
                                New York, New York 10007
                                (212) 442-0589

                        By:     _____
                                Jerald Horowitz (JH8395)
                                Assistant Corporation Counsel
                                Administrative Law Division

GABRIEL TAUSSIG,
AVE MARIA BRENNAN,
JERALD HOROWITZ,
JACQUELINE HUI,
          Of Counsel.