UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
JUANA SIERRA,                          :
                                       :
                Plaintiff,             :
                                       :
                -v-                    :    07 Civ. 6769 (JSR)
                                       :
CITY OF NEW YORK; NEW YORK CITY        :    OPINION AND ORDER
DEPARTMENT OF BUILDINGS, and PATRICIA  :
J. LANCASTER, in her capacity as       :
COMMISSIONER OF NEW YORK CITY          :
DEPARTMENT OF BUILDINGS; NEW YORK      :
CITY DEPARTMENT OF HOUSING             :
PRESERVATION AND DEVELOPMENT, and      :
SHAUN DONOVAN, in his capacity as      :
COMMISSIONER OF NEW YORK CITY          :
DEPARTMENT OF HOUSING AND              :
DEVELOPMENT; and EMAD IBRAHEM,         :
                                       :
                Defendants.            :
------------------------------------- x

JED S. RAKOFF, U.S.D.J.


        Section 27-2076(b) of the New York City Housing Maintenance

Code ("HMC") prohibits families with children under the age of

sixteen from residing in single room occupancy units ("SROs"), which

are defined in turn as "rooming units" that lack either an in-unit

kitchen or an in-unit bathroom.  Plaintiff Juana Sierra, a mother of

two children who formerly occupied two units of that type, has

challenged the restriction under the Fair Housing Act ("FHA"), 42

U.S.C. § 3604(a), arguing that it impermissibly discriminates on the

basis of family status.  Sierra asks the Court to declare the

ordinance invalid and enjoin its future enforcement, as well as to

award her damages.  The City defendants - the City of New York, the

N.Y.C. Department of Buildings ("DOB") and its Commissioner, and the

N.Y.C. Department of Housing Preservation and Development ("HPD") and

its Commissioner - oppose Sierra's request, defending section 27-
2076(b) as a valid means of ensuring the safety of City residents.
Each party contends that its respective position best protects the
interests of families and children.

This case has a long procedural history, which is described
in detail in the Court's earlier Orders. See Order dated December 6,
2008 (dismissing some of Sierra's claims under the Anti-Injunction
Act); Memorandum dated January 2, 2008 (explaining reasons for
December 6 ruling); Memorandum Order dated March 3, 2008 ("March 3
Order") (denying City defendants' motion to dismiss for lack of
standing); Memorandum Order dated May 13, 2008 ("May 13 Order")
(denying parties' cross-motions for summary judgment).  In its May 13
Order, the Court resolved the primary legal question bearing on this
case, that is, by what standard the Court should evaluate a
challenged statute that is facially discriminatory under the FHA.
The Court held that it must appply a "heightened level of scrutiny,"
upholding such a provision only where it "'further[s], in theory and
in practice, a legitimate, bona fide governmental interest and that
no alternative would serve that interest with less discriminatory
effect.'"  May 13 Order at 4-5 (citing Huntington Branch, NAACP v.
Huntington, 844 F.2d 926, 936 (2d Cir. 1988)).  The Court found,
however, that "the statute's present effect" – i.e., whether it, in
practice, helps or hurts children, and whether its aims could be
accomplished through non-discriminatory means - "is the subject of
genuine and material factual disputes between the parties."  Id. at

2

11.  Accordingly, the Court denied the parties' cross-motions for summary judgment.

On September 3-5, 2008, the Court conducted an evidentiary hearing to resolve those factual disputes and so resolve plaintiff's requests for injunctive and declaratory relief.  In support of the plaintiff's case, the Court heard testimony from Juana Sierra herself; Lance Freeman, Ph.D, an expert in urban planning; Kim Ping Lam, another tenant claiming to have been subject to discrimination under HMC section 27-2076(b); and Susan Cohen, a senior staff attorney and community justice project coordinator at Manhattan Legal Services and a longtime organizer of SRO residents.  In support of the defendants' case, the Court heard testimony from Moon Wha Lee, Ph.D., Assistant Commissioner for Housing Policy Analysis and Statistical Research at HPD; Roger Hart, Ph.D., an expert in environmental psychology; Mario Ferrigno, Assistant Commissioner for the Division of Code Enforcement at HPD; Paul Harkin, a supervising construction inspector from DOB; Frank Richards, Chief Inspector in the Lead Division at HPD; and Michael O'Connell, a supervising inspector at HPD.

Before addressing the merits of Sierra's challenge, the Court turns initially to the City defendants' motion, renewed during the bench trial, to dismiss Sierra's claims for lack of standing.  This is not the first time the City has challenged Sierra's standing to bring this suit.  When Sierra first filed her Complaint, she occupied, with her two young children, two SRO units at 24 West 119th

Street in Manhattan.  While this action was pending, however, she entered into a stipulation with her landlord, former defendant Emad Ibrahem, whereby she vacated the unit and received thousands of dollars in compensation.  The City defendants subsequently asserted that because Sierra no longer occupied an SRO and, in their view, was unlikely to find one that she could afford, section 27-2076(b) no longer caused her any "injury in fact" and thus she lacked standing to challenge it.  The Court disagreed for two reasons.  First, it found that Sierra already had suffered an injury directly traceable to the challenged provision, because it was the basis of the building code violation issued against her landlord, which was in turn the ground on which he commenced eviction proceedings against her.  Second, the Court found that Sierra had made "a sufficient (if thin) showing that section 27-2076(b) continues to limit her available housing options" because - at least at that stage of litigation - it appeared that Sierra was actively seeking to occupy an SRO and that some such units might be available at a price she could afford.  March 3 Order at 5-8.  Sierra's settlement with the landlord did not moot her claims against the City in these regards.

In support of its renewed motion, the City defendants argue that evidence from the trial casts doubt on both of the Court's earlier rationales.  Taking the second rationale first, the City defendants contend that Sierra's testimony during the trial demonstrates that she is not, in fact, seeking to rent an SRO.  Specifically, in questioning Sierra about her apartment search, the City asked her, "would you consider sharing your bathroom with

4

strangers?" (defined as non-family members) and "would you consider sharing your kitchen with people other than family?"  Sierra answered "no" to both questions.  Tr. 42:15-23.[1]  While the Court's prior determination on standing turned on the availability of SRO units to Sierra, the City defendants now argue that regardless of those units' availability, Sierra will not again be subject to HMC section 27-2076(b) because she is not interested in occupying an apartment covered by the provision.

Sierra responds, primarily, that she is sufficiently injured by being deprived of the <u>choice</u> of whether to live in an SRO or not. Plaintiff's Post-Trial Memorandum of Law ("Pl. Mem.") at 6.  Yet the Court fails to see how Sierra suffers from being deprived of a choice that she does not wish to make.  If Sierra sought to challenge a similar provision in another city where she had no intention of residing, for example, surely she would not be harmed by any limitations on her housing options in that city.[2]  <u>Cf. Gladstone,</u>

_____

[1]  If these answers seem puzzling in light of the fact that Sierra previously did occupy SROs, the explanation is that Sierra's prior living arrangement was, by all accounts, highly atypical of SRO living.  Sierra's two units at 24 West 119th Street were technically classified as SRO units, <u>see</u> Pl. Ex. 5, but Sierra did not, in fact, share a kitchen or bathroom with anyone outside her family.  <u>See</u> Tr. 40:22-23; 42:9-14.  According to Sierra's testimony, she occupied two units that each had a kitchenette, and her two units, which were the only ones on the floor, shared a bathroom with one another but with no other tenants.  <u>Id.</u>

[2]  For this reason, <u>UAW v. Johnson Controls</u>, 499 U.S. 187 (1991), on which Sierra relies, is inapposite.  It is true that the Supreme Court ruled in that case that depriving the petitioners of a "choice" – there, the choice "as to whether they wish to risk their reproductive health for a particular job" - amounted to impermissible discrimination.  <u>Id.</u> at 197.  In

Realtors v. Bellwood, 441 U.S. 91, 113 n.25 (1979) (approving of
district court's dismissal on standing grounds of two plaintiffs who
lived outside the area alleged to have been affected by defendants'
discrimination and who had failed to allege any other harm).

Ultimately, however, the Court need not resolve the question
of whether the provision's possible future effects on Sierra are
sufficient to confer standing.  While that factor may bear on
Sierra's ability to seek injunctive relief, the requirements of
Article III standing are satisfied so long as Sierra has already
suffered a cognizable injury.

As to the Court's earlier finding that Sierra had already
been harmed by HMC section 27-2076(b), see March 3 Order at 5, the
City argues that the Notice and Violation of Hearing issued by the
DOB against Sierra's landlord, previously not presented but now in
evidence before the Court, indicates that it was was for a violation
of HMC section 217, which forbids occupancy contrary to the
certificate of occupancy, and not for a violation of 27-2076(b).  See
Pl. Ex. 9 ("DOB Violation").  However, while the DOB Violation does
cite section 217, it also, in describing the "violating conditions
observed," states that "rear apt. #3 (1st floor) [one of Sierra's
units] had a 14 year old female child . . . . The above situation

_____

Johnson Controls, however, that choice was one that the
petitioners undisputedly wished to make: i.e., the petitioners
wanted to obtain the battery-making jobs from which the company
excluded them.  Id. at 192.  Here, Sierra does not wish to avail
herself of the opportunity to live in an SRO.  In any event, the
Supreme Court did not consider any challenge to the petitioners'
standing in Johnson Controls.

doesn't comply with Housing Maintenance Code 27-2076 prohibited occupancies: . . . B. No rooming unit shall be occupied by a family with a child under the age of 16." Id. Given this specificity, it is fair to construe the DOB Violation as one both for occupancy contrary to the certificate of occupancy and occupancy in violation of section 27-2076(b).[3] Indeed, Sierra's landlord cited the latter violation (as well as occupancy contrary to Sierra' lease agreement) in issuing, first, a Ten Day Notice to Cure and, second, a Thirty Day Notice of Termination, which notices culminated in the landlord's bringing holdover proceedings against Sierra. See Pl. Exs. 10-11.[4]

Because Sierra has already suffered a "'distinct and palpable injury'" as a result of HMC section 27-2076(b), she has met "the sole requirement for standing to sue" under both the FHA and Article III. Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982) (citing Warth v. Seldin, 422 U.S. 490, 501 (1975)). This is true regardless of whether Sierra continues to suffer an injury redressible through injunctive relief. Cf. id. at 370-71 ("Irrespective of the issue of injunctive relief, respondents continue to seek damages to redress alleged violations of the Fair Housing Act. . . . Given respondents'

---

[3] During trial, the parties disputed whether an inspector from DOB would possess the authority to issue a violation of HMC section 27-2076(b). See, e.g., Tr. 215:15-216:2; 220:1-224:11. For a variety of reasons, the Court is not satisfied that the answer to this question was proved at trial one way or the other. Accordingly, the Court takes the DOB violation at face value.

[4] That Sierra herself understood the holdover proceedings to have been brought because her landlord "wanted [her] to pay more" is immaterial. Tr. 44:23-25. The grounds stated in the Ten Day and Thirty Day Notices are more conclusive indicators of Sierra's landlord's basis for commencing the proceedings.

continued active pursuit of monetary relief, this case remains
definite and concrete, touching the legal relations of parties having
adverse legal interests." (internal quotation marks omitted)).

Accordingly, the Court turns to the merits of the plaintiff's
claims for injunctive and declaratory relief.  HMC section 27-2076(b)
provides, in relevant part:

> No rooming unit shall be occupied by a family with a
> child under  the age of sixteen years, except that if a
> child  is  born  to  a  family  residing  in  such
> accommodations,  the  unlawful  occupancy  shall  not
> commence until one year after the birth of such child.

The HMC further defines a "rooming unit" as "one or more living rooms
arranged to be occupied as a unit separate from all other living
rooms, and which does not have both lawful sanitary facilities and
lawful cooking facilities for the exclusive use of the family
residing in such unit."  HMC § 2004(15).  The City of New York
enacted section 27-2076(b) in 1960 to protect children from what it
deemed to be the inappropriate, unsafe, and unhealthy environments of
SROs.[5]

As the Court noted in its May 13 Order, the rationales cited

---

[5]  See, e.g., NYLS' New York City Bill Jacket, 1960 Local
Law 6 (Jan. 19, 1960) (declaring that single room occupancy units
without toilet and kitchen facilities "do not constitute decent,
safe and healthful living accommodations for children under the
age of sixteen years," and that "the rearing of children of such
age in such inadequate and undesirable dwelling accommodations
endangers their health, safety and welfare and is detrimental to
the welfare of the people of the city"); Report Re. Proposed
Local Law, Int. No. 331, Pr. Nos. 390, 464, Dated Feb. 2, 1960
(recommending approval of provision because SRO units, with their
"[l]ack of family privacy, lack of proper kitchen facilities and
lack of adequate, private sanitary facilities[,] a[dd] up to a
most unhealthy environment in which to rear children").

8

by the City at the time the provision was enacted reflect a legitimate, bona fide governmental interest; however, the question now facing the Court is whether, today, the provision works "in practice" to further those interests. May 13 Order at 7-8. The burden of so proving falls on the City defendants, and the Court finds that the evidence adduced by the City defendants during the trial is sufficient to meet that burden.

The critical feature separating a rooming unit subject to HMC section 27-2076(b) from a unit not subject to that provision is that a rooming unit "does not have both lawful sanitary facilities and lawful cooking facilities for the exclusive use of the family residing in such unit," i.e., it lacks either a private kitchen or a private bathroom or both.[6] Accordingly, the Court has considered only evidence pertaining to risks necessarily or very strongly associated with residences lacking such features.

This limitation led the Court to disregard a variety of evidence offered by the City in support of the provision. For example, the City claimed that SROs were particularly likely to be unhealthy for children because of the "demographic profile of rooming unit residents." See Expert Report and Disclosure of Roger A. Hart ("Hart Report"), Def. Ex. C, at 37-39. The City's argument was, in

---

[6]  Sierra's own SRO arrangement was, by all accounts atypical. See supra note 1. However, because Sierra is asking the Court to enjoin enforcement of HMC section 27-2076(b) across the board, the Court has made an effort to consider the effects on children of the more standard SRO unit: a room or rooms whose inhabitants share an exterior kitchen and/or bathroom with other tenants.

essence, that SRO buildings are more likely than other apartment buildings to be inhabited by single male households and by those with substance abuse problems and other special needs.  While the former is statistically true, see Expert Report and Disclosure of Moon Wha Lee, Ph.D. ("Lee Report"), Def. Ex. A, at 8, the conclusion that the presence of such households has a detrimental impact on children is one that could rely only on speculation and on impermissible stereotypes.  See Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1050 (9th Cir. 2007) (holding that facially discriminatory restrictions under the FHA may not be justified by stereotypes); Bangerter v. Orem City Corp., 46 F.3d 1491, 1503 (10th Cir. 1995) ("Restrictions predicated on public safety cannot be based on blanket stereotypes . . . ."). As to the latter, the City defendants produced, at most, anecdotal evidence that special needs residents are more common in SROS, and have primarily relied, again, on stereotypes.[7]  In any event, neither the presence of a greater number of single male households nor those with special needs is in any way particularly linked to the unique features of an SRO: the lack of an in-unit kitchen or bathroom.

_____

[7]  See The Relationship Between Residence in a SRO and Child Health and Well Being, Report Prepared by Lance Freeman, Ph.D. for the Plaintiff Juana Sierra ("Freeman Report") at 16 ("The City of New York . . . impl[ies] that the mentally ill, substance abusers and those with health problems . . . are likely to be residing in SROS[ and that] residents such as these make bad neighbors for children . . . . In making this argument the City is subscribing to stereotypes of SROs are part of 'skid row' and as a housing of last resort for very poor men.").
   In addition, the Court notes Cohen's very helpful testimony that in fact, in many SRO residences, strong social networks do exist.  See Tr. 79:10-16.

Similarly, the Court lends no weight to the City defendants' claim, primarily advanced earlier in this litigation, that SRO housing tends to be of lower overall quality – in terms of maintenance and building defects and general building dilapidation – than non-SRO housing. The report of plaintiff's expert, Dr. Lance Freeman, strongly suggests that both as a logical and an empirical matter SRO housing is not likely to be meaningfully worse with respect to those criteria than is other low-end housing. See The Relationship Between Residence in a SRO and Child Health and Well Being, Report Prepared by Lance Freeman, Ph.D. for the Plaintiff Juana Sierra ("Freeman Report") at 3-14.[8] By contrast, the City defendants have offered no material evidence supporting their argument in this regard.

Even disregarding arguments about substandard quality and demographic profiles, however, the City defendants have offered substantial evidence that the defining features of SRO housing are detrimental to children.

First, the fact that a bathroom is removed from a family's

---

[8] The Court has considered Dr. Lee's critique regarding the sampling and potential non-sampling errors of Dr. Freeman's analysis; however, the Court agrees with Dr. Freeman that his results, at least, "are useful for gauging the overall quality of SRO units" and "the direction of the relationships" between SROs and non-SROs. Freeman Report at 15.

The Court further notes that, even if it found SRO housing to have significantly more building and maintenance defects than non-SRO housing or found that Dr. Freeman's results were not conclusive either way, the plaintiff would have a strong argument that the City defendants could effectively address that problem through stricter enforcement of those provisions of the housing code directed at such defects.

living space and shared with non-family members necessarily has
impacts both on children's health and safety and on their privacy and
development.  Shared bathrooms expose children to dangers that their
parents – no matter how conscientious - are unable to control:
primarily, exposure to strangers and exposure to contagions.  See
Hart Report ¶¶ 12, 60-61, 67; Tr. 317:2-25.[9]  The first may seriously
compromise a child's safety; for example, Dr. Hart estimated that a
child might encounter as many as thirty or forty different
individuals in and around a single bathroom,[10] see Tr. 319:3-14, and
the Court heard anecdotal evidence that locking mechanisms on shared
bathrooms are frequently either broken or inadequate, see Tr. 230:5-

---

[9]  The plaintiff has challenged the entire body of testimony
presented by Dr. Hart on the ground that he does not qualify as
an expert under Federal Rule of Evidence 702.  See, e.g.,
Plaintiff's Reply to Defendants' Post-Trial Memorandum of Law
("Pl. Reply Mem.") at 9.  Dr. Hart's testimony may not be
admissible as "scientific" expert evidence under Daubert v.
Merrell Dow Pharmaceuticals, 516 U.S. 869 (1995), but it is
certainly admissible as expert evidence under Kumho Tire Co. v.
Carmichael, 526 U.S. 137, 151-52 (1999) (clarifying that courts
must ensure the reliability of expert evidence that does not
purport to be purely "scientific," but that they should not
subject such evidence to the strict requirements set forth in
Daubert).  Here, Dr. Hart drew on a variety of both qualitative
and quantitative studies in the fields of psychology, medicine,
urban planning, public health, and other disciplines, as well as
his substantial personal experience, in preparing his report.
See Hart Report at ¶ 1-6 & Attachment 2.  The Court was, and
remains, fully satisfied that his testimony is reliable and
admissible under Rule 702.  See Kumho Tire Co., 526 U.S. at 152
(granting the trial judge "considerable leeway in deciding in a
particular case how to go about determining whether particular
expert testimony is reliable").

[10]  Although by law only six individuals may share a
bathroom, Tr. 203:6-7 (testimony of Richards), as a practical
matter, the residents of a floor may use any bathroom on that
floor.  This fact led to Dr. Hart's estimate.  See Tr. 317:7-
318:15.

15 (testimony of O'Connell).  As to risk of infection, while the
Court received no conclusive evidence that SRO bathroom facilities
are, as a rule, less hygienic than in-unit bathrooms,[11] it is
impossible, as a logical matter, for a parent to control the
cleanliness of a shared bathroom in the way he or she might a private
bathroom.  <u>See</u> Tr. 319:3-14.  Additional problems stem from the fact
that younger children cannot use an exterior bathroom without adult
supervision; where it is lacking, they may endanger themselves by
attempting to use the bathroom unassisted or by waiting, possibly
risking medical consequences.  <u>See</u> Hart Report ¶ 60, 63.
Furthermore, Dr. Hart presented research from psychology and social
science literature concluding that shared, exterior bathrooms have
negative impacts on children's development: for young children, for
example, by thwarting toilet training, and for older children and
adolescents by depriving them of privacy needed for healthy
development.  <u>See</u> Tr. 302:10-303:20; Hart Report ¶¶ 59-60, 69-73, 78.

Shared kitchens likewise pose health and safety risks for
children.  Kitchens are dangerous places for children, but it is
difficult if not impossible for a parent to "child-proof" a shared
kitchen; nor can a single parent leave a child unattended in the
rooming unit while preparing meals.  <u>See</u> Tr. 310:1-312:18; 315:14-

<hr>

[11] Several witnesses testified that SRO bathrooms – like
bathrooms in all low-income housing – "run the gamut" in terms of
cleanliness, <u>see, e.g.</u>, Tr. 81:2-3 (testimony of Cohen), and Dr.
Hart testified that the bathrooms he observed had in fact been
recently cleaned, <u>see</u> tr. 296:16-19.  However, Inspector Richards
testified that "[i]n the majority of cases the bathrooms are not
clean," Tr. 203:15, 205:15-18, and Inspector O'Connell testified
similarly, <u>see</u> Tr. 229:6-7.

316:18; Hart Report ¶ 17.  Parents face additional obstacles to safe preparation of food; for example, many shared kitchens lack refrigerators, but even where refrigerators are present, parents may hesitate to use them because of concerns over food security.  See Hart Report ¶¶ 79-82; Tr. 204:24-25 (testimony of Richards).[12]  It is also a particular challenge to keep shared kitchens clean for reasons similar to those related to shared bathrooms, and thus food preparation in shared kitchens carries greater health risks; there are, moreover, safety risks associated with bringing food back to eat in the living unit.  See Hart Report ¶ 15, 41 & fig. 7; Tr. 315:8-316:6.

Finally, children's physical and psychological development is likely to be impeded by the nature of the living space within an SRO. The fact that SROs tend to be quite small is not, in and of itself, the problem, for lack of space is not indispensably linked to SRO housing: SROs, like regular apartments, can be small or large.[13]  By definition, however, only SROs may consist of a single room.[14]  (Any

---

[12]  Dr. Hart reported that during his site visits, he observed little to no food stored in shared refrigerators.  See Tr. 312:22-25.

[13]  The Court did hear anecdotal evidence that SROs tend to be much smaller than non-SRO apartments, and that may be the case.  But if the City were primarily concerned with the size of children's living space, it would be more appropriate to exclude them from apartments below a certain square footage, for example, rather than from SROs.

[14]  They do not have to consist of a single room, as a "rooming unit" for purposes of section 27-2076(b) is defined as "one or more living rooms arranged to be occupied as a unit" and lacking either a bathroom or a kitchen (emphasis added); but in practice it appears that most SROs do consist of single rooms,

non-SRO housing would have, at the least, a separate bathroom.) Dr. Hart cited research suggesting that living in a "single undifferentiated space," can delay development and deny children needed refuge. See Tr. 276:17-277:1; 295:1-10; Hart Report ¶¶ 97, 99.

In short, the essential elements of an SRO - lack of in-unit bathroom, lack of in-unit kitchen, and, usually, single-room living space - are detrimental in many respects to the welfare of children and inherently cannot be remedied by alternative measures. Moreover, as Dr. Hart repeatedly emphasized, these multiple harms cannot be considered independently, but rather have cumulative negative impacts. See, e.g., Hart Report ¶ 10.

The plaintiff challenges the above evidence, arguing that it does not provide adequate support for HMC section 27-2076(b) for several reasons. First, as an evidentiary matter, the plaintiff asserts that the studies cited by Dr. Hart may substantiate his claims about the possible effects of certain aspects of SROs on children, but he has cited no scholarly proof that such effects in fact result. In particular, she notes that he has not referenced any longitudinal or cross-sectional studies demonstrating that they afflict children raised in SROs more severely than others. See, e.g., Freeman Report at 15-21.

In a perfect world, legislatures would always have scientific

---

which is why, indeed, they are referred to as "Single Room Occupancy" units. See Hart Report ¶ 95; Tr. 91:15-17 (testimony of Cohen).

studies to guide and justify the measures they enact; however, such studies very rarely exist, and in any event, are in no way required to support a challenged statute – even one, like this one, that is facially discriminatory.  To require such studies before finding that an ordinance "further[s] . . . in practice, a legitimate, bona fide governmental interest" would be, in effect, to hold that no facially discriminatory statute ever could be upheld.  Clearly, that is not the law, nor should it be.

As the legislative history of the FHA indicates, Congress intended to prohibit the exclusion of families with children from housing opportunities based on invidious discrimination and stereotypes.  See Fair Housing Amendments Act of 1988 House Report, H.R. Rep. No. 100-711, at 19 (1988), reprinted in 1988 U.S.C.C.A.N. 2173.  Such discrimination is a far cry from the City's rationales here, however - at least as limited by the Court.  Unlike in other cases where FHA challenges were sustained, the City has produced extensive evidence demonstrating concrete physical and psychological effects of SRO living on children, rather than merely generalizations and conclusory assertions.  See Cmty. House, Inc., 490 F.3d at 1051 (finding that "[t]he City provides little support to establish that the men-only policy benefits women and families by protecting their safety" - there, a single conclusory affidavit - but refusing to "foreclose the possibility that at a later stage in this litigation, the City may be able to provide evidence to establish that its men-only policy is indeed justified by legitimate safety concerns); Bangerter, 46 F.3d at 1504-05 (holding that the facts in the record

16

at that time did not support restrictions on the living opportunities of disabled individuals, but emphasizing that restrictions tailored to those individuals "could be acceptable under the FHA[] if the benefit to the handicapped in their housing opportunities clearly outweigh whatever burden may result to them" and that "[i]t could be that the evidence will show that [one of the restrictions imposed] might prove to be beneficial to the handicapped").[15]  Indeed, the Court denied the City's summary judgment motion, and conducted this evidentiary hearing, precisely so that the City would be forced to produce this type of detailed, objective support.

The plaintiff's second major challenge to the City's evidence is that, even if the Court finds the City's proof sufficient to establish that SRO housing has negative impacts on children, the City has failed to prove that those impacts are worse than any that children would suffer in feasible alternative housing situations.  In other words, if children are excluded from SROs, the only available housing options their families can afford are likely to be just as problematic.  This argument is a variation of the claim the plaintiff advanced at the summary judgment stage, which was that to the extent

---

[15]  Outside the housing discrimination context, courts have upheld facially discriminatory restrictions where they were shown to be grounded in legitimate safety concerns.  See, e.g., Dothard v. Rawlinson, 433 U.S. 321, 336-337 (1977) (upholding male-only requirement for job of prison guard in maximum-security male penitentiaries because there was "substantial testimony from experts on both sides of this litigation that the use of women as guards in 'contact' positions under the existing conditions . . . would pose a substantial security problem, directly linked to the sex of the prison guard," and consequently, being male was a "bona fide occupational qualification" under Title VII).

17

section 27-2076(b) drives families from SROs, it delivers them into homeless shelters or onto the streets.

Yet the Court heard no material evidence supporting this hypothesis. As an initial matter, the only displaced family of which the Court is specifically aware – Sierra's own family - is in neither situation. Rather, Sierra and her children now live with her sister and her sister's family. See Tr. 34:14-35:2. While the Court in no way suggests that this situation is ideal – on the contrary, the "doubled up" conditions are undoubtedly crowded - it is a far cry from living on the streets; moreover, there is a strong argument to be made that because Sierra and her children now share kitchen and sanitary facilities with family members only, this arrangement is safer for her family than the typical SRO.

Furthermore, the Court heard testimony from Dr. Lee that the vast majority (96 percent) of available apartments in New York City in Sierra's price range are in fact regular apartments, not SROs. Lee Report at 7. Dr. Lee concluded that because the number of families living in SROs is fewer than the number of vacant apartments available for less than $600, perfect enforcement of 27-2076(b) would not render any families homeless. Id. at 3. While the Court appreciates plaintiff's argument that the low vacancy rate might make apartments in that price range hard to acquire despite their absolute number, and that Dr. Lee's conclusions is thus overly simplistic,[16]

---

[16] The Court further recognizes that, as Dr. Freeman testified, the vacancy rate – which Lee did not calculate - is a useful indicator of the interaction between supply and demand, and that according to Dr. Freeman's calculations the vacancy rate

the statistic shows, at the least, that SROs in no way present the only residential option for families of Sierra's means.  This is particularly true in boroughs outside of Manhattan.[17]

Likewise, the Court heard no material evidence tending to support the plaintiff's other primary argument at summary judgment: that section 27-2076(b) is enforced primarily by landlords seeking to evict families with children so that they can rent to higher-paying tenants.  In terms of statistical information regarding who reports section 27-2076(b) violations, it appears that no information is available one way or the other, both because landlords are likely to report violations anonymously and because the HPD complaint database is not equipped to record complaints originating from landlords as opposed to other sources.  See Tr. 126:5-14.  However, the plaintiff was not able to come forward even with anecdotal evidence of landlords' engaging in such conduct - an inability that would be inexplicable if the practice were as widespread as the plaintiff

---

of regular apartments is significantly lower than the vacancy rate of SROs.  Rebuttal Prepared by Lance Freeman, Ph.D. for the Plaintiff Juana Sierra, at 1-5.  Nonetheless, the Court accepts Lee's testimony that the number of vacant apartments does, at least directly, reflect on the supply and demand of housing, as the absolute number represents what apartments remain available after existing supply and demand have operated.  See Tr. 256:16-257:4.

[17] Ms. Cohen did testify that she believed that individuals who left SROs became homeless, 88:21-89:7, but she did not specifically refer to families.  More importantly, the Court found her testimony in this regard to be far too subjective and impressionistic to be accorded material weight.

claimed.[18]  Indeed, Cohen, who had extensive experience organizing SRO

tenants against landlord abuses, said she had never encountered a

charged violation of 27-2076(b) in forty years of experience.  Tr.

90:8-22; 92:14-16.  What is more, Cohen stated that she only even

observed children living in SROs a couple of times during that entire

period, see Tr. 90:8-22, a level of frequency that appears to comport

with the experiences of other witnesses.[19]  Finally, Ferrigno

testified that in the past ten years, HPD has issued only 95

violations of 27-2076(b), 58 of which were "picked up in the line of

[an inspector's] travel," rather than reported.  Tr. 130:21-131:2.

---

[18]  The plaintiff presumably called Kim Ping Lam because
plaintiff believed Lam would provide an example of a tenant
evicted through a landlord's improper reliance on HMC section 27-
2076(b).  Lam, however, could testify only, relying on triple and
double hearsay, that the business manager at his building told
first Lam's wife, and then himself, that his lease was not being
renewed because his name was not on the lease and, subsequently,
that his occupancy was in violation of HMC section 27-2076(b).
See Tr. 61:2-7; 62:17-21; 64:23-66:11.  Yet even if this hearsay
were credited, there was no evidence that the City defendants
(the parties, after all, that Sierra is seeking to enjoin) ever
issued a violation of section 27-2076(b) at Lam's landlord's
request, or that any eviction proceedings were ever commenced
against Lam.  See Tr. 66:12-17.  And perhaps most amazingly,
according to Lam's own testimony, his apartment was not even
properly classified as an SRO: it is a five-room apartment with
its own kitchen and bathroom for his family's exclusive use.  See
Tr. 56:16-58:14.  As the HPD database's records on the building
reflect that, indeed, all units therein are "Class B" dwellings,
which the Court is told is roughly equivalent to an SRO or
"rooming unit," the Court can only conclude that the units are
improperly classified.  See Pl. Ex. 6.

[19]  Dr. Hart stated that of several hundreds of units in the
SRO buildings he visited, he observed only six units occupied by
children.  See Tr. 313:3-5.  Inspector Richards noted that over
thirteen years of inspecting many hundreds of SRO buildings, he
observed children occupying SROs "on one or two occasions."  Tr.
202:1.

While this appears to be at least somewhat less than the full count,[20] it still indicates the relative rarity of reported violations of 27-2076(b). By way of comparison, HPD issued around 500,000 total violations just last fiscal year, see Tr. 15-17 - of reported violations of section 27-2076(b). All of this thoroughly discredits the plaintiff's assertion that 27-2076(b) is being widely deployed by landlords in a way that harms families.

In sum, the Court concludes that the City has carried its burden of demonstrating that HMC section 27-7076(b) furthers, in theory and in practice, legitimate government interests in the health, safety and welfare of children that cannot be achieved through other alternatives, and that HMC section 27-2076(b) does not violate the Fair Housing Act. The Court therefore denies Sierra's requests for injunctive and declaratory relief. Moreover, the above conclusion also moots, as a matter of law, Sierra's claim for damages against the City defendants, which presupposed their enforcement of an invalid regulation. Accordingly, the Clerk of the Court is directed to enter judgment dismissing the Complaint with prejudice.

SO ORDERED.

Dated: New York, NY
October 1, 2008

JED S. RAKOFF U.S.D.J.

---

[20] This is the case because two or three years ago, according to Ferrigno, responsibility for fielding complaints on section 27-2076(b) shifted from HPD to DOB. See Tr. 132:23-133:3.

21